**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:21-cv-03286-NYW-MEH

VINCENT TERRANOVA,

Plaintiff,

v.

SAFECO INSURANCE COMPANY OF AMERICA,

Defendant.

---

**PLAINTIFF'S RESPONSE TO SAFECO INSURANCE COMPANY OF AMERICA'S MOTION FOR SUMMARY JUDGMENT**

---

Vincent Terranova ("Plaintiff") files his response to Safeco Insurance Company of America's ("Defendant") motion for summary judgment (Dkt. No. 39) and states as follows:

## I. INTRODUCTION

Discovery has revealed extensive acts of bad faith by Defendant that preclude summary judgment. This is an insurance claim involving Defendant's insurance adjuster, Nicholas Buller, who was ill-qualified to investigate the complex water loss. While he entirely relied on an engineer to determine the cause of the loss, Buller's inexperience gave him no basis to understand or otherwise evaluate the engineering evaluation resulting in the acceptance of a highly flawed investigation leading to an underpayment of the claim. Even when Mr. Buller was later presented with evidence by two other engineers demonstrating a dispute over the cause of damage to the windows, Buller favored the flawed opinions of Defendant's engineer over the countering opinions of Plaintiff's expert opinions with no reasonable explanation.

Defendant's second adjuster, Mandy Winters, assisted Mr. Buller with the adjustment of portions of the claim. Both adjusters misapplied the additional living expense ("ALE") coverage payments due under the policy resulting in unreasonable underpayment of said coverage. These gross underpayments of ALE benefits are a separate coverage issue from the Coverage A payment made by Defendant after the conclusion of the appraisal.

As a separate issue, Defendant held back benefits due under the policy by withholding items from the appraisal award without reasonable basis. Further, there is no genuine dispute of fact that Mr. Buller purposefully delayed payment of covered benefits by using an outdated price list for the pendency of the claim. Worst of all, he tried to influence the appraisal panel to adopt his misinformed position regarding outdated estimate pricing from 2017 even though he knew it was improper to attempt to influence the panel. When his attempts to influence the appraisal panel failed, Mr. Buller conceded and paid the updated appraisal award's price list. These facts taken together are not presented in Defendant's motion and preclude summary judgment on all of Plaintiff's claims. In further support, Plaintiff states as follows:

## II. RESPONSE TO UNDISPUTED MATERIAL FACTS ("SOF")

1. Plaintiff admits SOF Nos. 1-8.

2. Regarding SOF No 9, Admitted in part and denied in part. Plaintiff admits that the inspection took place, and that Safeco documented the loss with some photographs. Plaintiff admits that Lori Wortham was present at the inspection. Denied to the extent that Defendant's factual statement is inferring that Lori Worthan was participating in the inspection process.

3. Regarding SOF No. 10, Admitted.

4. Regarding SOF No. 11, Admitted.

5. Regarding SOF No. 12, Admitted in part. Denied as to any inference that Plaintiff was not working to obtain reputable contractor for the amount of money indicated in Defendant's February 2017 estimate.

6. Plaintiff admits SOF Nos. 13-16.

7. Regarding SOF No. 17, Admitted except that the referenced document was not attached to Defendant's **Exhibit B**. For context, the estimate is appended to Plaintiff's ASOF No. 12.

8. Regarding SOF Nos. 18-28, Admitted.

9. Regarding SOF No. 29, Admitted in part. Denied to any extent inferring that Defendant's appraiser had no role in the amount of time required to complete the appraisal.

10. Regarding SOF No. 30, Admitted.

11. Regarding SOF No. 31, Denied as argument of counsel. The predominance of changes in the appraisal award estimate from Defendant's prior estimate is subjective.

## II. STATEMENT OF ADDITIONAL MATERIAL FACTS ("ASOF")

1. The policy includes the following additional living expense ("ALE") provision:

> 1. If a loss covered under this Section makes that part of the residence premises where you reside uninhabitable we cover Additional Living Expense, meaning the necessary increase in living expenses you incur so that your household can maintain its normal standard of living.
>
> Payment shall be for the shortest time required, not exceeding 24 months, to repair or replace the damage or to permanently relocate.

