IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-03286-DDD-NYW

---

DEPOSITION OF: NICK BULLER
June 28, 2022
Via RemoteDepo

---

Nick Buller
June 28, 2022

VINCENT TERRANOVA,

Plaintiff,

v.

SAFECO INSURANCE COMPANY OF AMERICA,

Defendant.

---

PURSUANT TO NOTICE, the remote deposition of NICK BULLER was taken on behalf of the Plaintiff on June 28, 2022, at 9:25 a.m., with all parties participating on RemoteDepo, before Maria M. Orton, Registered Professional Reporter and Notary Public within Colorado.





**EXHIBIT 7**

Page 18

Herrett; Marc Pierson; Mitch Mosier, M-o-s-i-e-r; and John Suarez; and Richard Leggett.

Q. Prior to this position we are talking about, that you are a large loss field adjuster, correct --

A. Yes.

Q. How many claims a year did you handle, approximately?

A. Approximately 60 to 65.

Q. And of those claims, do you -- can you guess how many got reported to DORA with complaints?

A. I don't --

MR. LUDWIG: Object to form.

A. No, sir.

Q. (By Mr. Archuleta) You said that you only had one prior claim that you were involved in that went to a lawsuit; is that correct?

MR. LUDWIG: Objection, form. Misstates his prior testimony.

A. I've been involved in one deposition before.

Q. (By Mr. Archuleta) Okay. Do you know of -- strike that.

Do you know how many of the claims you've handled have gone to a lawsuit?

A. No.

Q. Is it more than one?

Page 19

A. Yes.

MR. LUDWIG: Objection, form.

Q. (By Mr. Archuleta) But you've only been deposed in one of those cases, correct?

MR. LUDWIG: Objection, form. Misstates his prior testimony.

A. Yes.

Q. (By Mr. Archuleta) We've talked about your background. When you are -- prior to Liberty Mutual, you were doing drywall work, correct?

A. On the side, in the summer. Prior to that, I held one job outside of college.

Q. What was that job?

A. I was a risk analyst for a company that owned mobile home communities and employed contractors throughout the United States.

Q. A job that has nothing to do with insurance claims adjustment, correct?

A. No.

MR. LUDWIG: Objection, form.

A. I'm sorry. My answer to your question was, "No," that's not correct. I managed general liabilities and workers' comp claims as part of the risk analyst position, so I did have involvement in insurance.

Q. (By Mr. Archuleta) Other than the drywall

Page 20

construction experience you had working for your father, do you have any other construction experience?

A. The drywall and painting.

Q. Any water-remediation experience?

A. No.

Q. And you understand what I mean by that, correct?

A. Yes.

Q. Any kind of experience in cleaning mold?

A. No.

Q. Any kind of experience evaluating the cause of a loss in a construction role?

A. No.

MR. LUDWIG: Objection, form.

Q. (By Mr. Archuleta) Do you have any Xactimate training?

A. Yes.

Q. When did you get that training?

A. I don't recall the specific date.

Q. Do you hold any Xactimate certifications?

A. I don't recall.

Q. Do you have any -- has anyone formally trained you on Xactimate in -- as a -- in any position at Liberty Mutual?

A. Yes.

Page 21

Q. Do you know the individuals who trained you, who they were?

A. No.

Q. Has it been -- is it fair to say it's been a long time since you've received that training?

MR. LUDWIG: Objection, form.

A. I'm not sure -- "long time" is subjective.

Q. (By Mr. Archuleta) Go ahead.

A. Go ahead.

Q. But you don't recall when the training occurred? So it's been long enough that you don't recall, correct?

A. Correct.

Q. I want to talk about some of the individuals involved in this claim. While you were involved on this claim, Vincent Terranova's claim, that was as a large loss field adjuster, correct?