*See* **Exhibit 1**, at ECF 000084. The provision time limit is not tied to the date of loss. *Id.*

2. Related to Defendant's SOF No. 10, Defendant's estimate is based upon a field report drafted by Defendant's secondary adjuster on the claim: Mandy Winters. *See* **Exhibit 2**, at ECF 005037-40.

3. In her report, Ms. Winters classified, "the home [as] not livable in its current state." *Id.*, at ECF 005040.

4. Related to Defendant's SOF No. 10, the estimate was also based upon a field report drafted by Defendant's primary adjuster on the claim: Nicholas Buller. *See* **Exhibit 3**, at ECF 004994.

5. Mr. Buller's report included a finding that, "Trim and windows themselves will require repairs due to the moisture content in the home." *Id.*

6. The report also vaguely described that Mr. Buller discussed additional living expense coverage with Plaintiff "onsite." *Id.*

7. Defendant's February 17, 2017, estimate used an Xactimate price list from February 2017. *See* **Exhibit 4**, at ECF 004609

8. In Mr. Stark's engineering report dated March 6, 2017, Mr. Stark noted that, "Many factors lead to failures of the [window] seals: opening and closing the windows; changes in the wind direction; temperature fluctuations; opening and closing doors in the house; and changes in atmospheric pressure all cause cyclic stresses on the windowpanes, frames and seals." *See* **Exhibit 5**, at ECF 002041. The report did not state that Mr. Stark ruled out window seal failure due to temperature fluctuations or changes in atmospheric pressure. *See generally* **Exhibit 5**. The report also noted that cracks in the stone pavers and mortar joints on the back patio were the result of long-term soil movement. *Id.* at ECF 002045.

9. Upon review of Mr. Stark's report, Mr. Buller only noted in his claim log that Mr. Stark's finding that the window seal failure was, "due to wear & tear & deterioration of the seals." *See* **Exhibit 6**, at ECF 004394.

10. Mr. Buller admitted, in deposition, he did not review any failure to rule out listed other causes but instead it was, "[his] expectation is that they completed a thorough and supported evaluation of the damage and ultimately the cause." *See* **Exhibit 7**, at 99:14-21; 101:14-19. Part of Mr. Buller's reasoning for this failure was that he did not consider himself a party to Donan's evaluation process. *Id.*, at 99:22-100:3.

11. To be clear, Mr. Buller testified he had no specific recollection of following up with Mr. Stark regarding the report's findings. *Id.*, at 100: 4-14.

12. Mr. Buller admitted that he had no idea what Mr. Stark was referring to by the terms "atmospheric pressure" and "temperature fluctuations" with reference to the damaged windows in his report *Id.*, at 100:15-23.

13. Mr. Buller also admitted that his personal construction experience was limited to painting and drywall repairs. *Id.*, at 19:25-20:13.

14. Defendant's August 16, 2017, estimate referenced in Defendant's SOF No. 17 used a price list from February 2017. *See* **Exhibit 8**, at ECF 002952.

15. On September 27, 2017, Defendant's adjuster Mandy Winters sent Plaintiff a letter including among other things that ALE coverage would expire on December 31, 2017. *See* **Exhibit 9**. She sent multiple subsequent communications reiterating the same statement of ALE coverage including on December 13, 2017, and September 11, 2018. *See* **Exhibit 10**, at ECF 002843, 002753.

16. On September 11, 2018, Defendant's adjuster Mandy Winters sent Plaintiff a letter noting that she also believed ALE coverage would only be for four months total based upon the estimated time for completion of repairs after coverage was resolved. *Id.*, at ECF 002843.

17. In deposition, Mr. Buller defended his and Ms. Winter's decision by stating that the policy limits ALE repairs to the "reasonable period of repair." *See* **Exhibit 7**, at 40:21-41:2. However, he admitted that the ALE provision was not tied to the date of loss. *Id.*, at 186:19-25; 188:1-8. Regardless, he also refused to answer the following basic question:

> Q. So if repairs are still outstanding, how is -- where is the named insured supposed to live if ALE is exhausted?
>
> A. So every claim is handled based on their own set of circumstances and facts and subject to the policy terms and conditions.