A. Yes.

Q. At any point in this claim were you in a management role?

A. Yes.

Q. At what point?

A. July 15, 2021, I believe is the day I transferred to large, management.

Q. But in that position, were you managing any



EXHIBIT 7

Page 38

A. No.
Q. Are you -- do you have any kind of job duty (Internet failure) --
THE COURT REPORTER: I didn't hear that entirely.
MR. ARCHULETA: I'll ask it again.
Q. (By Mr. Archuleta) Do you have any kind of duty to document communications you make in the file?
A. Yes.
Q. Does that include just email communications?
A. No.
Q. So Liberty Mutual does not require that you document emails in the claims notes, correct?
A. I'm sorry, I think I may have misunderstood your question. We have to document phone, email, any correspondence, in the claim file.
Q. And whose responsibility, do you know -- well, strike that.
Do you know if claims notes are audited for completeness?
A. I do not.
Q. As part of the claims-note-documenting process, are you required to make contemporaneous notes?
A. Could you rephrase that question? I'm not sure. I just want to make sure I understand

Nick Buller
June 28, 2022

Page 39

"contemporaneous."
Q. Sure. "Contemporaneous," meaning is it okay to draft a claims note days after something occurred?
A. The file needs to be documented.
Q. Right away, or at any point?
A. As soon as possible.
Q. Do you know who reviews your claims notes at Liberty Mutual?
A. No.
Q. Do you know if it was Ron -- was it Ron Williams? Did he ever review your claims notes?
A. Potentially.
Q. Okay. In terms of ALE coverage on a claim, is that a decision that you make by yourself?
A. No.
Q. Who would you have made ALE coverage decisions with on a claim in this time period, during Vincent Terranova's claim?
A. Mandy Winters.
Q. Do you know if it was Mandy Winters' decision regarding how long ALE coverage would last?
A. We work on it together.
Q. Do you know who's the decision-maker related to ALE coverage?
A. It's a collective effort.

U.S. Legal Support | www.uslegalsupport.com

Page 40

Q. Does it require the approval of both you and Mandy Winters?
A. We would communicate on it.
Q. In terms of making recommendations for the length of time that ALE coverage would be approved, is it your testimony that both you and Mandy Winters contributed to that decision?
A. Yes.
Q. Is it your testimony that anyone else contributed to that decision, other than you and Mandy Winters?
A. I'm not sure.
Q. Okay. On this claim, do you recall anyone else informing that decision?
A. I do not.
Q. Okay. When you are determining how long ALE coverage should last, what factors play into that decision?
A. Every claim is handled based on their own unique set of circumstances and facts.
Q. Well, let's talk about the decision about ALE coverage. So ALE coverage, the length of time that you approve is based on -- on the reasonable amount of time to do repairs; does that sound right?
A. Correct. So the policy provisions would

Page 41

apply, reasonable period of repair, and any other factors that may impact that time frame.
Q. And you said you don't have any construction experience related to making repairs related to insurance claims, correct?
A. Correct.
Q. So what experience or training do you have in making that decision about how long to approve ALE coverage?
A. On the job experience.
Q. But it's not experience related to your experience in having completed similar repairs, correct?
THE DEPONENT: You are on mute, Jon, if you are talking. I saw your lips move.
Q. (By Mr. Archuleta) So let me repeat my question. When you are making the ALE decision about how long to approve repairs -- I'm sorry -- how long to approve ALE, are you making that based upon someone telling you how long a repair should take?
A. It's based on claims experience that I have.
Q. So over the years, you've just worked so many claims, you under- -- you have an idea of how long a repair should take, correct?
A. That, along with communicating with the repair provider.



EXHIBIT 7

moving, but I didn't hear anything.
MR. LUDWIG: Objection, form.
A. I'm not -- I'm not aware.
**Q. (By Mr. Archuleta) Okay. Do you -- do you think it's appropriate if, for instance, you are involved in the appraisal process?**
MR. LUDWIG: Objection, form.
A. Again, not sure what -- what the question's seeking.
**Q. (By Mr. Archuleta) I'm just asking you if it's okay if -- you are allowed to be in the appraisal process.**
A. What do you mean by "involved"?
**Q. For instance, are you allowed to influence your appraiser's decision-making process?**
A. No.
**Q. Okay. That would be inappropriate, correct?**
A. Yes.
**Q. And we're not talking about inappropriate because the policy says so, right? The appraisal clause doesn't say what you can and cannot do, right?**
A. I don't have it specifically in front of me, but generally, no; it's an appraisal, competent, unbiased.
**Q. Okay. And when we talk about competency,**