*Id.*, at 182:16-21.

18. On February 14, 2019, Mr. Stoycheff emailed Mr. Buller and explained that his observations of the property revealed a concern that Defendant's emergency mitigation contractor American Restoration may have improperly dried the Property following the loss resulting in secondary damages. *See* **Exhibit 11**, at ECF 002268.

19. Part of the disclosures to Mr. Buller on October 21, 2019, included SBSA's engineering report reviewed by Liberty Lewis regarding SBSA's observations from 2017. *See* **Exhibit 12**, at SBSA 000068. In that disclosure, SBSA's window observations were as follows:

> a. Broken and Inoperable Windows
>
> As stated in the Observation Report issued on June 1, 2017, multiple cracked and inoperable windows are present throughout the residence. The leak event introduced additional moisture and humidity into the residence that saturated the window framing. The increased moisture content of the window framing, in turn, caused swelling of the window framing. The water leak reportedly occurred in January 2017. During this time, external temperatures were below the freeze point

> of water. When water freezes, it expands in volume. The expansion of water as it froze caused additional swelling of the window framing and increase pressure on the glass panes. The increased pressure then resulted in broken glass panes and inoperable windows.

*Id.*. at SBSA 000051.

20. On October 29, 2019, Mr. Buller conducted a triage review with Mandy Winters and his supervisor Scott Gilbert regarding Mr. Stoycheff's submittals. *Id.*, at ECF 002128. The note indicates that Defendant collectively agreed to reinspect the property. *Id.*

21. On November 20, 2019, Mr. Buller summarized his re-inspection with the parties in a claims note. *See* **Exhibit 13**, at ECF 001998. Rather than decide anything on-site, Mr. Buller again relied upon Donan Engineering Co., Inc. ("Donan") to determine coverage when he wrote, "we are pending Donan updated engineering report and will update and repair estimate where appropriate." *Id.*

22. On November 24, 2019, Donan produced an updated engineering report conceding that the pro-longed 14-day dry out period from the Loss contributed to swelling/contraction of the window frames and damage to the seals. *See* **Exhibit 14**, at ECF 004105.

23. On December 12, 2019, Defendant's adjuster Mandy Winters sent Mr. Stoycheff a letter representing that the statute of limitations on the claim would run on January 21, 2020, even though Colorado statute C.R.S. § 10-4-110.8 does not tie the statute of limitations to the date of loss. *See* **Exhibit 15**, at ECF 001841.

24. Related to Defendant's SOF No. 27, its December 16, 2019 estimate also used a nearly two-year-old price list from February 2017. *See* **Exhibit 16**, at ECF 001776.

25. On April 6, 2020, Mr. Buller drafted a claims note indicating there was no ALE coverage left on the claim as the "reasonable period of repairs has been exceeded." *See* **Exhibit**

**17**. This statement was made despite the ongoing appraisal. *Id.* He drafted a similar note on July 15, 2021. *See* **Exhibit 18**, at ECF 000343.

26. On April 13, 2021, during appraisal, Nicholas Buller had a two-hour conversation with his appraiser, Mark Neufeld. *See* **Exhibit 19**, at ECF 000339. During that conversation both individuals discussed forwarding the following policy provision to the umpire Roy Becker for consideration:

> 5. Loss Settlement. Covered property losses are settled as follows:
>
> a. Replacement Cost. Property under Coverage A or Bat replacement cost, not including those items listed in 5.b.(2) and (3) below subject to the following:
>
> (1) We will pay the full cost of repair or replacement, but not exceeding the smallest of the following amounts:
> (a) the limit of liability under the policy applying to Coverage A or B;
> (b) the replacement cost of that part of the damaged building for equivalent construction and use on the same premises as determined shortly following the loss;
> (c) the full amount actually and necessarily incurred to repair or replace the damaged building as determined shortly following the loss;
> (d) the direct financial loss you incur; or
> (e) our pro rata share of any loss when divided with any other valid and collectible insurance applying to the covered property at the time of loss.