**what does that mean to you?**
A. An ability to perform the job as the appraiser.
**Q. Is the appraiser required to, for instance, know the substance of what they're evaluating?**
A. I'm not sure what the appraiser is required to know.
**Q. Okay. How do you go about selecting an appraiser?**
A. Based on claims experience and every individual claim.
**Q. Okay. Who was your appraiser on this claim?**
A. Mark Neufeld, with J.S. Held. And it's N-e-u-f-e-l-d.
**Q. Thank you. How did you go about determining or picking Mark for this appraisal?**
A. J.S. Held, I had worked with them in the past, and it was assigned to them, and subsequently Mark.
**Q. Had you worked with Mark before?**
A. Not in this capacity as an appraiser, no.
**Q. Okay. Did you pick Mark or did you pick J.S. Held?**
A. I picked Mark.
**Q. Okay. Now, in terms of the word "disinterested," what does that word mean to you as it**



**relates to the appraisal clause?**
A. Unbiased.
**Q. Does that mean that the appraiser can advocate for the party he selects -- or that selected him, I should say?**
THE COURT REPORTER: Mr. Ludwig, I saw --
MR. LUDWIG: Objection, form.
THE COURT REPORTER: -- yeah, I saw your lips moving.
A. Could you restate the question?
**Q. (By Mr. Archuleta) I'll reask the question. Does that mean -- does the word "disinterested" mean that the appraiser you select can advocate for your position?**
MR. LUDWIG: Objection, form.
A. I don't know. No. The appraiser is hired to provide an opinion.
**Q. (By Mr. Archuleta) Is it supposed to be an independent opinion?**
A. Yes.
**Q. Is it supposed to be your opinion?**
A. No.
**Q. Okay. Would it be inappropriate for you to tell your appraiser how to appraise the loss?**
A. Yes.
**Q. Would it be inappropriate for you to provide**



**your opinion to the appraiser?**
A. What do you mean by "opinion"?
**Q. On this claim, you've made certain coverage decisions, correct?**
A. Yes.
**Q. Okay. Would it be appropriate for you to convey a coverage position you have to your appraiser?**
A. All information available was provided to the appraiser at the time of the appraisal.
**Q. Okay. Are appraisers supposed to decide coverage in Colorado?**
MR. LUDWIG: Objection (Internet failure) --
THE COURT REPORTER: I didn't hear that. I heard only "objection." Is that all you said?
MR. LUDWIG: Objection, form. Calls for legal conclusion.
A. I don't know.
**Q. (By Mr. Archuleta) So you are not -- you don't know whether or not appraisers can decide coverage in Colorado, correct?**
A. Not to my knowledge, no.
**Q. Okay. And how important is it to you that appraisers conduct investigations without your influence?**
A. It's part of the --
MR. LUDWIG: Objection, form.



EXHIBIT 7

Page 62

A. It's part of the appraisal clause.
Q. (By Mr. Archuleta) Okay. And if you direct your appraiser on how to conduct their appraisal, is that a problem for you?
MR. LUDWIG: Objection, form.
A. Could you be more specific in relation to "direct"?
Q. (By Mr. Archuleta) If you tell your appraiser how to limit the award based on what coverage is available in the policy, is that allowed?
MR. LUDWIG: Objection, form.
A. No.
Q. (By Mr. Archuleta) And if that happened, would you think that the award is not binding?
MR. LUDWIG: Objection, form.
A. I don't know.
Q. (By Mr. Archuleta) Now, related to this appraisal in this matter, did you at all give any kind of direction to your appraiser?
MR. LUDWIG: Objection, form.
A. Could you be more specific as it relates to "direction"?
Q. (By Mr. Archuleta) Did you tell your appraiser when to invoke the umpire?
A. Not specifically, no.