*Id.*; *see also* **Exhibit 20**, at ECF 000435, 37. This provision was then sent to Mark Neufeld with Mr. Buller's insinuation that the provision be presented to Mr. Becker to set the appraisal award at the date of loss price list. *Id.*

27. Mr. Buller admitted in deposition that it would be improper to attempt to influence the appraisal panel and that he was not allowed to tell his appraiser how to limit the award. *See* **Exhibit 7**, at 58:14-18; 62:8-12.

28. The appraisal award estimate finally accounted for more current pricing of repairs in that it used a price list for June 21, 2021. *See* **Exhibit 21**, at Becker 00307.

29. The award also included $3,869.76 for repairs to the patio paver bricks from the date of loss. See *Id.*, at Becker 000346 ("Mason – Brick / Stone – rear patio).

30. On September 15, 2021, Mr. Buller requested additional authority from his supervisor James Hudson and noted that "I have reviewed the price list in the award (June 2021) with "examining" and they do not feel we can request a re-price to February 2017). *See* **Exhibit 22**, at ECF 000317-18. The email also summarized the appraisal award differences as primarily related to the price list increase and a difference in the scope of HVAC repairs among other categories. *Id.*

31. On September 16, 2021, Mr. Buller drafted a claims note stating he had provided a technical review and approval of the appraisal award except that he denied coverage for the patio damage awarded in appraisal citing Donan's 2017 report. *See* **Exhibit 23**, at ECF 000315.

32. In Mr. Buller's deposition dated June 28, 2022, Mr. Buller admitted he was unaware whether Colorado law allows appraisers to determine the cause of a loss. See **Exhibit 7**, at 261:14-17.

## III. LEGAL STANDARD

### *A. Summary Judgment Standard*

Summary judgment is required under Fed. R. Civ. P. 56(a) when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is material when it "might affect the outcome of the suit under the governing

law," and a dispute is "genuine" when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In considering a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Once the moving party demonstrates an absence of a genuine dispute of material fact, the burden shifts to the non-moving party to present evidence that demonstrates a genuine dispute of material fact. *See 1–800–Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1242 (10th Cir. 2013) (citation omitted). In doing so, the opposing party must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact") (citation omitted). Where a motion for summary judgment rests on credibility determinations, summary judgment is inappropriate as such matters are jury functions, not those of a judge. *Anderson*, 477 at 253-254.

## IV. ARGUMENT

### *A. Defendant is Not Entitled to Summary Judgment of Plaintiff's Claims for Statutory and Common Law Bad Faith.*

As an initial matter, Plaintiff has retained Stephen Strzelec, a claims practices expert, to provide opinions regarding the standards applicable to property and casualty claims handling, based on his knowledge and experience. Mr. Strzelec has over thirty-seven years of experience handling or evaluating insurance claims. *See* **Exhibit 24**, Strzelec Expert Report, at p. 1. Mr. Strzelec, has also been qualified as an expert in both State and District Federal Courts throughout

the United States, including the United States District Court for Colorado. *Id.*, at p.2. Mr. Strzelec prepared a 65-page report detailing Defendant's failure to comport with minimum industry standards in the handling of Plaintiff's claim leading to an unreasonable delay of insurance benefits. Mr. Strzelec's opinions create an issue of material fact of whether Defendant had a reasonable basis for its actions which should be resolved by the jury.

Regardless, Defendant's motion fails because it presumes that the only issue for Plaintiff's C.R.S. § 10-3-1115 and 1116 claim is the timing of claims payments after it issued various coverage decisions. This case is dissimilar from *Wak Inc. v. Ohio Security Insurance Co.* where the insured made no attempt to justify their dispute in scope to the insurer before invoking appraisal, thus, there was no basis for the insured's unreasonable delay claim. In this case, as explained below there are multiple issues with Defendant's adjustment that create a genuine dispute of material fact precluding summary judgment.