Nick Buller
June 28, 2022

Page 63

Q. Okay. In your opinion, what kind of communications are you allowed to have with your appraiser?
MR. LUDWIG: Objection, form.
A. I'm not certain, other than all I did was follow up.
Q. (By Mr. Archuleta) Okay. So communicating with your appraiser to get a status update, that's fine, correct?
A. Yes.
Q. Okay. Would it be okay to discuss insurance coverage under the policy with your appraiser?
A. I don't know.
Q. Okay. Do you know if you did that in this case?
A. I don't recall.
Q. I want to ask a few other questions on the rules of the road.
Now, in terms of "like kind and quality," is that decision a coverage determination under a policy?
MR. LUDWIG: Objection, form.
A. Can you be more specific as it relates to "coverage"?
Q. (By Mr. Archuleta) So if an item pre-exists on a property, is a -- is covered damages, is what you

U.S. Legal Support | www.uslegalsupport.com

Page 64

replace it with a coverage decision?
MR. LUDWIG: Objection, form.
A. I would have to review the specific policy.
Q. (By Mr. Archuleta) Okay. Regarding the appraisal process, just going back to that, when you get an appraisal award in, is there any kind of steps you need to get the appraisal award paid, like technical reviews or stuff like that?
MR. LUDWIG: Objection, form.
A. Yes.
Q. (By Mr. Archuleta) Can you explain to me what your process would be after receiving an appraisal award?
A. I would review the award, review policy provisions, and work on securing authority to request appropriate payment.
Q. With a technical review?
A. If necessary.
Q. Okay. And do you know if appraisal is allowed to determine causation in Colorado?
MR. LUDWIG: Objection, form.
Q. (By Mr. Archuleta) And the cause of a loss?
A. At the time of the loss, I do not know.
Q. What about now?
A. I don't know specifically now.

Page 65

Q. Do you know if Colorado law has changed on that topic?
MR. LUDWIG: Objection, form.
A. I don't know right now.
Q. (By Mr. Archuleta) If an appraisal award awards something that is not damaged from a loss, is it your opinion that you should not pay for that item that was awarded in appraisal?
MR. LUDWIG: Objection, form.
A. Every claim is handled on their own unique set of circumstances and facts. We'd have to review that particular instance.
Q. (By Mr. Archuleta) Okay. Now, do you understand -- you've reviewed the policy in this matter, correct?
A. Not recently.
Q. Not related to this deposition, correct?
A. Correct.
Q. Okay. Do you understand that this policy is an all-risk policy?
MR. LUDWIG: Objection, form.
A. I'd have to review the policy.
Q. (By Mr. Archuleta) Okay. Do you want -- do you want to do that right now?
A. Sure.



EXHIBIT 7

is that an evaluation that you are making?
A. It's an expectation.
Q. Okay. Well, I'm asking you, do you assume the accuracy of the report when you receive it?
MR. LUDWIG: Objection, form.
A. So the report is reviewed with all the information I have available at the time it's received.
Q. (By Mr. Archuleta) Is it reviewed with anyone else other than yourself?
A. Every claim we handle individually based on their own set of circumstances and facts.
Q. Okay. On the page I'm looking at -- it's ECF 002041 of the same Exhibit 3 -- I've highlighted some factors that Donan says for why sealers might -- why seals of windows may fail. Do you see that?
A. Yes.
Q. They write, opening and closing the windows might cause window seal failures; do you have any reason to question that?
A. I do not.
Q. Change in wind direction; do you have any reason to question that?
A. I do not.
Q. Temperature fluctuations; do you have any reason to question that?

Nick Buller
June 28, 2022



A. I do not.
Q. Opening and closing doors in the house; do you have any reason to question that?
A. No.
Q. Changes in atmospheric pressure all -- pressure all cause cyclic -- this is changes in atmospheric pressure. Sorry. Do you have any reason to question that factor?
A. No.
Q. Do you understand what he's saying when he makes these statements?
MR. LUDWIG: Objection, form.
A. Yes.
Q. (By Mr. Archuleta) Okay. So do you know whether or not Donan Engineering eliminated as a factor for the window seal failure here whether opening and closing the windows may have caused it, the cause of the loss to the windows?
A. My expectation is that they completed a thorough and supported evaluation of the damages and ultimately the cause.
Q. But did you, yourself, ask them whether or not they eliminated these other factors in determining that the cause of loss was not caused by water, a sudden water -- a sudden water event?