***I. Failure to Update Price List on Supplemental Payments.***

Defendant unreasonably delayed payment by using an outdated price list on all its supplemental payments preceding the appraisal award. **ASOF 14; ASOF 24.** At issue, Defendant refused to update pricing even though it continued to update and increase coverage through subsequent estimates. On February 17, 2017, Defendant's original price list used a February 2017 Xactimate price list. **ASOF 7.** Further, Defendant's second estimate dated August 16, 2017, used the same price list even though Defendant modified its coverage position from $111,376.42 RCV to $208,009.45 RCV. **ASOF 14; SOF 17.** Defendant's final estimate dated December 16, 2019, also used the same February 2017 price list – even though Defendant substantially increased coverage for additional repairs. **ASOF 14; SOF 28.**

A change by the insurer of the amount of loss would override the policy's requirement that the cost be "determined shortly after loss." However, the Defendant's position on this is clear. For instance, four years after the loss, on April 13, 2021, Mr. Buller spent two hours strategizing with Defendant's appraiser Mark Neufeld after providing him with a policy provision intended to sway the umpire Mr. Becker to use a date of loss price list instead of current pricing. **ASOF 26.** Mr. Buller cited the Loss Settlement provision that includes the following language that Defendant will pay the lesser of: ". . . (c) the full amount actually and necessarily incurred to repair or replace the damaged building as determined shortly following the loss." *Id*. This provision was eventually submitted to Mr. Becker through Mr. Neufeld, but Mr. Becker did not act on it. *Id*. When Mr. Buller reviewed the appraisal award, he noted his conversation with an examiner that while Mr. Buller attempted to re-price the award from its price list of June 21, 2021, to February 2017, "examining" advised against it. **ASOF 30.** Mr. Buller's refusal to update the price list after additional increases in coverage and his attempts to sway the appraisal panel is inappropriate and against industry standards. *See* **Exhibit 24**, Strzelec report. at pg. 57.

Moreover, Mr. Buller's application of the Loss Settlement provision failed to properly consider coverage given the ambiguity in the provision. Ambiguous terms in an insurance policy are construed against the insurer. *Thompson v. Maryland Cas. Co.*, 84 P.3d 496, 502 (Colo. 2004). Ambiguous terms in an insurance policy or exclusion to coverage are those "that are reasonably susceptible to different meanings," *Pub. Serv. Co. of Colorado v. Wallis and Companies*, 986 P.2d 924, 933 (Colo, 1999), or "susceptible on [their] face to more than one reasonable interpretation." *Union lns. Co. v. Houtz*, 883 P 2d 1057, 1061 (Colo.1994).

Here, the Loss Settlement provision is ambiguous because insurance claims are often adjusted and updated over a long time period. The Loss settlement language above is susceptible to many interpretations. It could mean that the pricing is determined at the time additional coverage is applied. Another interpretation could be that the provision has nothing to do with pricing at all. Alternatively, the provision could mean that the pricing basis is solely based upon the initial coverage determination although that also would have to comply with the words "shortly following the loss." Since the term "shortly following the loss" is not defined, it could mean any amount of time following the loss. *See generally* **ASOF 26**. Since the provision is ambiguous, it should be interpreted against Defendant to mean that pricing is determined at the time Defendant applies coverage and updated each time after.

Alternatively, Mr. Buller's interpretation conflicts with Colorado's reasonable expectation doctrine. The doctrine applies when "where an ordinary, objectively reasonable person would, based on the language of the policy, fail to understand that he or she is not entitled to the coverage at issue." *Bailey v. Lincoln Gen. Ins. Co.*, 255 P.3d 1039, 1048–49 (Colo. 2011). Under this doctrine, an objective reasonable insured reading the Loss Settlement provision would interpret the provision to mean coverage is calculated at each time coverage is determined. This interpretation makes sense because pricing changes over time and the Policy's provision references "the amount actually and necessarily incurred" which would seem to mean that the amount Defendant owes depends on when repairs are actually completed. **ASOF 26**. Moreover, if Mr. Buller's initial position was correct, it would assume that coverage was determined accurately at the outset of the claim. Defendant's own conduct rebuts this position.