U.S. Legal Support | www.uslegalsupport.com



MR. LUDWIG: Objection, form.
A. Again, I -- I'm not party to their evaluation process.
Q. (By Mr. Archuleta) Okay. Did you talk with Michael Starke at all related to this report?
MR. LUDWIG: Objection, form.
A. I don't recall any specific conversations.
Q. (By Mr. Archuleta) Did you have any questions for Michael Starke about this report when you received it?
A. I don't have any recollection of that, no.
Q. If you had talked with Michael Starke about this report, would it be documented in the claims notes?
A. I would expect, yes.
Q. Okay. And just a question about this: What is your understanding about what a change in atmospheric pressure means?
A. I'm not certain in terms of what they're referencing in this particular example.
Q. Okay. Temperature fluctuations; do you understand what that means in this context?
MR. LUDWIG: Objection, form.
A. Yeah, I -- I don't know.
Q. (By Mr. Archuleta) Okay. Did you at all talk with Donan Engineering about this report after they



sent it to you?
A. I don't have any recollection of any specific conversations with them.
Q. Okay. But it's your testimony today that, based on this report, that's how you evaluated -- you made your coverage determination on the windows based on this report?
MR. LUDWIG: Objection, form. Misstates his prior testimony.
A. Yeah, that's not what I said before. My testimony is that I review all available information at the time to come to a coverage determination, and this is a piece of that.
Q. (By Mr. Archuleta) Okay. Do you know whether or not humidity played a factor into whether or not the windows failed?
MR. LUDWIG: Objection, form.
A. My expectation is that Donan completes a thorough and supported evaluation of the cause.
Q. (By Mr. Archuleta) Well, I'm asking you your opinion. So I -- I have Donan's report. What is your opinion about whether or not humidity caused the loss of the windows -- the window damage?
A. As I have stated previously --
THE COURT REPORTER: I didn't hear you,



EXHIBIT 7

and so those items would be included within my authority.
Q. Okay. So at some point you got authority -- it's more than this amount. Is -- was it a -- do you recall if it was, like, a solid number, like 250,000 or am I just --
A. The file would bear out that number if -- if we were to review it.
Q. Okay. All right. And then going down to the bottom of this, it says that All Phase, they -- they think the construction could be done in four to five months; is that right?
A. At the time of the inspection and this note, yes.
Nick Buller
June 28, 2022
Q. Okay. Was ALE exhausted by this time?
A. Yes.
Q. So if repairs are still outstanding, how is -- where is the named insured supposed to live if ALE is exhausted?
A. So every claim is handled based on their own set of circumstances and facts and subject to the policy terms and conditions.
Q. Well, I'm asking you. Like, what was your thought, if they couldn't get ALE payments, where did you want them to live when construction was occurring?
MR. LUDWIG: Objection, form.



A. I'm required to enforce the policy and the policy is a contract.
Q. (By Mr. Archuleta) Do you have leeway to extend ALE to account for repairs?
MR. LUDWIG: Object to form.
A. Is it possible to restate the question? I'm not sure what you are trying to ask.
Q. (By Mr. Archuleta) Is it possible for you in your position -- do you have authority to extend ALE to account for when the repairs are actually being completed?
MR. LUDWIG: Objection, form.
U.S. Legal Support | www.uslegalsupport.com
A. So I -- I handled this claim like I handle all claims, subject to the policy terms and conditions and based on their own merits and facts.
Q. (By Mr. Archuleta) Okay. Did you think it was appropriate that ALE be extended past -- four to five months after this email to account for the restoration period?
A. As stated previously, the additional living expense coverage had been exhausted prior to this note.
Q. Okay. So the fact that it's still being adjusted three years later, that doesn't play into your decision about ALE coverage, correct?
MR. LUDWIG: Objection, form.



A. So we handle every claim based on their own set of facts and circumstances and subject to the terms and conditions of the policy.
Q. (By Mr. Archuleta) Right. And so I'm saying, like, even though it's exhausted in the policy, do you have the ability to get that extended within your authority?
MR. LUDWIG: Objection, form.
A. Are you referencing extracontractual?
Q. (By Mr. Archuleta) Yeah. I'm saying, like, is -- I know -- I understand what the policy says. I'm just asking you, in your position, do you have the authority to extend ALE past the time period stated in the policy?
MR. LUDWIG: Objection, form.
A. So every claim is handled based on their own set of circumstances and facts and we have to enforce the policy terms and conditions. I don't have the authority to go outside the bounds of the policy.
Q. (By Mr. Archuleta) Okay. Have you ever extended ALE beyond a period stated in the policy?
A. Me, personally, no, I have not.
Q. Has anybody you know of done that at Liberty Mutual?
A. That would be hard for me to ever have any