Applying these contract principles, the Court should read the Loss Settlement provision to mean that either (1) the provision is ambiguous and interpret it against Defendant as the drafter, or (2) the correct pricing is updated each time defendant applies additional coverage to the scope of loss. At different points in time, Defendant changed its coverage opinion, resulting in additional payments. **SOF 10; SOF 17; SOF 28**. It makes no sense that when Defendant continued to increase its approved scope of damages through 2020, that pricing would be limited to 2017 pricing if such pricing was no longer realistic. *See e.g., LaSalle Nat. Bank v. Massachusetts Bay Ins. Co.*, No. 90 C 2005, 1997 WL 211220, at *2 (N.D. Ill. Apr. 22, 1997) (holding a failure to update replacement costs "would violate the intent of the parties expressed in the policy"). Defendant's motion concedes that a large portion of the appraisal award difference is the difference in pricing from February 2017 to June 2021. **SOF 31.**

This pricing issue is important because the policy in this matter is a replacement cost policy which is intended to restore Plaintiff's property to its pre-loss condition. *Dupre v. Allstate Ins. Co.*, 62 P.3d 1024, 1030 (Colo. App. 2002). Given Colorado case law regarding the policy and the doctrine of reasonable expectations, Mr. Buller's position of keeping pricing tied to February 2017 is untenable due to the unreasonably delayed payments of covered benefits between 2017 and the appraisal award in late 2021. Now Plaintiff anticipates that Defendant will say that a substantial of the increase in the appraisal award is due to pricing differences which Defendant attributes to Plaintiff's delay. However, Plaintiff did not control Defendant's unreasonable omission of covered items in its initial estimate, nor did Plaintiff control the duration of appraisal. Furthermore, this alleged fact does not negate Defendant's failure to apply the same consideration to its other supplemental payments that used outdated February 2017 Xactimate pricing.

***II. Defendant Improperly Relied on the Donan Report.***

Defendant also conducted an inadequate investigation from the outset, relying on unreasonable and unverified information., Mr. Buller's original field report noted that that, "[t]rim and windows themselves will require repairs due to the moisture content in the home." **ASOF 5.** He then retained Donan to provide an engineering analysis. **SOF 11.** Donan's report concluded that the cause of damage to the windows was long term use resulting in a seal failure. **ASOF 8.** However, the same report noted other important factors contributing to the window damage, such as temperature changes and changes in atmospheric pressure. *Id.* There is no discussion in the initial Donan report of having reviewed mitigation company's report, the pro-longed 14-day dry out period, or how the excessive dry-out time could have contributed to swelling/contraction of the window frames and damage to the seals.[1] *Id.*

Commented [AK1]: N, ASOF 8 does not actually say "wear and tear" it only directs to Exhibit 5. Do you want to rephrase the ASOF 8?

Commented [NTA2R1]: This was added by jb. In review, I think that long term use is better than wear and tear. You are correct.

There is no explanation for Mr. Buller not ruling these factors out from the loss event, even though he initially noted the windows would "require repairs from the moisture content in the home." Mr. Buller mindlessly accepted Donan's findings. Mr. Buller admitted in deposition to blindly accepting Donan's report without any further questioning or verification and that he did not even understand what the aforementioned factors meant. **ASOF 10; ASOF 11.** Defendant's failure to give equal consideration to the insured's experts does not meet minimum industry standards. *See* **Exhibit 24**, Strzelec Report at pg. 65.

Plaintiff admits that its SBSA report from September 2017 was not produced to Defendant until October 2019. However, even after receipt acknowledging SBSA's conclusion that the

[1] Subsequent Donan report acknowledged that temperature changes and atmospheric pressure contributed to swelling/contraction of the window frames and damage to the seals. **ASOF 22.**