indication as to that. I'm not pertinent to every conversation on every claim.
Q. Oh, sure. What is the purpose of additional living expenses coverage?
MR. LUDWIG: Objection, form.
A. There's -- it's multiple. Primarily to cover any additional living expenses that occur, subject to the conditions of the policy, relative to making the home uninhabitable for the duration that is the shortest period of time to reasonably complete the repairs.
Q. (By Mr. Archuleta) Okay. Do you want to -- let's see. Give me a second and I'll bring up the provision. We can talk about what it actually says. All right. I've got to bring up the provision. I think I found it.
So correct me if I'm wrong -- we are looking at page 16 of the policy. It's Exhibit 1. Would you agree with this definition of additional living expenses, which covers increased living expenses during the time required to repair or replace the damage to the dwelling, or if you permanently relocate, the time required to move your household to a new location?
A. So if you read the last sentence --
MR. LUDWIG: Objection, form.
A. This is not the policy, as you will see in



EXHIBIT 7

Page 186

the last sentence of that paragraph.
Q. (By Mr. Archuleta) What is this? Is this like a summary?
A. I'm not certain what this is. Yeah, there you go. A summary of coverage.
Q. Okay. All right. I might need to look further for this. Sorry. What was your understanding of how long the -- I guess we could bring it up. Is this the coverage provision we are talking about related to additional living expenses, the actual provision in the policy, page 28 of Exhibit 1?
A. That appears to be correct, yes.
Q. And I'm not trying trick questions on you. I thought I had found the one before. So it says, "Payment shall be for the shortest time required, not exceeding 24 months, to repair or replace the damage or to permanently relocate." Is that right?
A. You read that statement correct, yes.
Q. Is that 24 months of ALE coverage, or is it 24 months from the date of loss? What is it?
MR. LUDWIG: Objection, form.
A. Right. My understanding is 24 months from the date of loss.
Q. (By Mr. Archuleta) Does it say that?
A. I don't see that right there.

Nick Buller
June 28, 2022

Page 187

Q. Okay. So it doesn't say it in the provision that it's from the date of loss, correct? Please review it. Take your time.
A. So there's other endorsements that speak to additional living expense, and there's probably more than -- more than this. I believe there's at least three bullet points. So I would have to review it in full, as well as any state endorsements. But, you are correct, it doesn't say "from the date of loss" right in that section.
Q. Okay. Do you want to review the policy and tell me if there's another provision that might apply?
A. If you keep -- if you keep scrolling through, under the Colorado state special provisions.
Q. Okay.
A. Typically speaks to ALE.
Q. All right. We are in the Colorado section, page 50, starting. I am also trying to find what we are looking for here.
A. So it does not appear that there's any additional communication in this endorsement relative to additional living expense.
Q. There's no additional -- you mean in this section you don't see it, correct?
A. Correct.

U.S. Legal Support | www.uslegalsupport.com

Page 188

Q. Okay. Okay. Is it fair to say that it's not 24 months from the date of loss, based upon your review of the policy?
MR. LUDWIG: Objection, form. Also asks for a legal conclusion.
A. Right, so I -- I'm not certain, relative to any case law in Colorado or how it's been interpreted in the past.
Q. (By Mr. Archuleta) Okay. Have you ever read a provision where it actually says 24 months from the date of loss, where it actually has those extra words, "from the date of loss"?
MR. LUDWIG: Objection, form.
A. I've reviewed many policies with different additional living expense language.
Q. (By Mr. Archuleta) Any recollection of such a provision?
A. I'm not remembering a specific provision or endorsement or policy that contains that language presently.
Q. Is it your understanding, as of 12/16/2019, you paid 24 months of additional living expenses?
A. I don't know exactly what was paid on additional living expense. That was not my portion of the claim.