window sealant failure was from the water loss, Defendant did nothing with that information except hand it back to Donan for a new re-inspection. **ASOF 19; ASOF 21.** Importantly, Mr. Buller's deposition testimony shows he lacked the necessary construction experience to properly evaluate the loss. **ASOF 13.** Indeed, Mr. Buller noted in a subsequent claims note that Donan's engineering report would inform his decision moving forward. **ASOF 21.** Due to Defendant's failure to provide independent analysis of Plaintiff's submitted documents, Plaintiff invoked appraisal. **SOF 28.** Unsurprisingly, the appraisal panel included the replacement of damaged windows in its award, as they determined that the damage was a result of the loss. See e.g., **Exhibit 21** at pg. Becker 000309; 17; 19. When faced with conflicting expert opinions similar to the factual circumstances of this claim, this Court has refused to conclude that no reasonable jury could find that an insurer acted unreasonably in preferring its expert's opinion to a contrary opinion without weighing those opinions and drawing conclusions as to their respective value. *Leeper v. Allstate Casualty Insurance Company et al*, Case 1:13-cv-03460-PAB-KMT (March 21, 2016) (Brimmer, J.). The facts of this case demonstrate that Defendant failed to objectively consider the information provided by Plaintiff's multiple consultants, and instead acted unreasonably in preferring Donan's flawed opinions to those of Plaintiff's consultants.

### ***III. Defendant Improperly Denied Coverage for the Patio Damages that were Awarded in Appraisal.***

After the Appraisal Award was issued, there is no genuine dispute of fact that Defendant denied coverage for the portion of the award attributable to patio damage. **ASOF 31**. The appraisal panel awarded $3,869.76 for repair of patio paver bricks. **ASOF 29**. Despite the award of damages for the patio, on September 16, 2021, Mr. Buller denied coverage for this portion of the award citing Donan's engineering report. **ASOF 31**.

Moreover, just days before Ms. Winters' coverage letter, on October 1, 2021, the Tenth Circuit determined that appraisal awards in Colorado necessarily include a determination of the cause of the loss. *See Bonbeck Parker, LLC v. Travelers Indem. Co. of Am.*, 14 F.4th 1169, 1181 (10th Cir. 2021). Given this binding precedent, Defendant's post-appraisal coverage denial was unreasonable. Even if he did not know about the *Bonbeck* opinion at that time, he was still unaware of the decision as of his deposition date that occurred last summer. **ASOF 32**. Regardless, Defendant has never agreed to pay the patio damage amount it excluded from the appraisal award even though *Bonbeck* establishes these benefits are currently owed.

***IV. Defendant Misrepresented the Policy Coverages for Additional Living Expenses.***

There is also clear evidence in this matter that Defendant misrepresented the terms of Plaintiff's ALE coverage resulting in underpayment of ALE. Specifically, as noted above Plaintiff's Policy includes ALE coverage not to exceed 24 months, to repair or replace the damage or to permanently relocate. **ASOF 1**. The provision itself does not refer to a reasonable time to repair. *See id*. Nonetheless, Defendant has misstated the ALE coverage to Plaintiff resulting in underpayment on the claim. **ASOF 15-17; ASOF 25**.

First, Mandy Winters informed Plaintiff on multiple occasions that coverage was only through December 31, 2017, claiming that a reasonable construction period would be four months. **ASOF 15-16.** Since December 31, 2017, was not within four months of the date of loss (January 31, 2017), Ms. Winters' letter indicates she was likely limiting coverage from the September 27, 2017, letter date and adding an additional four months from that date. Based on the policy language, coverage should technically be for the shortest period of 24 months total, or the time it takes to repair or replace damaged property. **ASOF 1**. At issue, while Plaintiff agrees that major

further adjustment of the claim occurred in 2019 and then finally with the appraisal award in September 2021 the plain language of the ALE provision does not suggest that coverage ended 24 months after the date of loss or that any construction period limit runs before coverage scope is expanded.

Moreover, Mr. Buller wrote several claims notes during appraisal suggesting that there was no ALE coverage because more than 24 months had passed since the date of loss (even though ALE benefits were not paid during much of that time). *See e.g.*, **ASOF 25**. In deposition, Mr. Buller admitted he interpreted the provision to mean 24 months from the date of loss. He also admitted the provision did not tie the 24-month language to the date of loss. **ASOF 17**. Taken together with Ms. Winters' statements, both adjusters at least misapplied and misrepresented the ALE provision to Plaintiff. Based on Ms. Winters' application of the provision in September 2017, she understood that coverage should extend four months after additional coverage is applied. Since appraisal concluded on September 14, 2021, with an additional payment from Defendant of $200,847.99 on October 1, 2021, if she was being consistent, she would have allowed for additional ALE payments after the date of the final appraisal award. No such payment occurred. Therefore, Defendant's representations regarding ALE coverage violates C.R.S. § 10-3-1104 (1)(h)(I)(an insurer violates Colorado's unfair claims practices act by, "Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue.").