Page 189

Q. That was Mandy Winters'; is that right?
A. That's correct.
Q. Okay. I'll save those questions for her. I won't torture you anymore.
Do you know if she still works there?
A. Yes, she does.
Q. Okay. Do you still work with her?
A. In my current capacity as a field team manager, I do not have the same interaction that I did before.
Q. Okay. All right. And I am going to look at Exhibit 24, All Phase Restoration estimate.
(Deposition Exhibit 24 was marked.)
Q. The date of the estimate looks like 12/16/2019. If we go down to the bottom -- I just want to make sure we are talking about the same estimate. See the number 218,000 on this page, page 48 of the estimate? Do you see that?
A. Yes.
Q. Is that the same number as the -- Exhibit 23, 218,657.51?
A. Appears to be, yes.
Q. Okay. Did you base Exhibit 23's claim note on Exhibit 24, the All Phase Restoration amount?
MR. LUDWIG: Objection, form.

Page 258

Q. Okay. So it's not titled "Technical review," is it? That's just what you -- oh, it is. Okay. In the email chain, correct?
A. Yes.
Q. Is there a reason why you would put this in email form instead of a claims note?
A. Our process changed between when prior technical reviews were completed and this one was completed.
Q. What changed?
A. We sent them via email.
Q. No longer put them in the claims notes, correct?
A. So this is uploaded to the claim file, but the notation is not through the claim file.
Q. Okay. The next part, the -- on the next page, I guess, or at the bottom of that page, ECF 317, you put, "The differences in the appraisal award versus our estimate." Is that after your review of the appraisal award, you kind of just summarized the differences?
A. From a very high level. That's, by no means, all-inclusive of the differences.
Q. Okay. Did you -- how long did you review the appraisal award; do you recall?

Nick Buller
June 28, 2022

Page 259

A. I don't have a recollection on the time.
Q. Okay. Did you review the appraisal award for accuracy?
A. I reviewed the appraisal award for that, yes.
Q. Okay. Do you know if the -- sitting here today, you don't know if the appraisal award included retrofit windows?
A. We could certainly look it up.
Q. And I might do that when we do our -- I might do one more break just to grab that document.
On here, it says the claim was "pre-LLS." What does that mean?
A. LLS is large loss summary. It's an Excel spreadsheet that we complete internally to validate our reserves.
Q. Okay. Is that a document that you -- do you know if you have still have that document?
A. Well, so as I referenced here, this claim was prior to us using that large loss summary, so there is no relevant one.
Q. Oh, okay. All right. Let me see if I'm labeling any -- I'm going to label this document as Exhibit 41.
(Deposition Exhibit 41 was marked.)

U.S. Legal Support | www.uslegalsupport.com

Page 260

Q. What is this document?
A. It's a note that I created on September 16, 2021, requesting payment based on the appraisal award estimate.
Q. This is a different document than the technical review you submitted to your manager, correct?
A. Yes.
Q. Okay. Why -- is there a reason why you are documenting it in more than one place?
A. So as I stated previously, our process for technical reviews changed during this claims process. Our payment request process did not change.
Q. This is the payment process, correct?
A. Yes.
Q. Okay. Who is Marsili, by the way?
A. That would be Ken Marsili. He is James Hudson's -- or was James Hudson's manager at the time.
Q. Okay. There's a note in here that you completed the technical review. You did change the award, because you took out the patio damage per the Donan report; is that right?
A. That's correct.
Q. Why did you do that?
A. Because it's a coverage denial. And that needs to -- award -- the appraisal award estimate is

Page 261

still subject to the terms and conditions of the policy.
Q. And what specifically about the patio damage was not covered?
A. The patio damage itself. It -- we previously discussed that, yes.
Q. It wasn't covered because it wasn't caused by the loss?
A. Per the terms and conditions of the policy, there was a -- a denial on the patio damages.
Q. Due to the Donan determination about the cost, correct?
A. After review of all the information available to us at the time.
Q. Okay. And sitting here today, do you know whether or not appraisal awards in Colorado can determine causation?
A. As I've answered previously, I don't know.
MR. ARCHULETA: Okay. I want to take a short break so I can grab the appraisal award, and then I think -- I'm going to ask him on that and then I'll be done. Going off the record.
(Recess taken, 3:54 p.m. to 4:01 p.m.)
Q. (By Mr. Archuleta) I'm going to share my screen, the appraisal award. Do you see this document?
A. Yes.