### *B. There is a Genuine Dispute of Material Fact that Defendant Knowingly and Recklessly Disregarded Coverage that was Obvious.*

There is also a genuine dispute of material fact precluding summary judgment on Plaintiff's common law bad faith claim. There is clear evidence in the record that Defendant misinterpreted Plaintiff's ALE coverage and knowingly refused to appropriately adjust its scope of repairs or use

current pricing on the claim over the course of several years. In deposition, Mr. Buller could not explain his position**.** *See e.g.,* **ASOF 17**. Clearly, given the chance to correct his mistake, he was unwilling to admit that he was mistaken.

Moreover, Defendant's motion itself shows reckless disregard related to using outdated pricing. Defendant's motion cites as an undisputed fact that the majority of pricing changes in the appraisal award are attributed to pricing increases from the date of loss to 2021. **SOF 31**. If this was true, Defendant concedes that pricing changes occurred, as a result of items that were missed in the initial investigation, and yet Mr. Buller still in appraisal attempted to undermine the award by manipulating the umpire with his interpretation of the Loss Settlement provision to limit the award. **ASOF 26**. Mr. Buller admitted in deposition that it would be improper to attempt to influence the panel and that he was not allowed to tell his appraiser how to limit the award. **ASOF 27**. Yet that is exactly what he did. **ASOF 26.** These facts alone show there is a genuine dispute of material fact precluding summary judgment on Plaintiff's common law bad faith claim. As clarification the actual changes in the repair scope of the appraisal award spanned multiple repair categories including window repairs, structural components, insulation, drywall, HVAC, and other general conditions. *See generally*, **Exhibit 21**, appraisal award estimate.

## V. Conclusion

The Court should deny Defendant's motion because Defendant's adjustment of the claim was flawed and purposefully underpaid portions of the claim that forced Plaintiff to invoke appraisal. Using an outdated price list on supplemental estimates compounded the necessity for appraisal. There is also the outstanding issue that Defendant misinterpreted the ALE provision to underpay the claim even after appraisal was concluded. Mr. Buller's deposition responses indicate

a complete lack of care for his insured client's wellbeing including making sure he could live in a habitable place during reconstruction and following appraisal. Defendant's further denial for patio damage awarded in appraisal is contrary to binding precedent and has not been remedied. Therefore, there is a genuine dispute of material fact precluding summary judgment on all claims.

WHEREFORE, Vincent Terranova, by and through his counsel of record, Merlin Law Group, P.A., and requests the Court DENY Defendant Safeco Insurance Company of America's motion for summary judgment and for such other relief as the Court deems just.

Respectfully submitted this 24th day of April 2023.

*s/ Nathanael Archuleta*
Jonathan E. Bukowski, Esq.
Larry E. Bache, Jr., Esq.
Nathanael Archuleta, Esq.
Merlin Law Group, P.A.
1001 17th Street, Suite 1150
Denver, CO 80202
jbukowski@merlinlawgroup.com
lbache@merlinlawgroup.com
narchuleta@merlinlawgroup.com
***Attorneys for Plaintiff***

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of April 2023, a true and correct copy of the foregoing **PLAINTIFF'S RESPONSE TO SAFECO INSURANCE COMPANY OF AMERICA'S MOTION FOR SUMMARY JUDGMENT** was filed via the CM/ECF system and was served upon the following:

Brian J. Spano, Esq.
Holly C. White, Esq.
Jon M. Ludwig, Esq.
Lewis Roca Rothgerber Christie LLP
1601 19th Street, Suite 1000
Denver, CO 80202
Telephone: (303) 623-9000
Email: bspano@lewisroca.com
hwhite@lewisroca.com
jludwig@lewwisroca.com
***Attorneys for Defendant***

*s/ Agnieszka Karcz*
Agnieszka Karcz, Paralegal