**Stephen L. Strzelec**
***Strzelec Consulting Services***

August 9, 2022

# PRELIMINARY DISCLOSURE OF STEPHEN L. STRZELEC

**Vincent Terranova v. Safeco Insurance Company of America**
**United States District Court, District of Colorado**
**Civil Action No. 1:21-CV-03286-NYW**

## BACKGROUND AND QUALIFICATIONS:

I was an employee of State Farm Insurance from January 14, 1985 through August 5, 2002. During my tenure at State Farm, I rose from my initial position as a Trainee Claim Representative (CR) in the Fire Company to Fire Reinspector/Trainer, Fire Superintendent, Auto CR, Auto Superintendent, Auto Divisional Claim Superintendent, and to the Auto/Fire Section Manager for the State of Alaska. I handled or supervised thousands of insurance claims under various types of policies in various States. My work included the investigation, evaluation, negotiation and resolution of these claims.

As a Superintendent, I was responsible for decision-making on coverage, liability, amounts owed, and procedures. I directly supervised claim supervisors, claim representatives, estimators, and support staff, handling both first and third party claims. I was also responsible for hiring, training and developing new employees as well as the continued training of employees.

As State Farm's Auto Divisional Claim Superintendent for Alaska, then later as State Farm's Auto/Fire Section Manager for Alaska, I was responsible for setting and maintaining claim-handling standards. I was also responsible for ensuring corporate policies, practices, and procedures were followed by every employee. I prepared and reviewed management reports that addressed numerous issues in the Claims operation. I was responsible for supervision of all litigation in Alaska, including suits against the company for bad faith or extra-contractual damages.

I also served as the Claim Manager for the Alaska Insurance Guarantee Association from 1996 to 2002, overseeing the handling of all claims presented to the Alaska Insurance Guarantee Association.



**EXHIBIT 24**

While at State Farm, I attended various training classes and seminars. These included: Fire Claim Training Series, Evaluating Structural Losses, Fire Basic Claim School, Fire Intermediate Claim School, Fire Estimatics School, Training for Trainers, Management Orientation, Management I-IV, Management Overview, Supervisory Skills, SST Goal Setting, Performance Management Skills, Managing the PP&R Process, Fire Claim Management Course, Situational Leadership, Strategic Planning, Presentation Excellence, BCC I-IV, Auto Claim School, Bodily Injury Claim Management Course, Physical Damage Claim Supervision, Auto Claim Management Course, Auto Divisional Claim Supt. Workshop, Fire Divisional Claim Supt. Seminar, Field Claim Management, Leadership Principles, XACTIMATE Software Training, First Party Seminar, CAT/CMR Redesign, Training, TEACH, Auto Section Manager Forum, and the Fire Section Manager Forum.

I also attended training outside of State Farm. This included: VALE National Building Loss Evaluation School, ICAR (6 parts), and TTI Advanced Auto I.

I was recognized for my contributions at State Farm including:

- I was selected to serve on a committee to reorganize Fire Claim School.
- I received special recognition for the supervision of the Alaska wildfires.
- I was selected to be a member of the Steering Committee for the new Section Manager Forum.

As a claim representative, Reinspector/Trainer, Superintendent, Divisional Claim Superintendent, and Section Manager, I participated in numerous catastrophes and handled or supervised the handling of thousands of claims in both Auto and Fire.

My formal education includes a BS degree in Business Administration from City University of Seattle in 1987. I obtained the Chartered Property and Casualty Underwriter (CPCU) designation in 1994 and the Chartered Life Underwriter (CLU) designation in 2000.

I have been working as a claims practices expert since November 2002 after approximately eighteen years in the insurance industry. I have been retained as a national claim-handling expert or consultant in 32 States, including; Alaska, Alabama, Arizona, Arkansas, California, Colorado, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nevada, New Jersey, New Mexico, North Dakota, Oklahoma, Pennsylvania, South Dakota, Texas, Washington, West Virginia, and Wisconsin. I have provided affidavits, declarations, and testimony in numerous cases and I have qualified as an expert in both State and District Federal Courts. Attached, as Exhibit B. is a listing of cases where I have provided testimony during the last four years.

From my casework, developing and presenting seminars on claim practices trends, and from the subjects I constantly study, I have specialized experience and training in insurance claim practices and the practices of the insurance industry.

I have spoken on insurance claim practices subjects to lawyer groups and at various Bar

Association CLE Seminars in Arizona, Illinois, Nevada, New Mexico, and Washington from 2003 to the present. *(See Exhibit* C, *Presentations and Publications)*

My opinions expressed herein are based on my experience and training in the insurance industry, my knowledge of statutory and regulatory standards applicable to property and casualty claim handling, my review and knowledge of claim files, claim handling requirements, the documents I have reviewed in this case, my review and knowledge of texts, literature, and articles discussing claim handling. I am qualified by training and experience to provide the opinions I am expressing in this case.

**LISTING OF TESTIMONY:**

A list of testimony is attached as Exhibit B.

**PUBLICATIONS AND PRESENTATIONS:**

Many of my presentations included articles published within the course resources and course guides. These are listed under Exhibit C, Presentations and Publications.

**COMPENSATION:**

My billing guide is attached as Exhibit D.

**ENCLOSURES:**

1. Curriculum vitae – Stephen L. Strzelec
2. List of recent testimony.
3. List of presentations and publications.
4. Billing information
5. Insurance Industry Standards and Principles.
6. Colorado Laws and Regulations
7. Timeline

**DOCUMENTS AND OTHER INFORMATION CONSIDERED:**

1. Complaint and Answer
2. Safeco Policy (POL0001-00051)
3. Misc. Pleadings
4. Safeco Disclosures (EFC-000001-005553)
5. Terranova Disclosures (VT0001-00881)
6. Suppl. Disclosures (Becker 0001-00979)
7. Suppl. Disclosures (JSH-SDT 0001-008717)

8. Suppl. Disclosures (CHG 0001-001008)
9. Suppl. Disclosures (VIP0001-0026)
10. Deposition of Nick Buller w/Exhibits
11. Insurance industry literature and texts from commonly obtainable sources. Examples include:

    a) *Casualty Claim Practice – Donaldson*
    b) *Best's Key Rating Guide - A.M. Best Company*
    c) *Insurance Claims and Disputes - Windt*
    d) *How to Draft and Interpret Insurance Policies - Wollner, (1999)*
    e) *Casualty Insurance Claims - Brownlee*
    f) *Aggressive Good Faith ... - Rokes*
    g) *Claim Basics - Kaplan Financial Education*
    h) *Insurance Practice for the Millennium (2000) - Petittla*
    i) *Organizational Behavior in Insurance - White, et al*
    j) *The Claims Environment – Markham (1st Edition)*
    k) *The Claims Environment - Hoopes (2nd Edition)*
    l) *Claims Leadership and Organizational Alignment (1st Ed. 2013) Frappolli and Myhr*
    m) *Casualty Claim Practice (1996) - Hirsch*
    n) *The Legal Environment of Insurance – Lorimer*
    o) *Insurance Company Operations - Webb*
    p) *Principles of Insurance - Mehr, (5th ed.)*
    q) *Property and Liability Insurance Principles – Luthardt (3rd ed.)*
    r) *Property and Liability Insurance Principles – Cook (5th ed.)*
    s) *Principles of Risk Management and Insurance – Rejda (8th ed)*
    t) *Litigation Road, The Story of Campbell v. State Farm – Stempel*
    u) *Claims Operations: A Practical Guide – Murdock*
    v) *Fundamentals of Risk and Insurance – Vaughn*
    w) *Delay, Deny, Defend – Feinman*
    x) *Managing Bodily Injury Claims – The Institutes (Text Book and Course Guide, 1st and 2nd Editions)*
    y) *Claim Basics - Kaplan Financial Education*
    z) *Claims Leadership and Organizational Alignment (1st Ed. 2013) Martin J. Frappolli and Ann E. Myhr*

## GENERAL INSURANCE PRINCIPLES

Insurance is a risk transfer device. The insured pays a premium, and an insurer assumes the risk of something bad happening. The risk of loss or some part of that risk is transferred to the insurance company. The process works by the combining of homogeneous units, the same type of exposure units, and the application of the law of large numbers. Unpredictable individual losses become collectively predictable. When an insured pays a premium into a pool of funds, the insurance company uses actuarial science to predict frequency and severity of loss. Frequency is the number

of losses, usually expressed as a number per thousand policies. Severity is how much the average loss will cost.

People place great importance on their health and property, so they buy insurance to minimize the economic impact of accidents and losses. The premium pays for a conditional promise to pay if loss occurs that is covered by the policy. During any given policy period, most insureds receive only peace of mind for their premium dollars, while the few that suffer a covered loss typically receive significantly more than the premium paid. Most insurance contracts are offered to the insured on a take it or leave it basis; they are written by the insurer without input from the insured.

## CLAIMS-HANDLING STANDARDS

An insurer owes the insured a duty of good faith and fair dealing separate from the duties under the insurance contract and those arising from statute, regulation, or case law. The insurer's duty of good faith and fair dealing is affirmative and unconditional. Internal claim guidelines usually acknowledge this and give guidance on how to deliver the required level of service.

In one form or another, most states have enacted statutes, regulations, or supervision that governs claim-handling practices. These claims practices standards impose certain duties and obligations on an insurer in the handling of a first-party claim. While statutes, regulations, or other standards set outlines for good claim handling, they do not completely define the parameters required for every specific situation; that requires internal standards of fairness by the insurer. A detailed review of these industry standards and good faith obligations is attached to this disclosure as **Exhibit E**.

Colorado’s public policy explicitly requires insurers to act in good faith:

> Such policy requires that all persons having to do with insurance services to the public be at all times actuated by good faith in everything pertaining thereto, abstain from deceptive or misleading practices, and keep, observe, and practice the principles of law and equity in all matters pertaining to such business. § 10-1-101, C.R.S.

Industry standards require claim handlers to know and comply with applicable law and regulations that impact claim handling and treat policyholders in a manner consistent with requirements of the law. The National Association of Insurance Commissioners created a Model Unfair Claims Practices Act (the "Act"), that provides statutory and regulatory standards for the handling of insurance claims. Over 45 states have adopted the Model Unfair Claims Practices Act, either in part or in its original form. The industry recognizes the importance of the Model Act and address it in the AIC-33 (Associate in Claims) textbook, “The Claims Environment” (Markham, First Edition, 1993, p249) when it states, “insureds are frequently permitted to introduce evidence of violations of the Model Unfair Claims Settlement Practices Act and Model Unfair Claims Settlement Practices Regulations because the model act is a recommended standard of care. It was developed by the National Association of Insurance Commissioners as a guide for insurance regulators in every state to establish reasonable claim practices.”

Colorado has promulgated these claims standards for insurance companies to follow under the Colorado Revised Statute 10-3-1104 (1)(h); referred to as The Unfair Claim and Settlement Practices Act. C.R.S. §10-3-1104(1)(h)(I) to C.R.S. §10-3-1104(1)(h)(XV) defines unfair claim settlement practices as follows:

> (h) Unfair claim settlement practices: Committing or performing, either in willful violation of this part 11 or with such frequency as to indicate a tendency to engage in a general business practice, any of the following:
> (I) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue; or
> (II) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies; or
> (III) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; or
> (IV) Refusing to pay claims without conducting a reasonable investigation based upon all available information; or
> (V) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed; or
> (VI) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear; or
> (VII) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds; or
> (VIII) Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application; or
> (IX) Attempting to settle claims on the basis of an application which was altered without notice to, or knowledge or consent of, the insured; or
> (X) Making claims payments to insureds or beneficiaries not accompanied by statement setting forth the coverage under which the payments are being made; or
> (XI) Making known to insureds or claimants a policy of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements or compromises less than the amount awarded in arbitration; or
> (XII) Delaying the investigation or payment of claims by requiring an insured or claimant, or the physician of either of them, to submit a preliminary claim report, and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information; or
> (XIII) Failing to promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage; or
> (XIV) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.
> (XVII) Failing to adopt and implement reasonable standards for the prompt resolution of medical payment claims.

In addition, Colorado statutes also provide:

> C.R.S. §10-3-1113
>
> (1) In any civil action for damages founded upon contract, or tort, or both against an insurance company, the trier of fact may be instructed that the insurer owes its insured the duty of good faith and fair dealing, which duty is breached if the insurer delays or denies payment without a reasonable basis for its delay or denial.
>
> (2) Under a policy of liability insurance, the determination of whether the insurer's delay or denial was reasonable shall be based on whether the insurer's delay or denial was negligent.
>
> (3) Under a policy of first-party insurance, the determination of whether the insurer's delay or denial was reasonable shall be based on whether the insurer knew that its delay or denial was unreasonable or whether the insurer recklessly disregarded the fact that its delay or denial was unreasonable.
>
> (4) In determining whether an insurer's delay or denial was reasonable, the jury may be instructed that willful conduct of the kind set forth in section 10-3-1104(1)(h)(I) to (1)(h)(XIV) is prohibited and may be considered if the delay or denial and the claimed injury, damage, or loss was caused by or contributed to by such prohibited conduct.

These regulations impose certain duties and obligations on an insurer in the handling of claims consistent with the claims handling standards cited above. Insurance industry standards require all claim handlers to be familiar and in compliance with the laws and regulations that impact claims. Attached to this report as **Exhibit F**, is my collection of Colorado law, regulations and case law that pertain to claims handling. Some of this is detailed as follows:

Colorado prohibits unreasonable delay or denial of first-party insurance benefits (CRS 10-3-1115 and 1116).

These regulations impose certain duties and obligations on an insurer in the handling of claims consistent with the claims handling standards cited above.

**PRELIMINARY REVIEW, ANALYSIS AND FINDINGS:**

According to the Declarations page produced with the Certified Policy, the Terranova home is located at 43 W Ranch Trail, Morrison, CO and insured under policy number OY7555527. The policy period was listed as August 10, 2016 to August 10, 2017. The Declarations page lists the following coverages:

| | LIMIT OF LIABILITY |
|---|---|
| Coverage A- DWELLING | $1,400,000 |
| B- OTHER STRUCTURES | $140,000 |

| | |
|---|---|
| C- PERSONAL PROPERTY | $700,000 |
| D- ALE (LOSS OF USE) | $280,000 |
| Building Ordinance or Law (10%) | $140,000 |

The following language may be relevant to this loss:

**SECTION I – PROPERTY COVERAGES**

**COVERAGE A – DWELLING**

We cover:

1. We cover the dwelling on the ***residence premises*** shown in your Policy Declarations used principally as a private residence, including structures attached to the dwelling other than fences, driveways or walkways.

. . .

**BUILDING PROPERTY LOSSES WE COVER**

We cover accidental direct physical loss to property described in Building Property We Cover except as limited or excluded.

**COVERAGE C - PERSONAL PROPERTY**

1. Personal property owned or used by any insured is covered while it is anywhere in the world. When personal property is usually located at an insured's residence, other than the residence premises, coverage is limited to 10% of the Coverage C limit. Personal property in a newly acquired principal residence is not subject to this limitation for the 30 days immediately after you begin to move the property there.

   During the time the residence premises is under construction by or for the insured, our limit of liability for personal property other than on the residence premises shall be equal to the amount specified for Coverage C. Our total limit shall not exceed the policy limit for Coverage C in any one loss.

**PERSONAL PROPERTY LOSSES WE COVER**

We cover accidental direct physical loss to property described in Coverage C — Personal Property caused by a peril listed below except as limited or excluded.

12. Accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system, or from within a household appliance.

This peril does not include loss:

a. to the appliance or system from which the water or steam escaped;
b. caused by or resulting from freezing except as provided in the peril of freezing below; or
c. on the residence premises caused by accidental discharge or overflow which occurs off the residence premises.

For purposes of coverage under this peril, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment.

13. Sudden and accidental tearing apart, cracking, burning or bulging of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

We do not cover loss caused by or resulting from freezing under this peril.

**COVERAGE D – ADDITIONAL LIVING EXPENSE AND LOSS OF RENT**

1. If a loss covered under this Section makes that part of the residence premises where you reside uninhabitable we cover Additional Living Expense, meaning the necessary increase in living expenses you incur so that your household can maintain its normal standard of living.

   Payment shall be for the shortest time required, not exceeding 24 months, to repair or replace the damage or to permanently relocate.

The total limit of liability available for Additional Living Expense and Loss of Rent is stated on your Policy Declarations page and is the most we will pay for all loss or costs under 1., 2. and 3., above.

The periods of time under 1., 2. and 3. above are not limited by expiration of this policy.

We do not cover loss or expense due to cancellation of a lease or agreement.

No deductible applies to this coverage.

**SECTION I — PROPERTY CONDITIONS**

7. Appraisal. If you and we do not agree on the amount of the loss, including the amount of actual cash value or replacement cost, then, on the written demand of either, each shall select a competent and disinterested appraiser and notify the other of the appraiser selected within 20 days of such demand. The appraisers shall first select a competent and disinterested umpire; and failing for 15 days to agree upon such umpire, then, on request of you or the company, such umpire shall be selected by a judge of a court of record in the state in which the property covered is located. The appraisers shall then resolve the issues surrounding the loss, appraise the loss, stating separately the actual cash value or replacement cost of each item, and, failing to agree, shall submit their differences, only, to the umpire. An award in writing, so itemized, of any two of these three, when filed with the company shall determine the amount of loss.

Each party will:

a. pay its own appraiser; and
b. bear the other expenses of the appraisal and umpire equally

## Analysis and Discussion

These opinions are based on my experience and training in the insurance industry, my knowledge of statutory and regulatory standards applicable to property and casualty claim handling, my review and knowledge of claim files, claim handling requirements, the many documents I have reviewed in this and other cases, and my review and knowledge of texts, literature, and articles discussing claim handling. I am qualified by training and experience to provide the opinions I am expressing herein.

### Documentation Standards

In reviewing the claim file and documents provided it is important to do so within the context of the within the insurance industry standard that if it is not in the claim file, it didn't happen. This standard is detailed in the AIC-33 (Associate in Claims) textbook, "The Claims Environment" (Markham, First Edition, 1993, p340) where it states, "The standard for documentation is that the file should speak for itself. The basis for all decisions should be clear, all communications to and from the claim representative should be recorded, and is should be possible at any stage in the file's life to transfer it from one claim representative to another. Upon transfer of a file, what has been done and what remains to be done should be clear." It also states, "Good claim handling alone is not enough to avoid bad faith claims. Supporting evidence must be in the file to establish that the good work was indeed done. If the documentation is not in the file, then it can only be assumed that nothing happened. The absence of good log notes, correspondence, and investigative and evaluative material is another indicator that the claim representatives were not doing their job properly." (p249)

Nick Buller was asked in his deposition about the requirement at Liberty Mutual to properly document the claim file:

Q. Okay. Would you agree with me that it's important to draft accurate claims notes?

A. Yes.

Q. Should claim notes include all the rationale you make when you make a decision?

A. It needs to be factual.

Q. (By Mr. Archuleta) Is it okay to leave out factual information in the claims file?

A. No.

. . .

Q. (By Mr. Archuleta) Has anyone ever told you at Liberty Mutual that you need to document your analysis about a coverage decision in a claims note?

A. Yes.

Q. (By Mr. Archuleta) Do you have any kind of duty to document communications you make in the file?

A. Yes.

Q. Does that include just email communications?

A. No.

Q. So Liberty Mutual does not require that you document emails in the claims notes, correct?

A. I'm sorry, I think I may have misunderstood your question. We have to document phone, email, any correspondence, in the claim file. (Pp. 35-37)

**Standards Discussion**

The AIC textbook, "The Claims Environment" (Markham, First Edition, 1993), summarizes the required good faith claim handling that needed to take place in this claim when it states; "When a policyholder submits a claim to an insurance company, he or she does so on the belief that the matter in question is covered by the policy. Yet, policyholders generally do not understand all of the circumstances that are or are not covered in the policy and are not familiar with every provision in the policy affecting the amount they can recover." (p59)

All insurers know that undermining first party policy benefits carry the risk of increasing the insured's emotional and financial distress. With such knowledge, the public should expect an insurer to implement and enforce claim principles to carry out the policy's purposes with a high degree of skill, supervision, and concern for the insured.

When an insured purchases insurance, part of what he pays for is a reasonable and even-handed investigation. This is central to proper claim handling and is clearly detailed in the AIC-33 (Associate in Claims) textbook, "The Claims Environment" (Markham, First Edition, 1993, p27) where it states, "In a claim adjustment process, the claim is investigated, coverage and liability are determined, damages are measured, and if necessary, the claim is litigated. These tasks are carried out either by staff employees of the insurance company or by outside claim – adjusting services. Professionals and specialists in various fields, as well as fellow employees in the insurance company, also lend their support to the process."

The AIC textbook, "The Claims Environment" (Markham, First Edition, 1993), details the role of the claim handler, commonly referred to as the "adjuster". The text explains that the claim adjustment process begins with the assignment of a claim to a claim representative.

> The following are four tasks the claim representative must accomplish:
>
> 1, Investigation
> 2. Evaluation of coverage, liability, and damages
> 3. Negotiation or alternate dispute resolution (ADR) to achieve settlements
> 4. If necessary, litigation management (P. 9)

Regardless of title, whether it is; claims examiner, claims specialist, SIU investigator, contractor, or attorney; the person conducting/accomplishing the above tasks is considered by the industry as a claim handler. All claim handlers are required to meet industry standards, act in good faith, treat the insured fairly and give equal consideration to the interests of the insured.

In reviewing the claim handling, you must keep in mind that the insurance industry requires all claim handlers to deal with insureds honestly and not to hold back information or attempt to deceive the insured. The AIC textbook, "The Claims Environment" (Markham, First Edition, 1993), discusses the importance of being honest where it states:

> Bad faith claims can arise from any claim if the claim representative fails to do the following…
>
> - *Be honest and open* – Fraud by anyone in the insurance industry is both a crime and misuse of the public trust, punishable by criminal and civil penalties. Other forms of dishonesty are not as easily recognized, nor are they necessarily perceived by all claim representatives as being wrong. Some claim representatives may think that the way to get promoted is to save the company money by concealing benefits from insureds. Other claim representatives may develop a particular dislike for certain insureds and may try to misrepresent what the policy says in order to pay them less money. Claim representatives should never let personal feelings or egos overrule good judgment and should admit their mistakes and take action to correct them. (p308)

When reviewing the claim handling involved in any claim, or any group of claims, the reviewer must keep in mind that the industry accepted obligations of good faith and fair dealing and the requirement of meeting minimum industry standards in the handling of the claim are affirmative and unconditional. Imbedded within the industry, these obligations cannot be abdicated or transferred to agents or subcontractors. The responsibility to ensure these obligations are met remains fixed with the insurer.

Again, it is well established within the insurance industry that the obligation to investigate, evaluate, and determine what is owed on a first party claim is the responsibility of the insurance company. This service is paid for by the insured as part of the insurance premium. While the insurer has the obligation to investigate the loss and determine what is owed, the policy requires that the insured cooperate with this investigation and provide the appropriate documentation to assist the insurer in determining the amount of loss. This duty is central to proper claim handling.

Nick Buller was asked about his understanding of standards and requirements for handling claims. He agreed to many of the standards and duties detailed in this report. For example, he agreed to the following:

> Q. Do you believe that you have a duty to complete a full and fair investigation on insurance claims?
>
> A. Yes.
>
> Q. Do you believe that that means evaluating all the evidence?
>
> A. Presented to me, yes.
>
> Q. Okay. Do you think that you can, for instance, ignore evidence submitted and it be a full and fair investigation?
>
> A. Submitted to me, no.
>
> . . .
>
> Q. Would you agree with me that the fundamental purpose of insurance is to indemnify a policyholder?
>
> A. Per the terms of the policy.
>
> Q. (By Mr. Archuleta) And just a broad question, but what is your understanding of what it means to indemnify a policyholder?
>
> A. To make whole.
>
> Q. Does that mean to return them to preloss condition?

A. Per the terms of the policy, yes.

. . .

Q. Does preloss condition include making sure repairs are done with like kind and quality?

A. Yes.

Q. And what is your understanding of what "like kind and quality" means as it relates to materials?

A. Of similar nature and quality.

Q. (By Mr. Archuleta) So if something pre-existed on the property, would you make your best effort to try to -- and it was damaged and needed to be replaced, you would try to get the same thing, correct, generally?

A. Per the terms of the policy, yes. (Pp. 31-33)

**Investigation/Evaluation of the Water Loss**

Based on my review of the produced documents, it is my opinion that Safeco failed to meet their obligations of good faith and fair dealings and failed to meet minimum industry standards in the handling of the insured's loss. This includes the obligation to give equal consideration to the interests of the insured. Safeco failed to conduct a reasonable and timely investigation and evaluation of the insured's first party loss and to timely pay all amounts owed under the policy. Industry standards are clear; the insured's responsibility is to report a direct loss to the insured property and the insurer is responsible to investigate and pay all covered damages.

The documents reflect that on or about January 31, 2017, the insured property sustained a loss from the sudden release of water from a plumbing/heating system.

The loss was reported to Safeco on January 31, 2017, claim 287152846039 was opened and initial written contact was sent. The claim file reflects several attempts at contacting the housekeeper, Sjoran Fitzpatrick. On February 3, 2017 contact was made with American Restoration and Lori Worthan. The loss was assigned to Mandy Winters and Nick Buller.

On February 6, 2017, Nick Buller begins his inspection; taking photographs writing his estimate, etc. and on February 17, 2017, Nick Buller completes his First Field Report, that includes, in part:

**DAMAGES:**
**DWG :**
This is a single family home, built in the 1970's with upgraded 2x6 wall framing. The home sits on a partial basement, crawlspace and slab. Living space in the home consists of 3 bedrooms, 1 full bathroom and 3 ¾ bathrooms, billiards room, mechanical room

(unfinished), living room, kitchen, dining room, office and family room. Home has an attached oversized 3 car garage. The home is repairable related to this loss.

**Exterior**

No exterior dwelling damage was noted on this loss. Exterior siding evidences moisture wicking, which is primarily due to moisture from snow over the winter.

**Interior**

Mitigation was nearly completed when FE re-inspected this loss; there are a few items, which may require tweaks to the estimate once the mitigation is fully completed. Insured is meeting with multiple contractors and will advise me once they have chosen one to move forward with.

**Upper Level**

On the upper level of the home, 2' flood cuts were present throughout all rooms except the hall bathroom and master suite. The library paneling was dry, but the paneling has been stained and requires replacement as it has a rough unfinished texture. Flooring throughout this level was removed, except for the tile in the bathroom and the flooring in the master suite. The carpet in the master bedroom will be removed as it suffered significant staining beyond cleaning. Due to the humidity in the home during and after the loss, there are noticeable cracks along the ceilings require joint tape repairs and ceiling painting. The ceilings in bedrooms 1&2 are over 14' and require scaffolding.

**Main Level**

On the main level the walls are being removed from floor to ceiling in all rooms except for the hall bathroom, laundry room, office and family room. The middle section of the home suffered direct impact and saturation from the water above and prevented any opportunity of drying. Saltillo tile runs throughout the main level except for the family room (vinyl) and laundry room (pre-finished wood). The Saltillo tiles are cracking throughout due to be water saturation and being installed directly onto particle board. The flooring is not damaged in the office or hall bathroom and will attempt to clean. Faux paint finishes on majority of walls, rough cut unfinished paneling on dining room walls and ceiling will require replacement. Trim and windows themselves will require repairs due to the moisture content in the home. Scraping and preparation for paint and stain will be required. Contractor pointed out moisture in between panes on a handful of windows; advised that appeared to be due to wear & tear as sealants on windows had separated and deteriorated over time. Kitchen cabinets and countertops were removed prior to National Restoration being allowed to inspect and provide an opinion. American Restoration was placed on notice as they violated a conversation FE had with them to leave in place for inspection. Cabinets were 42" uppers with alder wood faces and particle board boxes; lowers were the same. Countertops were 1" granite with 2" rough cut faces and edges placed directly on plywood subdeck; these were removed and destroyed in the process. Granite did present cracking on the surface during initial FE inspection and likely were not salvageable. Appliances will need to be detached and reset; will be inspected by appliance specialist to determine reparability, most appliances were built-in and would be considered dwelling. Per the mitigation company, backsplash was installed directly onto drywall. Insulation and vapor barrier removed on exterior walls.

**Basement**

On this level, the billiards room is being gutted down to the studs. Insulation on the exterior walls and ceiling were affected. Walls were finished with T&G paneling, drywall

and simulated wood paneling that was painted. The ceiling was acoustic popcorn. The flooring was carpet. No damage to the stone hearth. The bathroom will be gutted except for the shower, which will be dried from above and all sides. The vanity will be able to be cleaned and re-installed.
Will be hiring an engineer to opine on window condensation as well as stone patio discussed below in OS damages note.
**OS DAMAGES:**
Insured has reported damage to their 21' x 24' stone patio; will have engineer to review and determine cause of loss and reparability.
**PP DAMAGES:**
Home is well furnished and furnished with artifacts and very high end finishes.
**LOU DAMAGES**: **ATOR/ADOC: ☐ Yes ☒ No**
With mitigation and repairs, the process is likely to approach 5 months from DOL.
**DISCUSSED NORMAL LIVING EXPENSE STATEMENT: ☒ Yes ☐ No**
This was presented to insured onsite.
**ITV/UIR**:
Cost guide variances noted as follows: total livable sf measures 3,571; home is 2 stories; 40% basement, 40% slab & 20% crawlspace; roof is architectural shingles; siding is 90% pine and 10% stone veneer; garage doors are wood and stained; 1 full bathroom and 3 ¾ bathrooms. Heating is hot water baseboard with a boiler system; no AC unit noted; Saltillo tile 50%; engineered wood 10%, ceramic tile 10%, carpet 25% vinyl 5%; wall finishes 70% faux finish paint, 30% t&g paneling; ceiling 20% painted paneling, 80% faux finish drywall; exposed beams in living room, kitchen and family rooms; 2 fireplaces with chimney; water softener.
**WORKPLAN:**
Review any additional demo once mitigation is completed; work with insured's chose contractor on ACOR.

It is clear from the first inspection forward that this is not a typical home and it is questionable if Xactimate is a valid estimating platform without the use of custom entries throughout. Mr. Buller recognizes many of the concerns and issues with determining; the scope of damage, the scope of repairs, and the cost of repair.

Mr. Buller testifies that he relies on the estimating software to determine the cost of repair:

> Q. And what I'm asking is, when you are making a decision about how to make -- as a field adjuster, what the cost of repair is, what do you rely on to make that decision?
>
> A. Our estimating software. (P. 34)

Mr. Buller quickly retains an engineer for assistance. There is no indication of anyone at Safeco completing any due diligence to determine the qualifications and objectivity of Donan or Michael Stark prior to retention. If Donan was selected from a preferred provider/vendor program listing, further information is required regarding how the list was formed and maintained; and how/why Mr. Buller selected Donan and how Mr. Stark was assigned.

On March 2, 2017, Michael Stark from Donan performs an initial scope study of the insured dwelling and by March 6, 2017, has completed his initial report, that includes, in part:

*Conclusions*

. . .

Differential foundation movement occurs as a result of heave or settlement in the supporting soils. When foundation movements occur, stresses develop in the structure and finish materials, caused by the change in support conditions when the structure moves or distorts with the foundation. This differential vertical movement has resulted in the observed damages (cracks, separations, etc.) to the stone pavers and mortar joints at the back patio.

A majority of the areas of exterior cracks within the stone pavers and mortar joints within the northwest quadrant of the back patio are older in nature, as indicated by the weathered, rounded, and worn edges of the crack surfaces and an accumulation of debris within the cracks. These conditions are consistent with long-term movement as the result of an ongoing condition that has occurred over an extended period of time.

**However, newer cracks in the stone pavers and mortar joints with clean, sharp, and distinct edges are within localized areas along the east edge and at the southwest comer of the back patio. These conditions are indicative of new damages and recent movement of the patio.**

The broken pipe and subsequent water leak from within the residence that ultimately drained out and across the back stone paver patio, as reported by Ms. Worthan did not independently cause the recent differential movement of the patio surface. **However, the reported water loss event has contributed to the recent differential movement and relative heave/settlement of the back patio surface and has exacerbated the cracks within the stone pavers and mortar joints along the east edge and southwest comer of the back patio.**

. . .

**The observed condensation, water staining, and debris accumulation within the double glass panes at the identified window units at the Terranova residence are consistent with expected, long-term seal failure. The deterioration of the seals is the result of prolonged sun exposure and thermal expansion/contraction of both the glass panes and the air cavity during the installed lifetime of the window units.**

Cracks are in the glass of the interior, removable storm-window inserts at two east-facing window units in the basement, one west-facing window in the main-level office, and one east-facing window in the upper-level, north guest bedroom. Additionally, the interior glass is cracked at a west-facing double-paned window in the library. **The cracks are consistent with differential structural movement and minor framing deflections, in**

> **conjunction with expansion and contraction of the glass window panes resulting from seasonal fluctuations in ambient temperature and relative humidity. The broken windows are not the result of the recent water leak.**
>
> *Summary of Conclusions*
> In summary, based on what is known at this time, I am of the opinion that:
>
> • The cracks in the stone pavers and mortar joints on the back patio are the result of long-term soil movement.
> **• The reported broken pipe and subsequent leak contributed to and exacerbated the existing cracks along the east edge and southwest comer of the patio.**
> • The condensation within the exterior single-pane window units with removable interior storm-window inserts is not the result of the recent water leak. These window configurations are not damaged or defective.
> **• The condensation of moisture and the water stains between the panes of the insulating glass of the double-paned windows are the result of typical age-related deterioration of the seals at the perimeter of the units.**
> **• The deterioration of the seals is the result of prolonged sun exposure and thermal expansion/contraction of both the glass panes and the air cavity during the installed lifetime of the double-paned window units.**
> **• The cracks on the interior panes of the five identified windows are consistent with differential structural movement and minor framing deflections, in conjunction with expansion and contraction of the glass window panes.** (emphasis added)

The investigation may require the assistance of experts outside the company. When hiring an outside expert such as an engineer to assist in the investigation, the good faith duties remain. In order to fulfill the obligation to be fair to the insured and to hold the insured's interests at least equal to its own, the insurer must be diligent in hiring only qualified, objective and unbiased experts. When the report is received, the claim handler must objectively review the report and compare the information within to all the known facts and other information collected during the claim investigation. If the report raises relevant questions, leaves issues unresolved, or does not adequately explain the findings in clear language, the claim handler must continue the investigation. The AIC textbook, "The Claims Environment" (Markham, First Edition, 1993), discusses the use of experts in the handling of claims. It states, "When an insurer relies on the expertise of others, it can relieve or reduce its bad faith exposure. It is still required to use care in reviewing the material it receives from the experts. Insurers should have in-house experts who can confirm or refute the opinions that they receive from outside experts." (p283)

The report by Donan raises significant questions that the insurer and claim handler must address prior to relying on it to deny or reduce the claimed damages. For example, Donan attributes the newer damage to the patio area as resulting from the current water loss. As the report states:

> The broken pipe and subsequent water leak from within the residence that ultimately drained out and across the back stone paver patio, as reported by Ms. Worthan did not independently cause the recent differential movement of the patio surface. **However, the reported water loss event has contributed to the recent differential movement and**

> **relative heave/settlement of the back patio surface and has exacerbated the cracks within the stone pavers and mortar joints along the east edge and southwest comer of the back patio.**

Further, the Donan report details condensation of moisture and the water stains between the panes of the insulating glass of the double-paned windows. However, as most experienced claim handlers recognize, window failure typically occurs either to a few random windows, due to age, etc., or to windows on a specific elevation, due to sun exposure, direct wind, or other elements from that specific direction. These questions must be asked and resolved prior to excluding these damages. There is no indication of any questioning the engineer for clarification.

The report also details cracks in the windows caused by expansion and contraction. How the high humidity and freezing event may have been the direct cause of this is not questioned.

The Donan report does not appear to analyze or provide a study/examination of the temperatures during the time of the water loss, calculations to determine the volume of water that escaped, and how these combined or may have combined to cause damage. There is no indication that Donan conducted any studies on how temperature and humidity impact windows, There is no indication that Donan requested photos of the structure prior to the loss for comparison.

However, the Donan Report does mention the importance of reviewing such information when it says:

> Many factors lead to failures of the seals: opening and closing the windows; changes in wind direction; **temperature fluctuations**; opening and closing doors in the house; and **changes in atmospheric pressure** all cause cyclic stresses on the windowpanes, frames, and seals. Exposure to radiation from the sun and environmental pollutants can also cause stress to window seals. Impact from insects, birds, rain, hail, and other objects can also contribute to wear. Such impacts will rarely break the seal of a healthy window, but they **can be the last straw for one already weakened by age and exposure**. Expansion and contraction of the air trapped between the panes can repeatedly flex the panes back and forth. Exposing the seals to water can also decrease their performance. Over time, the repeated wear takes its toll. Studies indicate that even properly installed, highquality windows have a 1-percent failure rate after 10 years and a 3-percent rate after 15 years. Lower-quality windows can expect to have even higher failure rates. Failure rates increase with windows receiving more direct sunlight. (emphasis added)

Also, the speed which the report was completed after the inspection was very unusual, especially for such an unusual and complex loss. Specifically, Michael Stark inspected the property on March 2, 2017 and he completed his 32 page report with photographs by March 6, 2017. After reviewing hundreds of files involving engineering reports, this type of speed in almost unheard-of.

Mr. Buller makes it clear in his deposition that he would not consider questioning an engineer, and simply assumes the engineering report is complete:

Q. (By Mr. Archuleta) Okay. Now, is it your recollection that Donan made a determination that the windows were damaged from -- from wear and tear?

A. Generally, my recollection is the windows were not -- their opinion was the windows were not damaged relative to this sudden incident that occurred.

Q. Do you know if Donan Engineering, or Michael Starke, eliminated other causes that might have caused the window damage?

A. I'm not -- I'm not involved in their decision-making process. I don't know how they go about evaluating it.

Q. (By Mr. Archuleta) When you are evaluating an engineering opinion, do you think it's important that your engineer eliminates other causes of potential loss?

A. To me, it's important for the engineer to evaluate what caused the loss.

Q. Is it important to you in reviewing that opinion, when you are making a coverage decision, that the opinion is based on sound scientific methodology?

A. My expectation is the engineer is thorough and substantiated in their evaluation. (Pp. 97-98)

Nick Buller goes on to explain that even though the report lists other factors that may have caused the window failures, his expectation is simply that the engineer completed a thorough and supported evaluation and because he is not a part of their evaluation process, he does not question any question that arises in the report. He further admits that he does not understand what the engineer is talking about where the report states that a change in atmospheric pressure or temperature fluctuations may have caused or contributed to the window failures:

Q. Okay. On the page I'm looking at -- it's ECF 002041 of the same Exhibit 3 -- I've highlighted some factors that Donan says for why sealers might – why seals of windows may fail. Do you see that?

A. Yes.

Q. They write, opening and closing the windows might cause window seal failures; do you have any reason to question that?

A. I do not.

Q. Change in wind direction; do you have any reason to question that?

A. I do not.

Q. Temperature fluctuations; do you have any reason to question that?

A. I do not.

Q. Opening and closing doors in the house; do you have any reason to question that?

A. No.

Q. Changes in atmospheric pressure all -- pressure all cause cyclic -- this is changes in atmospheric pressure. Sorry. Do you have any reason to question that factor?

A. No.

Q. Do you understand what he's saying when he makes these statements?

A. Yes.

Q. (By Mr. Archuleta) Okay. So do you know whether or not Donan Engineering eliminated as a factor for the window seal failure here whether opening and closing the windows may have caused it, the cause of the loss to the windows?

A. My expectation is that they completed a thorough and supported evaluation of the damages and ultimately the cause.

Q. But did you, yourself, ask them whether or not they eliminated these other factors in determining that the cause of loss was not caused by water, a sudden water -- a sudden water event?

A. Again, I -- I'm not party to their evaluation process.

Q. (By Mr. Archuleta) Okay. Did you talk with Michael Starke at all related to this report?

A. I don't recall any specific conversations.

Q. (By Mr. Archuleta) Did you have any questions for Michael Starke about this report when you received it?

A. I don't have any recollection of that, no.

Q. If you had talked with Michael Starke about this report, would it be documented in the claims notes?

A. I would expect, yes.

Q. Okay. And just a question about this: What is your understanding about what a change in atmospheric pressure means?

A. I'm not certain in terms of what they're referencing in this particular example.

Q. Okay. Temperature fluctuations; do you understand what that means in this context?

A. Yeah, I -- I don't know.

Q. (By Mr. Archuleta) Okay. Did you at all talk with Donan Engineering about this report after they sent it to you?

A. I don't have any recollection of any specific conversations with them.
. . .

Q. (By Mr. Archuleta) Well, I'm asking you your opinion. So I -- I have Donan's report. What is your opinion about whether or not humidity caused the loss of the windows -- the window damage?

A. -- my -- my opinion on what the cause was previously noted.

Q. But it was not humidity -- that caused the window loss, true?

A. Correct. (Pp. 98-102)

According to the policy language, the property is covered under all risk coverage. This policy provides direct physical loss coverage for the insured structure. This covers all direct physical loss to the property unless otherwise excluded. Again, this type of coverage is commonly referred to in the industry as **"all risk"** coverage. Once the covered property suffers a loss and it is reported to the insurance company, the responsibility to determine the cause(s) of loss and the amount of damage falls to the insurer. If an exclusion in the policy applies, it is up to the insurer to investigate and determine what specific damage is excluded from coverage and the balance of the claim should be paid timely. The insurance industry recognizes that this "all risk" type of language is very broad and the exclusions that accompany this language are to be interpreted narrowly. The Chartered Property and Casualty Underwriter (CPCU) textbook, "Insurance Contract Analysis" (Wiening, First Edition, 1992) discusses this type of policy compared to a named peril policy and explains:

> When a property policy is written on an "all risks" basis – with or without the "all," the policy does not say so, but the insured has the burden to show only the existence of an "all risks" policy and loss to covered property. The insured is not required to establish the cause of loss. Indeed, it can be much easier to establish the damage or destruction of property than it is to show its cause! Once the insured fulfills these minimal requirements, the insurer, if it wishes to preclude coverage, must then prove that the claim is excluded from coverage.
>
> Sometimes an insurer simply points to one or more exclusions as the basis for denying a loss under an "all risks" policy. This is not enough. The insurer must also show that the loss was proximately caused by the excluded peril. This places an especially heavy burden on the insurer because the contract of adhesion doctrine suggests that exclusions

> in the policy usually will be given the interpretation that is most beneficial to the insured. To sustain the burden of proof, it is not enough for the insurer merely to offer one reasonable interpretation under which the loss is excluded… With an "all risks" policy, on the other hand, the heaviest burden is on the insurer to prove that the loss was caused by an excluded peril. In both instances, this burden is not specifically addressed in the policies. (p391)

Instead of asking questions or requesting additional information, Mandy Winters almost immediately adds a claim note directed to Nick Buller detailing her coverage decision:

> Nick,
>
> I had a chance to review Donan's report. Thank you for engaging them to investigate the issues with the windows and patio further.
>
> In review, I'm in agreement that there would be no coverage for the window damages as they do not appear to be caused by the water loss claim, but that of wear and tear, deterioration and weather over time.
>
> The engineer states the patio damages were exacerbated by the water loss, but was a pre-existing condition due to expansion/contraction of the soil beneath over time and weather. I agree with you as the policy states the following:
>
> BUILDING PROPERTY LOSSES WE DO NOT COVER
>
> We do not cover loss caused directly or indirectly by any of the following excluded perils. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.
>
> These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area;
>
> 9. Earth Movement, meaning:
>
> a. the sinking, rising, shifting, expanding or contracting of earth, all whether combined with water or not.
>
> I agree that there would be no coverage based upon the opening language that any losses caused indirectly or directly by one of the exclusions, as well as contributing concurrently with one of the excluded perils. Unfortunately we would not have coverage for the patio damages under the claim.

On March 9, 2017, Mandy Winters sends the insured a partial denial letter that includes, in part:

> We have estimated that the rebuild of your damaged property could take up to 6 months. We will be able to afford coverage for your additional living expenses until September 1st, 2017. If you feel an extension is necessary, please provide a letter signed by you and

your contractor indicating what caused the delay and if it is insurance-repair related. Extension requests will be considered upon review of your correspondence and any attached supporting documentation. Safeco Insurance Company of America does not cover additional living expenses incurred as a result of changes, additions, alterations, or upgrades that are not related to the repair of damages covered by your policy and that extend the construction time frame.

We have received the pricing back on the Saltillo tiles and have adjusted our scope accordingly to reflect the pricing. A supplemental payment has been issued as follows, and the check has been sent separately.

Below is a breakdown of the payment issued to include the tile replacement. This payment has been made co-payable with you and your lender, Chase Home Finance. A copy of our scope will be e-mailed to you, so that you may provide to them.

Dwelling

| | |
|---|---|
| Total Estimate of Damage | $132,118.79 |
| Recoverable Depreciation | $24,588.36 |
| Prior Payments | $86,362.32 |
| Deductible | $2,500.00 |
| Total Payment | $18,668.11 |

After a review of your policy and the facts that have come to our attention, Safeco Insurance Company of America regrets that it is unable to pay for a portion of your claim because your policy does not provide coverage for part of the loss. Our reasons for this partial denial are as follows:

As you are aware, this claim arises from freezing pipes that burst and flooded the home. We contacted Donan Engineering to inspect the exterior patio as well as the condensation and cracking noticed on some of the windows. Our investigation revealed that your home was constructed in an area known to have expansive soils. This along with the fact that parts of the grade surrounding the home, slope into it which causes drainage to accumulate close to the structure. The water is absorbed by the soil and can cause movement. The damages to the stone patio revealed evidence of pre-existing damage caused by soil movement over time, as well as new damage that was likely exacerbated by the recent freeze loss with the resulting excess water.

The condensation and water stains on the windows were found throughout all elevations and levels of the home and are expectant of long-term seal failure with contributing factors such as weather and age. The recent freeze loss was not found to be the cause of these issues. Furthermore, the engineer confirms there are no damages to the windows themselves due to the staining and that the cracked windows were the cause of structure movement likely from the expansive soils. We will provide you with a copy of the

engineer's report for your review.

Unfortunately, your policy does not provide coverage for the damages to the patio stone pavers or the cracked and stained windows due to the following policy provisions.

Your HOMEOWNERS POLICY (HOM-7030EP 1/09), SECTION I-PROPERTY COVERAGES section states in part:

SECTION I-PROPERTY COVERAGES
BUILDING PROPERTY LOSSES WE DO NOT COVER

We do not cover loss caused directly or indirectly by any of the following excluded perils. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area;

5. continuous or repeated seepage or leakage of water or steam, or the presence or condensation of humidity, moisture or vapor which occurs over a period of weeks, months or years.

6. a. wear and tear, marring, scratching, deterioration;

b. inherent defect, mechanical breakdown;

c. smog, rust or other corrosion, or electrolysis;

d. smoke from agricultural smudging or industrial operations;

e. settling, cracking, shrinking, bulging, or expansion of pavements, patios, foundations, walls, floors, roofs, ceilings, swimming pools, hot tubs, spas or chimneys;

f. birds, vermin, rodents, insects or domestic animals;

g. pressure from or presence of plant roots.

However, we do insure for any resulting loss from items 1. through 6. unless the resulting loss is itself excluded under Building Property Losses We Do Not Cover in this Section. If loss to covered property is caused by water or steam not otherwise excluded, we will cover the cost of tearing out and replacing any part of the building necessary to repair the system or appliance. We do not cover loss to the system or appliance from which water or steam escaped.

9. Earth Movement, meaning:

> a. the sinking, rising, shifting, expanding or contracting of earth, all whether combined with water or not. Earth movement includes but is not limited to earthquake, landslide, mudflow, mudslide, sinkhole, subsidence, movement resulting from improper compaction, site selection or any other external forces, erosion including collapse or subsidence of land along a body of water as a result of erosion or undermining resulting from the action of water. This includes the channeling of a river or stream;
>
> b. erosion, shifting or displacement of materials supporting the foundation; and
>
> c. volcanic blast, volcanic explosion, shockwave, lava flow, lahars and fallout of volcanic particulate matter. This exclusion applies whether the earth movement is caused by or resulting from human or animal forces or any act of nature.
>
> We do cover direct loss by fire, explosion or theft.
>
> 17. Weather that contributes in any way with a cause or event not covered in this section to produce a loss. However, any ensuing loss caused by a covered peril and not otherwise excluded is covered.
>
> We are willing to reevaluate this decision if you have any new facts or information you believe may affect coverage of your claim. If you have new information, provide it to us in writing at your earliest opportunity.

The above denial letter fails to meet industry standards as there is no explanation as to why each cited Exclusion applies to the loss. The letter cites Exclusions 5,6,9, and 17.

Exclusion 5 excludes loss caused by "continuous or repeated seepage or leakage of water or steam, or the presence or condensation of humidity, moisture or vapor which occurs over a period of weeks, months or years." The letter and/or report only point to condensation in the windows as evidence of wear and tear, not a cause of loss. There is no explanation as to why the give back language does not apply. The policy states:

> However, we do insure for any resulting loss from items 1. through 6. unless the resulting loss is itself excluded under Building Property Losses We Do Not Cover in this Section. If loss to covered property is caused by water or steam not otherwise excluded, we will cover the cost of tearing out and replacing any part of the building necessary to repair the system or appliance. We do not cover loss to the system or appliance from which water or steam escaped.

Exclusion 6 (wear and tear; settling, cracking of pavements) like Exclusion 5, clearly gives back coverage for any resulting loss.

Exclusion 9 does not appear to apply to the facts and the denial letter fails to explain how/why it applies.

Exclusion 17 applies to weather. This exclusion also provides coverage for any ensuing loss not excluded. The denial again, does not connect this exclusion to the facts of the loss.

Further, a review of the photos and notes clearly reflect the Safeco estimates to date are deficient and the bottom line amount not adequate to restore the home. This includes numerous open items within the estimate. The undervaluation appears undisputed and is very evident as Safeco continues to adjust their estimate in the following months. After the Donan report, it appears Safeco abdicated the investigation to determine what was owed to the insured.

The above letter also details the COVERAGE D – ADDITIONAL LIVING EXPENSE AND LOSS OF RENT coverage under the policy. The coverage states:

> 2. If a loss covered under this Section makes that part of the residence premises where you reside uninhabitable we cover Additional Living Expense, meaning the necessary increase in living expenses you incur so that your household can maintain its normal standard of living.
>
> Payment shall be for the shortest time required, not exceeding 24 months, to repair or replace the damage or to permanently relocate.

The ALE time limit of 24 months applied to this loss is discussed in Mr. Buller's deposition. He interprets this as 24 months from the date of loss and not 24 months of total coverage.

> Q. And I'm not trying trick questions on you. I thought I had found the one before. So it says, "Payment shall be for the shortest time required, not exceeding 24 months, to repair or replace the damage or to permanently relocate." Is that right?
>
> A. You read that statement correct, yes.
>
> Q. Is that 24 months of ALE coverage, or is it 24 months from the date of loss? What is it?
>
> A. Right. My understanding is 24 months from the date of loss.
>
> Q. (By Mr. Archuleta) Does it say that?
>
> A. I don't see that right there.
>
> Q. Okay. So it doesn't say it in the provision that it's from the date of loss, correct? Please review it. Take your time.
>
> A. So there's other endorsements that speak to additional living expense, and there's probably more than -- more than this. I believe there's at least three bullet points. So I would have to review it in full, as well as any state endorsements. But, you are correct, it doesn't say "from the date of loss" right in that section. (Pp. 186-187)

Industry standards state that when there are two different interpretations of policy language, both a reasonable interpretation, an insurer must apply the one that is most favorable to the insured. The relevant and well-established principles of insurance policy interpretation (and industry standards) may be described as follows:

- Any ambiguities that may exist in an insurance policy -- involving two conflicting interpretations of a policy provision wherein one interpretation is favorable to the insured and one is favorable to the insurer -- are always decided in favor of the insured;

- An insurance policy is interpreted in accordance with the reasonable expectations of the insured;

- An insurer must give at least equal consideration to the insured's interests;

- Undefined words are given their common meaning.

On May 24, 2017, Nick Buller enters a claim note regarding a call from the insured's contractor:

> Call in from contractor/ he is disputing our material and labor pricing for the subfloor. He advised T&G 3/4" is $30/sf and his labor is higher than ours. He is at $15,490 for 2,140 = $7.24/sf. This is far above what our pricing is currently. He advised his estimate pales in comparison to what the customers are working on to send over; they have hired an architect/an engineer and other companies to assist in being "made whole." Don does not want to meet on Monday 6/5 as he wants to hear back from the customer

It appears that as a result of the Donan report and Safeco estimate, in June 2017, the insured retains SBSA to inspect the home. On September 25, 2017, SBSA submits their report that includes, in part:

> Per your request, SBSA, Inc. (SBSA) observed the residence located at 43 West Ranch Trail in Morrison, Colorado and reviewed information on the above-noted claim. This work was performed by Andrew J. Rudeen, MAE, EI on May 10, 2017. The site observation included visual observations of the exterior and interior of the residence, as well as a relative level survey of the main floor joists and basement slab-on-ground. The results of the observation are presented herein. For the purposes of this report, the home faces east.
>
> BACKGROUND INFORMATION:
>
> SBSA was contacted to evaluate the condition of the residence following a radiant floor heater leak at the second floor. The leak was reportedly discovered in January 2017 and introduced approximately 14,000-gallons of water into the residence. The leak originated at the southeast bedroom baseboard heater. The interior finishes in the basement and first floor had been completely removed prior to SBSA's site visit. The floor finishes and 2-feet of drywall above the second floor framing had also been removed.

## CONCLUSIONS:

### A. STRUCTURAL

### 1. FOUNDATION SYSTEM

#### a. Foundation Performance

Based on the results of the relative elevation survey of the main floor framing, minimal differential movement of the foundation system has occurred. The maximum slope of the foundation occurs at the north foundation wall in the crawlspace below the den. No visible damages to the floor decking, framing, or foundation wall were visible at this area. **This indicates the out-of-levelness occurred before the reported leak.**

In addition, the majority of the foundation system in the full basement is within typical construction tolerances. The maximum slope of the floor framing above the full basement occurs at the southeast corner of the basement and slopes toward the north 6/16-inch over a distance of approximately 8-feet (L/256). **Based on this, any minor differential movement occurring at the residence likely occurred before the leak.**

### 3. FLOOR SYSTEM – WOOD FLOOR

#### a. Moisture Damaged Floor Sheathing

The floor sheathing at the first floor reportedly consisted of two layers of sheathing prior to the leak occurring. The top layer of the sheathing had been removed prior to SBSA's observation. The bottom layer of sheathing was left in place.

The exposed sheathing at the first floor is stained and visibly warped due to the introduction of water from the second floor leak. The sheathing deflected and cracked under light pressure. Similar conditions are present at the second floor sheathing. Water staining and warping are present ranging from the master bedroom door to the south wall of the hall bathroom. Based on the observed conditions, the sheathing at the first and second floor is not adequate to be built on for structural framing purposes as the structural integrity has been reduced.

### 4. FRAMING

#### a. Corroded Beam Connections

The bolted steel angle connections at the second floor beams are corroded. The connections are tight and significant section loss was not observed at any of the connections. Given the amount of water introduced by the leak, the surface corrosion of the connections was likely a result.

b. Increased Checking and Torsion in Exposed Wood Beam

Longitudinal cracks (checking) are present at the 6x12 floor beams throughout. Checking, twisting, and shrinkage of the exposed timber framing are consistent with rapid changes in temperature and moisture content in the wood. Normal and expected drying of the wood beams does not result in the amount of damage present in this home. Some minor checking and shrinkage of the wood will occur naturally due to moisture contents in the timbers reaching equilibrium. However, the checking and separation of the exposed timber framing throughout the residence is substantial and beyond expected performance.

In addition to the observed beam checking, twist of the framing has created gaps and separation at some of the beam supports that would not have been present in original construction. The beam ends below the second floor sitting room and south wall of the southeast bedroom are both displaced and rotated at the supports.

The leak event led to high humidity levels at the residence which created an increase in the moisture content in the exposed timber framing. This rapid change in temperature and moisture content in the wood resulted in the increased longitudinal cracking, twisting, and shrinkage of the exposed timber framing beyond normal performance. This resultant damage is both cosmetic and functional damage to the timber framing. Therefore, the resultant damage to the exposed timber framing is directly related to the water loss event.

B. CIVIL

1. FLATWORK

a. Cracked Flagstone Patio

Mortar joint separations are present at the flagstone patio and the rear of the residence and are the result of water from the reported leak penetrating the soils below and freezing. When water freezes, the volume increases approximately 9- percent. The increased volume resulted in an increased vertical pressure under the flagstone patio. The resultant damages manifested as separated mortar joints and isolated flagstone cracks. There is limited debris in the mortar crack and the edges of the cracking remain sharp; there is no evidence of aging in the separation.

C. BUILDING ENVELOPE

Multiple cracked and inoperable windows are present throughout the residence. The leak event introduced additional moisture and humidity into the residence which saturated the window framing. The increased moisture content of the window framing, in turn, caused swelling of the window framing. The water leak reportedly occurred in January 2017. During this time, external temperatures were below the freeze point of water. When water freezes, it expands in volume. The expansion of water as it froze caused additional

> swelling of the window framing and increase pressure on the glass panes. The increased pressure then resulted in broken glass panes and inoperable windows.

On June 24, 2017, Nick Buller sends an email to Lori Worthan with his revised estimate. The email includes:

> I hope you and Vinny are doing well. Attached is a copy of my current estimate based on my re-inspection with your contractor at the property; please note, this is not the final estimate, as there are some items we are waiting on before finalizing the estimate. Here is a snapshot of what we are waiting on:
>
> - Framing code for the basement exterior walls; it has been identified by your contractor that these may not be up to current code. In order for coverage to trigger per your policy, we would need to confirm this is an enforced code in your county. This has been communicated to your contractor and my last conversation with him, was that he was waiting to hear back from them.
>
> - Electrical code concerns due to rusting as well as updating the outlet boxes. The same applies to this as above; your contractor is stiII waiting to hear back.
>
> - There was some concern raised by your contractor regarding HVACi's pricing of the baseboard heater replacements; Don stated to me, he would provide me with a bid. We are still pending this.
>
> I have offered to contact Jefferson County to discuss with them directly, but Don refused to provide me with their contact information. Could you please provide me with a copy of the permit pulled for this project, so that I can attempt to reach out to the building department directly in an effort to speed up their response.
>
> I am here to assist you through the claims process, so if at any time, you have any concerns, please make me aware of them as soon as possible, so I can address them immediately.

On August 16, 2017, Safeco includes a supplement for $59,777.93. The Safeco estimate totals RCV $208,009.45, ACV $183,976.27. This estimate fails to reasonably address the building issues identified in the SBSA report and continues to use the February 2017 price list, instead of the current one. No explanation is given for using the outdated price list.

On August 30, 2017, Nick Buller sends an email to Lori Worthan:

> I hope this message finds you well. I appreciate your patience during my review of Grey Eagle Builder's estimate; I have received approval on my revised estimate, which I have attached to this email for your reference. The updated estimate will be sent to Grey Eagle Builders as well for their review; there are a few questions I have for Mr. Greenless, that I will address with him directly. A supplemental payment, based on our revised estimate

has been issued to Vinny and the mortgage company; Mandy Winters will be reaching out to you shortly to review.

A few items of note:

- Our estimate is still pending documentation regarding the kitchen appliances (I understand you will be sending these to Mandy Winters at your earliest convenience)

- Grey Eagle Builders' estimate included pricing for windows/sliding glass doors and the stone patio. I have attached a letter dated March 9th of this year sent out by Mandy regarding the engineer's (Donan) evaluation and determination that those damages were not caused by this water loss event. To date, we have not received any documentation to support otherwise.

- Grey Eagle Builders' estimate also included damage to the driveway. This damage was caused by American Restoration and it would be their responsibility to make you whole. If you'd like, I can reach out to American Restoration to make them aware of these damages if they were not already and coordinate communication between you and them.

- The policy provides coverage to restore you to pre-loss condition; thus, my estimate is written to do so, with consideration for the known code upgrades presented at this time by Grey Eagle Builders. Should any additional code enforceable items be discovered, they will be addressed accordingly with your contractor.

On September 27, 2017, Safeco’s Mandy Winters sends the insured a letter advising of a supplemental payment bringing the total RCV damage to the dwelling to $208,009.45. Ms. Winters states the rebuild will take 4 months and any additional time, within the insured’s control, including securing a contractor willing to complete the work in accordance with the Safeco estimate will not be covered.

Below is a breakdown of the actual cash value of your property, which is what your policy provides. This amount is based on a thorough review of the damages and the facts of the loss and the cost of the repairs.

Dwelling

| | |
|---|---|
| Total Estimate of Damage | $208,009.45 |
| Recoverable Depreciation | $24,033.18 |
| Prior Payments | $105,030.43 |
| Deductible | $2,500.00 |
| Total Payment | $76,445.84 |

On November 29, 2018, the claim notes a call with the insured as well as sending the insured a

copy of the engineer report accessing the flagstone porch and windows. The claim note includes:

> Contacted Lori Worthan @ 720-570-6988 1 left vm, advised calling to check in. Contacted Vincent Terranova @ 303-570-15351 advised calling to touch base. He advised he is not happy with our company and that we need to learn to pay. Advised insured that we have communicated with him and with his contractor regarding open items and have not received any response to date. He inquired which items those were and I advised that we have sent multiple letters without response. Advised we are trying to move this forward and we'd like to meet out at the property with his contractor and an IPN contractor to finalize the estimate; he advised our contractors are sub-standard and will not allow them onto his property. I advised as well that his contractor's estimate includes many items that are not covered, because they were not damaged by the loss. He stated that was my opinion, I advised that is not accurate, that we engaged an engineer to inspect and provide their analysis and that this report has been sent to them previously. He requested I send him an email with the report, advised will do so. Insured then hung up the call.

On January 14, 2019, Safeco is advised that Michael Stoycheff has been retained as the insured's public adjuster. The correspondence includes:

> Our company has been retained by the above referenced insured to assist in the adjustment of their insurance claim. Enclosed is a copy of the Notice of Representation form signed by the insured. Please direct all future correspondence regarding this claim to our office as so noted below.
>
> As we are approaching the two-year anniversary of this loss, and the claim has not been resolved, we are requesting that Safeco to toll the two year period for filing suit pursuant to tll.is policy provision. It is only 20 days to the expiration of our contractual notice period, and we do not want to retain counsel to protect our rights. Please advise in writing by the end of next week, that Safeco is tolling m1til this claim is successfully adjusted.
>
> In order to assist in the adjustment of this claim, we would appreciate it if you would provide a Certified Copy of the Policy and Declaration page in force for this insured at the time of the loss. If applicable. if there is a notification provision in the policy in regard to putting your company on notice of intent to make claim for replacement cost loss, please let tll.is letter serve to do so. The insured retains the right to repair rebuild or replace the damaged property. Documentation will be submitted as soon as it is received.
>
> The insured intends to comply with all provisions of the policy and requests that your company do so as well. Should the policy contain provisions that require tile submission of a proof of loss, the insured will rely on the insurer to provide adequate notice to fulfill this requirement. If the insurer is unable to do so, please notify me as soon as possible.
>
> It will be necessary for anyone who wishes to view tile loss to contact us for an appointment. We look forward to working with you or your representative to do so in a timely manner. Might you advise me as to whom that person might be if it is not you?

On July 12, 2019, Derek Pumphrey of New Rome completes his engineering report on the loss. This includes, in part:

**PURPOSE AND SCOPE**

The purpose of our observation was to determine the following regarding the aforementioned site:

1. To determine the cause of the observed damage to the windows, glass sliding doors and interior finishes.
2. To provide repair recommendations associated with these observed distress items.

Note: Our observations only encompassed structural members and portions of the interior and exterior building finishes. Only limited destructive testing and/or removal of existing materials was performed as part of this scope of work and as identified in this report; otherwise no destructive testing was performed. The observations and opinions are only for the observed structural and specific building systems of the noted structure(s) at the sites. No other structures outside of the listed sites was / were observed, and a laser level survey was not conducted as part of the scope of work. Only limited measurements were recorded on site

**CONCLUSION**

It is our opinion, based upon a degree of engineering certainty, that the observed distresses at the interior of the residence noted are the result of exposure to inflections in the interior atmospheric conditions, especially lower dew point temperatures, that occurred after the ruptured radiant-heat line and the resulting shut-down of the boiler.

1. The ruptured water supply line - that supplied the baseboard heat from the boiler (that was located in the basement) to the rooms within the residence - was the root cause of the observed interior distresses to the residence. It is the understanding of this office that this ruptured line occurred in the Master Bedroom on the Upper Floor. Once this line ruptured, then the introduction of the moisture from the 14,000 gallons of water within the interior of the residence, along with dropping temperatures in January 2017, resulted in increases in relative humidity, loss of interior heat and subsequent lower dew point temperatures within the interior. As a result, moisture was introduced to many of the surfaces of interior finishes, fixtures and materials. For example, because the lower dew point temperature occurred after the ruptured radiant heat line, the resulting surface moisture that occurred damaged rafter insultation, drywall (a partial collapse occurred in the Kitchen in early 2017), floor sheathing, exposed metal surfaces and exposed wood surfaces. Examples include:

   a. The original plywood floor sheathing in the Living Room, Kitchen and adjacent rooms had evidence of significant water damage (as noted in the SBSA Original Report) to the point of loss of composite sections of the plywood layers. This required

replacement of these sheathing locations, which occurred prior to our site observation.

b. Water-staining on the exposed metal connections at the Kitchen area, which is evidence of surface water creation from a lower dew point temperature. The resulting water staining / corrosion as noted above occurred at these connections.

c. Existing cupping of the newer floor sheathing near the main entry / Kitchen areas indicates that the relative humidity and lower dew points were likely still in fluctuation after removal of the original floor sheathing.

d. Water stains on wall-hung pictures as observed in the provided photographs.

2. Based upon the data of the dehumidification efforts by American Restoration, changes in relative humidity and temperature - and by extension the interior air pressure - continued to occur from the commencement of these efforts (February 3, 2017) to the final date of entry (February 17, 2017). Therefore, these interior atmospheric factors exhibited distress on the interior surfaces of the residence, including the window glazing systems, long after the initial pipe rupture occurred.

   a. The Donan Report noted that "Many factors lead to the failures of the seals (in window glazing): opening and closing the windows, changes in wind direction, temperature fluctuations opening and closing doors in the house; and changes in atmospheric pressure all cause cyclic stresses on the windowpanes, frames and seals." (Page 6; underlined letters added for clarity in this reference).

   b. Because of the extreme introduction of temperature, relative humidity, moisture content and pressure within the house in a short time period (i.e. January and February 2017), then the damaged seals and loose gaskets that were observed in the double-pane windows is the result of short-term inflection of interior atmospheric conditions that resulted after the water line rupture. We agree with the Donan Report that extreme temperature, pressure and relative humidity changes can alter the performance of glazing. Add to these atmospheric changes the lower dew point temperatures on interior glazing surfaces and the result is what was observed at this residence: Loss of seal and gasket performance and a noticeable reduction in the effectiveness and performance of the window systems that was not apparent before the ruptured radiant line.

   c. The broken glazing at the glazing inserts is also the result of surface moisture at the adjacent stud framing to the windows and the subsequent alteration to the rough opening dimensions with the alteration to the stud dimensions.

3. The Donan report also noted that differential foundation movement caused the cracking in the interior storm window glazing that was observed in the Basement and the Upper Floor on the east-facing walls and the west-facing wall of the Office on the Main Floor.

   a. The glazing cracking at these individual window locations located along the north wall do not provide evidence that differential movement caused this cracking since the relative survey results from the SBSA Report of June 1, 2017 indicate an out-of-plane measurement of just greater than 1-inch on the Main Floor level and less than 1-inch at the basement floor level, with the low-point at each floor located at the north

wall located beneath the Master Bedroom. The greatest slope also occurred from this north wall to the east wall with a measured differential movement of ½".

b. Since this survey was conducted in May 2017 and the measured greatest differential movement occurred at foundation locations that are not along the walls where these cracked glazing were located, then the notion of any differential foundation movement damaging the glazing on the east wall is not logical. Rather, the introduction of significant interior atmospheric differential temperatures, pressures, humidity and dew point temperatures that then caused the adjacent framing to move with the noted cracking in the adjacent glazing is a more definitive explanation of the observed distress.
c. Aside from the supped OSB locations near the Office on the Main Floor, no evidence of excessive differential displacement in the flooring on any level was observed via foot placement along the locations of these floor levels.
d. It is therefore not a logical conclusion that the observed glazing cracking was the result of any differential foundation movement, but rather the result of significant interior atmospheric conditions immediately after the radiant heat line rupture.

4. The owner has noted that the windows did not have sagging gaskets or fogging at the double glazing prior to the ruptured line event. The photographic evidence of the residence in February 2017 provides evidence that the distress to the seals and gaskets has worsened since these photographs were taken and only occurred after the radiant heat line ruptured.

5. The exposed 6x wood beams at the Main Entry and the Kitchen were utilized primarily for decorative purposes, with the exception of the beam at the Main Entry and the roof girder beam at the north side of the Living Room. The photographs provided by the owner provide insight into the reasons for the water stains and warping of these beams: The drywall ceiling over these locations (Main Entry, Kitchen and Living Room) contained moisture after the ruptured water line to the point that excessive condensation occurred beneath the ceiling paint (near the Main Entry) and within the drywall ceiling and walls in the Kitchen. The amount of moisture in the drywall ceiling resulted in a partial collapse of the ceiling near the Kitchen window. The amount of trapped moisture, again due to the lower dew point within the interior after the baseboard heat no longer functioned and water was introduced within the interior, was the root cause for this excessive moisture and for the staining and warping of these exposed beams.

6. Other exposed beams, such as at the stairs near the Kitchen and the roof beam over the Sitting Room at the Upper Floor, had experienced checking after the ruptured radiant heat line.

On October 21, 2019, Michael Stoycheff sends Mandy Winters the completed partial Proof of Loss.

The SBSA report, detailed earlier in this report, was submitted to Safeco in October 2019 and much of the information/opinions were ignored or discounted by Safeco even though the SBSA report addresses numerous structural issues not addressed by Donan as well as damage to windows

caused by the water loss and freeze. This engineering report does not result in any significant action by Safeco; including a re-evaluation, a re-inspection with the engineer, or drafting a coverage letter on the SBSA findings. As Nick Buller explains his obligations and processes in his deposition:

> Q. Now, if an expert makes a decision on a claim, for instance, your expert, what do you do to evaluate if that decision is -- or if that – that recommendation is accurate?
>
> A. I review information that they present relative to my findings and the policy.
>
> Q. So you compare it to your previous findings, correct?
>
> A. I -- I compare it with any information available to me at the time.
>
> . . .
>
> Q. (By Mr. Archuleta) Now, would you agree with me that you can have a difference of opinion between, say, your expert and one retained by the named insured?
>
> A. Sure.
>
> Q. When you are presented with that kind of conflict between opinions, do you agree that you have a duty to weigh all the information equally?
>
> A. Yes.
>
> Q. And would you say that you do that?
>
> A. Yes.
>
> Q. Okay. It would not be fair if you just pick your expert over theirs, correct?
>
> A. We need to evaluate all information provided.
>
> Q. Okay. Do you think that part of your job duties include, for instance, selecting nonbiased experts?
>
> A. Yes.
>
> . . .
>
> Q. So when you are evaluating competing expert opinions, you would agree with me that it's not fair to default to your expert's opinion, correct?
>
> A. We need to evaluate all the information provided. (Pp. 51-54)

The most that occurs from the SBSA report is that on October 29, 2019, Nick Buller conducts a triage review with Mandy Winters and their respective supervisors. The SBSA report is discussed during Nick Buller’s deposition:

Q. Okay. And the SBSA engineer finds that external temperatures were below the freezing point of water during the loss date. Did you do any kind of evaluation about the temperature on the date of loss?

A. Personally, no.

Q. (By Mr. Archuleta) Do you recall anyone telling you that it was below freezing on the date of loss?

A. I recall there being opinions that that's what caused the leak to occur, is a freeze in the pipe.

Q. Okay. And this opinion is saying that the expansion of water caused by freezing allowed additional swelling of the window frames. Is that something that you reviewed prior to receiving this report from anyone?

A. So I have not received this particular opinion until the public adjuster included it in the proof of loss. This is the first I saw of it.

Q. (By Mr. Archuleta) What did you think of this opinion when you received it?

A. I don't recall my thoughts.

Q. (By Mr. Archuleta) Okay. Do you disagree with the opinion that is presented on this page that we are looking at, that the water -- that the freezing temperatures caused the glass to -- the seal on the glass windows to break?

A. My -- my opinion is that when we get two competing engineering reports, that we engage the engineers to review collectively at that point. That's the next step.

Q. You would want both of them to meet at the property; is that right?

A. Correct.

Q. Would you be part of the discussion of that kind of meeting, generally?

A. I would frame the purpose of the meeting, what it's trying to accomplish, but it's for them to complete their analysis.

Q. Okay. And if they can't meet -- if they can't come to an agreement on something, would that be your job to make the final decision, since you are making the coverage decisions?

A. We would review all the information that's available and make the appropriate decision based on the policy.

> Q. (By Mr. Archuleta) So in this case -- correct me if I'm wrong -- but the engineer for the public adjuster and your engineer did not come to an agreement on the cause of the window loss, correct?
>
> A. I don't recall that they did come to an agreement on the full scope of the window damage. (Pp. 154-156)

On October 29, 2019, the files notes the summary of the claim Triage that includes:

> Claim Note – MANCOO
>
> Triage Summary
>
> held call with management and stakeholders
>
> reviewed documents submitted by the PA including engineering and consultant reports and estimate of repairs
>
> estimate submitted includes previously denied damages under the claim
>
> partial proof submitted, relating only to DWG - agree will draft response and loop in PPS for inspection of the contents still outstanding
>
> FS to arrange for re-inspection with experts and contractor in effort to resolve differences in scope/cost

On November 19, 2019, a joint reinspection was completed by Michael Stark of Donan; Ms. Lori Worthan; Mr. Nick Buller and Ms. Kim Albert, Claim Resolution Specialists with Safeco; Mr. Scott Sarkisian, Senior Estimator with All Phase Restoration; Mr. Michael Stoycheff, Executive and General Adjuster with Adjusters International Matrix Building Consulting; Mr. Don Greenless, Owner of Gray Eagle Builders; and Mr. Derek Pumphrey, P.E., Engineer with New Rome Enterprises, LLC.

This re-inspection that occurred on November 19, 2019, and documented in the claim file the following day, is also discussed in Nick Buller's deposition where he states that he did not form any new opinions or get any new information as that was not the purpose of the reinspection:

> Q. Okay. Tell me if I'm scrolling too fast. There's a lot of pictures, and I don't want to ask you about all of them. We'll be here, literally, all day. So at this inspection, November 19, 2019, you did not form an opinion whether or not the windows were retrofit or flange windows, correct?
>
> A. Not to my recollection, no.
>
> Q. Okay. Because you weren't going to replace any of them, correct?

A. I'm sorry. The windows were not part of our scope of repairs.

Q. Okay. All right. So at the -- going back to Exhibit 22, the second-to-last line at the bottom, it says, "At this time, we are pending the Donan updated engineering report." Did you make any kind of determination or change your opinion at this November 19, 2019, inspection?

A. That wasn't the purpose of the inspection. I'd requested and framed that the engineers review and evaluate each other's opinions and provide an updated report. (Pp. 169-170)

On November 24, 2019, Donan's Michael Stark completes and submits his supplemental report. This 12 page report includes, in part:

> Additionally, Safeco provided Donan with additional documents from the insured' s engineers for review and comment. These documents included: Observation Report prepared by Solutions Before Solutions After (SBSA), dated June 1, 2017, observed by Mr. Andrew J. Rudeen, M.A.E, E.I., signed and stamped by Ms. Liberty L. Lewis, P.E.; Observation Report prepared by SBSA, dated September 25, 2017, observed by Sameer Rampurawala, E.I., signed and stamped by Mr. Jerad B. Faris, M.S.C.E., P.E.; and Report prepared by New Rome, dated August 21, 2019, signed and stamped by Mr. Derek E. Pumphrey, P.E. The purpose of the joint reinspection, as indicated by Safeco, was to observe the existing conditions of the back stone patio and the windows and to evaluate the cause of cracking damage to the patio and the condensation within the windows. Further, although it was outside the scope of work for the initial assignment, it was requested by Safeco that Donan provide an opinion regarding the replacement of wood suppo1t beams as recommended by the insured's engineers. The following are Donan's observations, comments, and conclusions regarding the additional joint reinspection site study and response to the provided documents.
>
> *Item 2, Window Condensation*
>
> *Document Review*
> Within the Observations section of their Report, New Rome states the following:
> *"Damage to several windows was also observed thus:*
>
> *a. Loose interior seals of the double-pane, west-facing windows at the Dining Area. The provided photographs from 2017 do not reveal the same degree of loose seals during the dehumidification procedures.*
>
> *b. Fogged double-pane window to the north of the sliding door at the Dining Area. No evidence of this fogged double-pane window was observed in the provided photographs during the dehumidification process.*
>
> *c. Loose gasketing of the Dining Area windows.*
> *[ ... ]*

Within the Conclusions section of the report, New Rome states the following: *"Based upon the data of the dehumidification efforts by American Restoration, changes in relative humidity and temperature - and by extension the interior air pressure - continued to occur from the commencement of these efforts (February 3, 2017) to the final date of entry (February 17, 2017). Therefore, these interior atmospheric factors exhibited distress on the interior surfaces of the residence, including the window glazing systems, long after the initial pipe rupture occurred."* New Rome continues: *"Because of the extreme introduction of temperature, relative humidity, moisture content and pressure within the house in a short time period (i.e. January and February 2017), then the damaged seals and loose gaskets that were observed in the double-pane windows is the result of such short-term inflections of interior atmospheric conditions that resulted after the water line rupture. We agree with the Donan Report that extreme temperature, pressure and relative humidity changes can alter the performance of glazing. Add to these atmospheric changes the lower dew point temperatures on interior glazing rand the result is what was observed at this residence: Loss of seal and gasket performance and a noticeable reduction in the effectiveness and performance of the window systems that was not apparent before the ruptured radiant line occurred."*

Within the Repair Recommendations section of the report, New Rome states the following: *"Remove the damaged window glazing and frames and replace with new double pane windows. Ensure that these new windows are installed per manufacturer recommendations, which includes the flashing at the sill, jambs and top to ensure code-compliant (i.e. manufacturer recommended installation techniques)."*

*Donan Response*

During the re-inspection of the house, window conditions similar to those documented during the initial study were observed. These conditions are comprised of debris accumulation (rather than active condensation), staining, and/or water streaks on the glass panes of numerous window units. The windows with these observed conditions include units within the living room, kitchen, dining room, and stairwell on the main level, and the guest bedrooms, bathroom, hallway nook, library, master bedroom, and lookout on the upper levels. Additionally, portions of the perimeter seals are deteriorated, displaced, and/or missing around the interiors and exteriors of multiple windows.

Donan concurs with New Rome that potentially extreme changes in the temperature, relative humidity, moisture content, and pressure occurred within the house as a result of the prior water loss event. These extreme changes transpired over a relatively short timeframe, from roughly late-January 2017, when the broken pipe and leak occurred, to reportedly February 17, 2017, when the dehumidification efforts were completed.

These changes in the temperature, relative humidity, moisture content, and pressure contributed to the process of the condensation of moisture occurring within numerous window units at the residence. However, the root cause of the moisture condensation is the deteriorated, displaced, and/or missing conditions of the perimeter seals at multiple

windows. These conditions, as were previously observed during the initial study, were consistent with long-term failure events due to typical age-related deterioration of the seals.

As stated within the Summary of Conclusions section of the original report, *"The condensation of moisture and the water stains between the panes of the insulating glass of the double-paned windows are the result of typical age-related deterioration of the seals at the perimeter of the units."* Additionally, it was stated, *"The deterioration of the seals is the result of prolonged sun exposure and thermal expansion/contraction of both the glass panes and the air cavity during the installed lifetime of the double-paned window units."*

The joint reinspection of the subject windows and the provided documents from the insured 's engineers do not provide any new data or information that would require Donan to revise the conclusions in the original report. Therefore, the conclusions related to the window condensation remain unchanged as originally submitted.

*Item 3, Broken Window Glazing*

*Document Review*

Within the Conclusions section of the Observation Report dated June 1, 2017, SBSA states the following: *"Multiple cracked and inoperable windows are present throughout the residence. The leak event introduced additional moisture and humidity into the residence which saturated the window framing. The increased moisture content of the window framing, in turn, caused swelling of the window framing. The water leak reportedly occurred in January 2017. During this time, external temperatures were below the freeze point of water. When water freezes, it expands in volume. The expansion of water as it froze caused additional swelling of the window framing and increase pressure on the glass panes. The increased pressure then resulted in broken glass panes and inoperable windows."*

Within the Repair Recommendations section of the same report, SBSA states the following: *"Remove and replace all broken and/or inoperable windows throughout."* SBSA provides nearly identical conclusions and repair recommendations regarding the broken and/or inoperable windows in their Observation Report dated September 25, 2017.

Within the Observations section of their Report, New Rome states the following: *"Damage to several windows was also observed thus:*

. . .

*Donan Response*

During the re-inspection of the house, window conditions similar to those documented during the initial study were observed. These conditions included windows with cracked glass panes at the following locations: two east-facing units in the basement, one west-

facing unit in the library, one west-facing unit in the main-level office, and one east-facing unit in the upper-level north guest bedroom. Additionally, isolated windows were noted to not fully operate and open/close.

The cracks are consistent with slight differential movement and minor framing deflections, in conjunction with expansion and contraction of the building materials resulting from fluctuations in ambient temperature and relative humidity. Donan concurs with New Rome that changes in the temperature, relative humidity, moisture content, and pressure occurred within the house as a result of the prior water loss event. The framing deflections and expansion/contraction of both the glass panes and adjacent wall and window framing components were exacerbated by the variation of interior atmospheric conditions resulting from the prior water loss event and that continued to occur during the dehumidification process. In this manner, the windows with broken glass window panes and/or the units that do not fully operate/open/close were adversely affected by the prior broken pipe and subsequent water loss event.

*Item 4, Wood Support Beams*

*Document Review*

Within the Conclusions section of the Observation Report dated June 1, 2017, SBSA states the following: *"Longitudinal cracks (checking) are present at the 6xl2 floor beams throughout. Checking, twisting, and shrinkage of the exposed timber framing are consistent with rapid changes in temperature and moisture content in the wood Normal and expected drying of the wood beams does not result in the amount of damage present in this home. Some minor checking and shrinkage of the wood will occur naturally due to moisture contents in the timbers reaching equilibrium. However, the checking and separation of the exposed timber framing throughout the residence is substantial and beyond expected performance.*

*In addition to the observed beam checking, twist of the framing has created gaps and separation at some of the beam supports that would not have been present in original construction. The beam ends below the second floor sitting room and south wall of the southeast bedroom are both displaced and rotated at the supports.*

*The leak event led to high humidity levels at the residence which created an increase in the moisture content in the exposed timber framing. This rapid change in temperature and moisture content in the wood resulted in the increased longitudinal cracking, twisting, and shrinkage of the exposed timber framing beyond normal performance. This resultant damage is both cosmetic and functional damage to the timber framing. Therefore, the resultant damage to the exposed timber framing is directly related to the water loss event."*

Within the Repair Recommendations section of the same report, SBSA states the following: *"The torsional displacement alters the bearing condition at each end of the exposed beam. While this has limited impact on the structural performance of the beam,*

*this altered alignment and increased checking alters the original aesthetic and prevents reinstallation of properly aligned and detailed wall finishes. Remove and replace the existing beam in kind."* SBSA provides nearly identical conclusions and repair recommendations regarding the increased checking and torsion in the exposed wood beams in their Observation Report dated September 25, 2017.

Within the Observations section of their Report, New Rome states the following: *"Observation of stains and warping of the exposed wood beams include the following:*

> *a. Warping of the 6 x 12 roof girder beam at the north end of the Living Room was observed, with noticeable warping at the east bearing end. Noticeable water staining and surface checking and deterioration of this girder beam was also observed, particularly from the first metal connection near the west side along the length toward the east bearing end.*

. . .

Within the Conclusions section of the report, New Rome states the following: *"The exposed 6x wood beams at the Main Entry and the Kitchen were utilized primarily for decorative purposes, with the exception of the beam at the Main Entry, the roof girder beam at the north side of the Living Room and the supported north-south roof beam over the Living Room. The photographs provided by the owner provide insight into the reasons for the water stains and warping of these beams: The drywall ceiling over these locations (A1ain Entry, Kitchen and Living Room) contained moisture after the ruptured water line to the point that excessive condensation occurred beneath the ceiling paint (near the Main Entry) and within the drywall ceiling and walls in the Kitchen. The amount of moisture in the drywall ceiling resulted in a partial collapse of the ceiling near the Kitchen window. The amount of trapped moisture, again due to the ruptured line in conjunction with lower dew point temperatures within the interior after the baseboard heat no longer functioned, was the root cause for this excessive moisture and for the staining and warping of these exposed beams."* New Rome continues: *"Other exposed beams, such as at the stairs near the Kitchen and the roof beam over the Sitting Room at the Upper Floor, had experienced checking after the ruptured radiant heat line."*

Within the Repair Recommendations section of the report, New Rome states the following: *"Remove the exposed and warped wood beams over the Kitchen Area, the Main Entry and to the north of the Living Room. Since the three (3) beams at the Main Entry, the roof girder beam at the north end of the Living room and the north-south roof beam at the Living Room are structural, then the supported roof rafters, floor joists (at the Main Entry) and other roof beams will need to have temporary shoring installed prior to the removal and replacement of these beams."* New Rome adds: *"For the beams that have experienced only checking (i.e. at the stairs and above the Sitting Room), use wood filler and other repair techniques to provide an appearance that matches the original."*

*Donan Response*

> During the re-inspection of the house, conditions of the wood support beams generally similar to those documented within the SBSA and New Rome reports were observed. These conditions included varied degrees of longitudinal cracking (or checking) and twisting of the support beams throughout the house. At isolated locations, the extent of twisting or warping of the member has created gaps and/or separations between the supports at the ends of the beams.
>
> In particular, the three support beams above the main entry, kitchen, and living room areas, respectively, as identified by New Rome above, exhibited conditions consistent with excessive twisting or warping of the member. This excessive twisting and warping has resulting in torsional displacement or rotation of the ends of the beams slightly off their bearing supports as initially installed.
>
> As it was outside the defined scope of the initial assignment, the checked, twisted, and/or conditions of the three identified beams were not directly observed or documented during the March 2017 study. However, the variation of interior atmospheric conditions and changes in temperature and moisture content of the wood support beams resulting from both the prior water loss event and dehumidification process contributed to the increased longitudinal cracking, twisting, and shrinkage of the exposed wood support beams beyond what would normally be anticipated.
>
> In this manner, the three support beams above the main entry, kitchen, and living room areas, respectively, as identified by New Rome above, were adversely affected by the changes in temperature and moisture content resulting from the prior broken pipe and subsequent water loss event. Donan concurs that the recommended removal and replacement of the three, main-level wood support beams as identified in the New Rome report are reasonable and appropriate

Based on the two engineering reports from the insured's experts, as well as the Donan report and supplement, it appears clear that the windows and patio continue to be areas of clear disagreement. While Safeco recognizes the unusual and extreme facts of the loss, Safeco does not appear to consider identifying a window expert to resolve the issue. Instead, continues to rely on their chosen engineer to maintain their denial of the damage to the windows, contrary to the two experts provided by the insured. Also, the Donan report refers to the fact that temperature fluctuations and changes in atmospheric pressure can result in damage to the windows and other factors can "be the last straw for one already weakened by age and exposure."

There is no explanation as to why Mr. Buller favored the opinion of his expert over the reports sent by its insured. This appears contrary to his testimony detailed earlier in this report. The loss is again reviewed by a group of Safeco employees in a Triage. On December 6, 2019**,** a summary of the claim triage is entered:

> Claim Note – MANCOO
>
> Triage summary

> held call w/ stakeholders
>
> discussed issues w/ potential further damage to contents stored in PODs on site, with no attention and exposure to harsh winter elements in over 2 years.
>
> Agreed letter sent previously and on multiple occasions notifying insured that further damage to items inside PODS would not be covered, furthermore damage unrelated to the water loss due to their storage would not be covered
>
> agree to re-iterate in letter to encompass dwelling damage seen in recent inspection
>
> PPS to work on sorting out prior payments for TL items along with TL items outstanding. Will request payment for items due
>
> will request call with legal stakeholder to discuss REDACTED

On December 10, 2019, Mandy Winters sends the insured a denial and reservation of rights letter with the reinspection results and contents concerns:

> This letter is a follow up to our recent re-inspection of your home and personal property located at 43 W Ranch Trl., Morrison, CO 80465. During the inspection, we observed a large amount of personal property stored into two pods, along with the attached garage and a detached bam. It is our understanding that the personal property items stored onsite, have remained in their current location for at least 2 years. Boxes were seen to have water lines as well as rodent feces throughout the pods and other storage areas.
>
> At this time, we have not confirmed the condition of these items, however please be advised that we had previously communicated to you in numerous correspondence, that there would be no coverage under your policy for any damages that may have ensued to the contents, as a result of but not limited to, improper storage, failure to mitigate, or exposure to harsh weather elements. It is your duty to protect your home and personal property from further damage and maintain your property following a loss.
>
> We made multiple attempts to reach out to you to assist with moving your belongings to a climate-controlled facility, in order to avoid any potential harm or damage to the contents. You had requested we contact your contractor, Don Greenless, to find out about the personal property. When we inquired with Don about the contents, he was unable to provide any information as to their condition, or if items needed to be addressed further. We also requested on multiple occasions to re-inspect the dwelling with a local contractor, in order to reach a resolution on the damages caused by the water loss. We received notice of representation by Adjusters International in January of2019. Following Adjusters International's involvement, a re-inspection was made available and took place on November 191h, 2019. During this inspection we observed the home to be in a gutted state, without any heat and evidence of lack of maintenance for an extended period. To re-iterate, it is your responsibility to protect your home from further damage and to

maintain your property following a loss and we would be unable to cover for any damages ensued, as a result of failure to do this.

Here's a recap of what we are still waiting for from you, in order to process the claim further:

We are still awaiting additional items in order to resolve your claim, please let us know the status of and submit the following information as soon as you have available:

1. Pinball machine report/evaluation including repair estimates by the technician
2. Additional contents packout costs, completed by your contractor, Grey Eagle Builders

Furthermore, we have previously issued a payment to you in the amount of $78,373.38 on 9/9/17, for the costs of cleaning/restoring your damaged art per the estimate received from Colorado Arts. A corresponding letter dated 9/12/17 outlining this payment, was also sent to you as well as a phone call placed to Lori Worthan. We were recently informed by Ivfike Bettman, that the art is still being stored by Colorado Arts, however no restoration has started. We are uncertain if additional damage has ensued to the art, due to a lack of prompt repair, however you may wish to have Colorado Arts start on restoration in order to avoid any additional damages. We are unable to provide coverage for any additional damages to the art, that may have ensued due to a lack of repair or mitigation.

At this time, we have received your contractor's estimate along with engineers reports and are reviewing this documentation. We are also awaiting further engineering reports following our reinspection of your property on November 19th, 2019. Once we have completed our review, we will be in touch with your public adjuster's office to discuss.

We now refer you to your policy form HOM-7030EP 1/09 HOMEOWNERS POLICY & HOM- 71 OOCOEP 11114 SPECIAL PROVISIONS - COLORADO which states in part:

SECTION I-PROPERTY COVERAGES

BUILDING PROPERTY LOSSES WE DO NOT COVER

We do not cover loss caused directly or indirectly by any of the following excluded perils. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area;

1. freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system, or of a household appliance, or by discharge, leakage or overflow from within the

system or appliance caused by freezing, while the dwelling is vacant, unoccupied or under construction, including being newly built, remodeled, reconstructed, renovated or repaired. This provision does not apply if you have used reasonable care to:

a. maintain heat in the building; or
b. shut off the water supply and drain the system and appliances of water;

2. freezing, thawing, pressure or weight of water, ice or snow whether driven by wind or not, to a swimming pool, hot tub or spa, including their filtration and circulation systems, fence, landscape sprinkler system, pavement, patio, foundation, retaining wall, decorative or privacy wall, bulkhead, pier, wharf or dock;

5. continuous or repeated seepage or leakage of water or steam, or the presence or condensation of humidity, moisture or vapor which occurs over a period of weeks, months or years.

6. a. wear and tear, marring, scratching, deterioration;
b. inherent defect, mechanical breakdown;
c. smog, rust or other corrosion, or electrolysis;
d. smoke from agricultural smudging or industrial operations;
e. settling, cracking, shrinking, bulging, or expansion of pavements, patios, foundations, walls, floors, roofs, ceilings, swimming pools, hot tubs, spas or chimneys;
f. birds, vermin, rodents, insects or domestic animals;
g. pressure from or presence of plant roots.

However, we do insure for any resulting loss from items 1. through 6. unless the resulting loss is itself excluded under **Building Property Losses We Do Not Cover** in this Section. If loss to covered property is caused by water or steam not otherwise excluded, we will cover the cost of tearing out and replacing any part of the building necessary to repair the system or appliance. We do not cover loss to the system or appliance from which water or steam escaped.

9. Earth Movement, meaning:

a. the sinking, rising, shifting, expanding or contracting of earth, all whether combined with water or not. Earth movement includes but is not limited to **earthquake**, landslide, mudflow, mudslide, sinkhole, subsidence, movement resulting from improper compaction, site selection or any other external forces, erosion including collapse or subsidence of land along a body of water as a result of erosion or undermining resulting from the action of water. This includes the channeling of a river or stream;
b. erosion, shifting or displacement of materials supporting the foundation; and
c. volcanic blast, volcanic explosion, shockwave, lava flow, lahars and fallout of volcanic particulate matter.

This exclusion applies whether the earth movement is caused by or resulting from human or animal forces or any act of nature.

We do cover direct loss by fire, explosion or theft.

10. Water Damage, meaning:

a. (1) flood, surface water, waves, tidal water, tsunami, seiche, overflow of a body of water, storm surge or spray from any of these, whether or not driven by wind, including hurricane or similar storm; or
(2) release of water held by a dam, levee, dike or by a water or flood control device or structure;

b. water below the surface of the ground, including that which exerts pressure on, or seeps or leaks through a building, wall, bulkhead, sidewalk, driveway, foundation, swimming pool, hot tub or spa, including their filtration and circulation systems, or other structure;

c. water which escapes or overflows from sewers or drains located off the residence premises;

d. water which escapes or overflows from drains or related plumbing appliances on the residence premises. However, this exclusion does not apply to overflow and escape caused by malfunction on the residence premises, or obstruction on the residence premises, of a drain or plumbing appliance on the residence premises; or

e. water which escapes or overflows or discharges, for any reason, from within a sump pump, sump pump well or any other system designed to remove water which is drained from the foundation area.

Water includes any water borne materials.

This exclusion applies whether the water damage is caused by or resulting from human or animal forces or any act of nature.

Direct loss by fire, explosion or theft resulting from water damage is covered.

12. Neglect, meaning your failure to use all reasonable means to save and preserve property at and after the time of a loss, or when property is endangered.

17. Weather that contributes in any way with a cause or event not covered in this section to produce a loss. However, any ensuing loss caused by a covered peril and not otherwise excluded is covered.

18. Planning, Construction or Maintenance, meaning faulty, inadequate or defective:

a. planning, zoning, development, surveying, siting;

b. design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

c. materials used in repair, construction, renovation or remodeling; or

d. maintenance;

of property whether on or off the insured location by any person or organization. However, any ensuing loss not excluded is covered.

**SECTION I-PROPERTY CONDITIONS**

3. An Insured's Duties After Loss. In case of a loss to which this insurance may apply, you must perform the following duties:

a. cooperate with us in the investigation, settlement or defense of any claim or suit;

b. give immediate notice to us or our agent;

c. notify the police in case of loss by theft;

d. protect the property from further damage, make reasonable and necessary repairs required to protect the property and keep an accurate record of repair expenses;

e. prepare an inventory of the loss to the building and damaged personal property showing in detail the quantity, description, replacement cost and age. Attach all bills, receipts and related documents that justify the figures in the inventory;

f. as often as we reasonably require:

(1) exhibit the damaged and undamaged property;

(2) provide us with records and documents we request and permit us to make copies; and

(3) submit to examinations under oath and subscribe the same. We may examine you separately and apart from your spouse, civil or domestic partner, or any other insured

You shall not interfere with us examining any other insured

8. Suit Against Us. No action shall be brought against us unless there has been compliance with the policy provisions.

**SECTION I-PROPERTY COVERAGES**

**BUILDING PROPERTY LOSSES WE DO NOT COVER**

Item 6.f. is deleted and replaced by the following:

f. birds, vermin, rodents, insects or domestic animals, except for breakage of glass;

Safeco Insurance Company of America respectfully continues to reserve any and all rights and defenses under the policy and any applicable state laws, which may now exist or which may arise in the future. No waiver or estoppel of any kind is intended or should be inferred. We do not waive any of the terms, conditions or requirements of the policy. If you have any questions, please contact me at the number below

On December 16, 2019, Nick Buller sends Michael Stoycheff an email advising receipt and sending of updated estimate from All Phase, Donan Engineering Report, and updated Safeco estimate. Also, Nick Buller updates payment Breakdown reflecting the RCV for the dwelling to now be $218,657.51 with an additional $10,614.67 paid as a supplement. Again, Safeco elects to use the outdated price list from the date of loss. Buller's notes include:

Supporting Documentation:
FS completed re-inspection as noted in file on 11/20/19. All Phase Restoration completed a review of the damages and updated an estimate for which the above payment is based on. This reflects the agreed cost of repairs with All Phase related to the 1/31/17 water loss. The period of repairs per All Phase is 4-5 months.

There is no explanation whatsoever for whether Nick Buller discussed with All Phase whether they would agree to price the same job at 2017 prices in 2019. Other than the pricing issue that is not addressed, it appears that by December 16, 2019 Liberty Mutual/Safeco has reached an agreement on the estimate with their own retained contractor:

Q. The date of the estimate looks like 12/16/2019. If we go down to the bottom -- I just want to make sure we are talking about the same estimate. See the number 218,000 on this page, page 48 of the estimate? Do you see that?

A. Yes.

Q. Is that the same number as the -- Exhibit 23, 218,657.51?

A. Appears to be, yes.

Q. Okay. Did you base Exhibit 23's claim note on Exhibit 24, the All Phase Restoration amount?

A. I did not, no. They agreed to -- we reached an agreement as it relates to the sum of the damages. So I have an updated estimate as well with the same figure.

Q. (By Mr. Archuleta) The same figure, okay. So you have your own estimate, but it's the same number, correct?

A. That's correct.

Q. Okay. Is there a reason you draft an estimate even though they have an estimate? I'm just asking.

A. So they were sent a copy of our estimate. They were requested to review and make adjustments that they would see necessary in order to restore the customer to preloss condition. They sent back that estimate, and we agreed upon that final number. (Pp. 189 - 190)

Q. Well, a different question is, where do you store draft estimates? On your desktop computer? Or where do you store them?

A. They're housed within the mobile desktop application of Xactimate.

Q. Are they accessible later, the drafts?

A. Yes. Well, they are accessible as they're in draft form. Once they're updated and completed, the drafts are no longer available.

Q. That's your understanding, correct?

A. That's my understanding, yes.

Q. Okay. Do you know if Liberty Mutual would have had a copy of the draft estimate you submitted to All Phase Restoration?

A. I don't. (Pp. 197-198)

Based on other claim documents I have reviewed, I am of the understanding that draft estimates are stored in the documents tab of XactAnalysis as a "rejected" document. If a claim handler creates an estimate then sends it out without uploading to be saved in Xactimate, the file is saved before exporting. The file must be manually deleted or it remains in the system.

With the dwelling damage continuing to be dispute, on January 27, 2020, the insured retains counsel and a letter of representation is sent to Mandy Winters and Nick Buller with a formal request for Appraisal. The letter states:

> By way of introduction, Merlin Law Group has been retained to represent the interests of Vincent Terranova, with regard to its claim for direct physical damage under Policy No.

OY7555527 and Claim No. 287152846039 resulting from a hail and windstorm occurring on January 31, 2017.

In an effort to provide both parties additional time to address and resolve outstanding items in the claim adjustment, please find a draft Tolling Agreement for your review and consideration. Please let us know at your earliest convenience if you are amenable to entering into said agreement. If we do not receive a response prior to, or you are not agreeable to enter into a tolling agreement, Vincent Terranova will be forced to file suit on or before January 31, 2020 to preserve his rights under the policy of insurance and Colorado law.

Please allow this correspondence to serve as Vincent Terranova's written request to participate in the appraisal process outlined within the insurance policy. In compliance with the terms of the policy, Vincent Terranova is appointing Brent Johnson to serve as his chosen appraiser. Mr. Johnson's contact information is below:

Brent L. Johnson
Brent L. Johnson Appraiser
803 Roland Avenue Chariton, IA 50049
Direct: (515) 559-4828
heartlandpa@yahoo.com

Please confirm Safeco Insurance Company of America will participate in the appraisal process and appoint its chosen appraiser.

Further, please consider this our formal request for a certified copy of the insurance policy including all attachments, applicable endorsements, declaration page(s). and applications in full force and effect at the time of the loss. Further, please provide our office with all recorded statements, correspondence, videos, statements, examination under oath transcripts, engineering reports, and estimates in your possession regarding this claim, along with any documents and information relied upon by Safeco Insurance Company of America in its coverage decision. Please also provide any underwriting documents that may provide the parties with information relating to the condition of the property and any prior claims made by your insured if being relied upon by Safeco Insurance Company of America in its coverage decision.

Please be reminded, there may be documents and/or exhibits which only Safeco Insurance Company of America or its agents may have which are related to Vincent Terranova's claim. Therefore, as these matters may be pending for quite some time before those various documents are identified, please consider this your insured's written request that any written or electronic files, documents, exhibits, handwritten notes, telephone messages, or other items in any related to the property and its policy, not be compromised, purged, lost destroyed or mishandled in any fashion. Rather, we ask that all such written, printed and electronic documents and other materials are guarded carefully until this matter is concluded in rota by either a judgment or an executed Settlement Agreement/Release.

By January 28, 2020, Safeco names Mark Neufeld as their appraiser. The appraisal provision and selection of an appraiser is detailed in Nick Buller's deposition. Mr. Buller agrees that when selecting an appraiser, you are selecting an individual, not a company. He further agrees that it would be inappropriate to make any attempt to influence the appraiser

> Q. (By Mr. Archuleta) Sure. Do you agree with me that this policy, the policy for Vincent Terranova, includes an appraisal clause?
>
> A. Yes.
>
> Q. Have you read the clause before?
>
> A. Yes.
>
> Q. Okay. Do you -- if you want, we can review it. But I can tell you that it says that each side will require -- pick a competent and disinterested appraiser. Does that sound right, "competent and disinterested"?
>
> A. Yes.
>
> . . .
>
> Q. (By Mr. Archuleta) So I'll -- what I'm asking is, do you have a duty under the policy's appraisal clause to appoint one person to adjust the claim on behalf of Liberty Mutual?
>
> A. Correct. We're assigning an appraiser.
>
> Q. Okay. And that -- "appraiser" means a person, not an entity, correct?
>
> A. Yes.
>
> Q. So it would be inappropriate to appoint, for instance, J.S. Held as the company, correct?
>
> A. Per the policy, you must name an appraiser.
>
> . . .
>
> Q. For instance, are you allowed to influence your appraiser's decision-making process?
>
> A. No.
>
> Q. Okay. That would be inappropriate, correct?
>
> A. Yes.

. . .

Q. Okay. Who was your appraiser on this claim?

A. Mark Neufeld, with J.S. Held. And it's N-e-u-f-e-l-d.

Q. Thank you. How did you go about determining or picking Mark for this appraisal?

A. J.S. Held, I had worked with them in the past, and it was assigned to them, and subsequently Mark.

Q. Had you worked with Mark before?

A. Not in this capacity as an appraiser, no.

Q. Okay. Did you pick Mark or did you pick J.S. Held?

A. I picked Mark.

. . .

Q. (By Mr. Archuleta) I'll reask the question. Does that mean -- does the word "disinterested" mean that the appraiser you select can advocate for your position?

A. I don't know. No. The appraiser is hired to provide an opinion.

Q. (By Mr. Archuleta) Is it supposed to be an independent opinion?

A. Yes.

Q. Is it supposed to be your opinion?

A. No.

Q. Okay. Would it be inappropriate for you to tell your appraiser how to appraise the loss?

A. Yes.

. . .

Q. Okay. And how important is it to you that appraisers conduct investigations without your influence?

A. It's part of the appraisal clause.

. . .

Q. (By Mr. Archuleta) If you tell your appraiser how to limit the award based on what coverage is available in the policy, is that allowed?

A. No. (Pp. 56- 62)

Also on January 28, 2020 Mandy Winters sends a letter to the insured's attorney, Jon Bukowski and Nick Buller sends the following to Safeco's appraiser, Mark Neufeld:

Here are the following items related to the above new appraisal:

- Latest ESX & PDF from All Phase Restoration for the repairs
- Latest Donan Engineering report regarding the deterioration/wear & tear (non-covered) to the windows, flagstone patio and covered water damage to exposed beams
- My initial photos • Initial & Follow-Up inspection report from SBSA (hired by insured)
- Repair estimate & beam repair estimate from Grey Eagle Builders (insured contractor)

Nick Buller's deposition goes into the above documents sent to Safeco's appraiser, the timing of those documents being sent, and why older, outdated documents are provided and not newer ones:

Q. (By Mr. Archuleta) Okay. He had the updated estimate, but this spreadsheet was outdated, correct?

A. This spreadsheet was not updated, reflective of the updated bid provided by Grey Eagle.

Q. Okay. And since it was outdated, do you know why you submitted it to him?

A. As stated previously, I wanted to make sure we had any information that I felt was relevant.

Q. (By Mr. Archuleta) Did you think it was relevant that he think the number from Grey Eagle was 407,000?

A. I don't know what he thought the number was. I made sure that he had all the information that I felt was relevant. (Pp. 217-218)

Another example of Mr. Buller sending early documents to the appraiser include the 2017 photos that were not specific to determining the amount of loss at the time of the appraisal. Mr. Buller's intent in providing the documents:

Q. Well, why did you send the 2017 photos to Mark Neufeld and not the 2019 photos?

A. I wanted to make sure Mark knew what the property looked like the earliest time I saw it. (Pp. 208-209)

By November 23, 2020 Safeco and the insured have agreed to extent a tolling agreement 5 times.

By the end of January 2021, the selected Umpire has become involved and on March 9, 2021, the Umpire inspects the loss.

On April 3, 2021, Nick Buller sends an email to Mark Neufeld with attachments. Mr. Buller appears to attempt to direct Mr. Neufeld to have the appraisal panel consider the cost of repair at the date of loss, not the current date. Safeco and Mr. Buller's continued position of utilizing the February 2017 price list for the repairs is unreasonable and clearly places Safeco's financial interests above those of the insured. Mr. Buller's attempt to direct the appraisal to follow this pattern and practice is not appropriate. The email states:

> Per our conversation, attached are status letters sent to the insureds over the course of a year from 9/2017 to 9/2018. These letters show the lack of response from the insured relative to the outstanding items needed to evaluate their claim as well as moving forward with repairs.
>
> Additionally, here is a screen shot of the loss settlement portion of the policy and I will specifically direct you to 5b; which states we will pay the full cost of repair or replacement of that part of the damaged building for equivalent construction and use on the same premises as determined shortly following the loss. I believe this speaks directly to the timing around evaluating the damages and cost of covered repairs.
>
> Please let me know if you need anything else

Mr. Buller also discusses his April 6, 2020, Plan for Resolution. Here, he also documents his decision that ALE ends 24 months after the date of loss, not after 24 months of use:

> Q. Is there a reason why you create a note like this, Plan for Resolution? Are you trying to inform someone that you are taking steps in the appraisal process? What . . .
>
> A. It's to summarize for whomever the current status and open items on the claim.
>
> Q. Okay. You wrote down there again, "No ALE exposure at this time. Reasonable period of repairs has been exceeded." Do you see that?
>
> A. Yes.
>
> Q. Okay. So at the time that appraisal ends, do you think that ALE should be extended to account for the reasonable repair period of the award?
>
> A. All review is subject to the policy terms and conditions (P. 231)

On April 13, 2021, Nick Buller sends an email to Mark Neufeld directing him to the Loss Settlement provision in the policy without explanation. He also provides Mark Neufeld with several letters and notes that the letters show outstanding items due to Plaintiff's lack of response in providing the line items. It seems highly inappropriate that Mr. Buller was providing his

appraiser his opinion about how the appraisal award should be determined based upon policy language, especially since Mark Neufeld and the panel were not deciding coverage.

Q. Well, in the email it says, "These letters show the lack of response from the insured relative to the outstanding items needed to evaluate their claim." Do you see that?

A. Yes.

Q. Did you think it was important that he know that the insured was not responding to requests for information?

A. I thought it was important for him to have any information I felt was relevant. And that information, I felt, was relevant.

Q. Okay. How is it relevant to his evaluation if the insured was not responding to document requests?

A. I think it's more along the lines of allowing him to understand what items we were still requesting.

Q. Okay. The second paragraph looks like, "Additionally, here is a screen shot of the loss settlement portion of the policy." You are submitting policy language to him; is that right?

A. In this instance, yes.

Q. And saying, "I believe this speaks directly to the timing around evaluating the damages and cost of covered repairs." Do you see that?

A. Yes.

Q. Is there a reason why you are sending him policy language?

A. I don't recall the specifics as to why this was sent.

Q. Okay. Were you trying to influence his opinion by telling him what the policy did and did not cover?

A. No. My position all along was that I told him to do his job, and that's it.

Q. Okay. Did you want him to decide coverage?

A. That's not part of his purview.

Q. That's your testimony, it's not -- it's your understanding that's not what he was supposed to do, correct?

A. Correct.

Q. Okay. So you don't know why you did this, correct, you didn't -- why you sent this policy provision to him?

A. I don't recall the specifics around how this -- or why this was sent. (Pp. 242-244)

Mr. Buller is asked about the charges from Mark Neufeld and specifically the charge for two hours including a call with Mr. Buller:

Q. Sure. Do you recall receiving this invoice from Mark Neufeld?

A. I have no reason to believe I did not receive it.

Q. Okay. I have one question on this document. He has noted that on April 13, 2021, that same day we are talking about that appraisal -- that -- that policy provision that you sent to him, same date, he has marked that he billed two hours for discussing with you the policy provisions, the status update, prepare package, and forward to panel. I don't know what that means. Did you draft any part of his opinion related to the appraisal award?

A. No.

Q. What did you talk about with him for two hours?

A. I think you are misstating what's presented here. In -- that two hours includes a discussion with me, as well as preparation, package and forward. I don't recall the timeline or the contents of that conversation with Mark.

Q. Okay. Do you have any reason to believe it was not two hours? Like, do you recall it being less than two hours long?

A. I don't recall any –

A. I don't recall any two-hour conversation with Mark relative to this claim. (Pp. 252-253)

July 1, 2021, Nick Buller make a claim note advising receipt of the Umpire’s initial estimate at $459,000.

On August 11, 2021, Brent Johnson sends an email to the appraisal panel advising of missing items on the estimate. This 57 page report advises:

I have been reviewing the estimate provided for review from Roy Becker and there are items that are missing that I believe need to be included. I will start in the Lower Level and work my way up to the Upper Level. This report may not include all things, but all

> attempts were made to be accurate. I have attached pictures where the missing damage(s) are and tried to be specific to the Umpire estimate but there is no "line item numbers" so I tried to describe each item.

On August 20, 2021, Mark Neufeld sends an email to Mandy Winters and Nick Buller advising that he reviewed the 57 page report and provided a response to the Umpire.

On September 14, 2021, the appraisal panel delivered an appraisal award totaling **$464,465.60** replacement cost and **$399,308.69** actual cash value; signed by the Umpire and insurer's appraiser.

On September 15, 2021, Nick Buller sends an email to James Hudson detailing the facts of the claim and requesting additional authority:

> Hi James,
> I am requesting additional authority on the above claim that I have retained from my prior role. Here are the facts of
> the claim:
> 1. Two frozen pipes in the upper level baseboard heating system of the home failed
> a. This home is a two-story home on a partial basement; all three levels were affected
> 2. This is a Safeco HOM-7030 that incepted on 8/10/16
> 3. American Restoration (NPV) performed mitigation and insured rejected our request to have an IPN contractor
> out
> 4. The insured' GC, Grey Eagle presented and estimate and we were unable to come to an ACOR
> 5. We engaged Donan who opined the condensation in window panes was not related to the loss nor was the rear
> patio flagstone damage; partial denial in file on 3/9/17
> 6. The insured owns a restaurant and home in the BVI and left the home unoccupied for several years before hiring
> a PA and then later an attorney
> 7. The PA presented a GC estimate over $850k for the Dwelling repairs
> 8. In 2020, we engaged JS Held to handle the appraisal of the damages
> 9. Yesterday we received the attached appraisal award
> 10. Within the award, is the patio damages, page 40 under Exterior, for $3,869.76, I've reviewed with examining and we will stand behind our denial
> **11. I reviewed the price list in the award (June 2021) with examining and they do not feel we can request a re-price to February 2017**
> **The differences in the appraisal award vs. our estimate of $254,641.67 is primarily driven by the price list increase, supervision, HVAC scope increase and items contained within the General category (i.e. supervision, storage, jobsite cleanup).**
> (emphasis added)

In his deposition Nick Buller was asked about his comments in number 11 above regarding requesting a re-price to the award:

Q. Okay. We talked about this previously, but the appraisal award sets the binding amount of the loss, correct?

A. That's correct, subject to the terms and conditions of the policy.

Q. In terms of the price lists, there's this weird comment here, "I reviewed the price list in the award, June 20, 2021" -- "and they do not feel that we can request a re-price." What is that about?

A. So the appraisal award estimate, the price list, which is what Xactimate uses to set prices for individual line item components, was dated June 2021 in the appraisal award, and our estimate, meaning my Safeco estimate that I prepared, had February 2017, which is when the loss occurred.

Q. Okay. And did you want it to be repriced to 2017 pricing, or is -- or am I misreading that?

A. It's -- it's not relevant. I had no involvement in the appraisal award estimate or establishment. It was a conversation that I had in a summary; that's all it was. (Pp. 256-257)

Based on the documents reviewed, including the claim file, as well as the deposition testimony reviewed, if appears clear that Mr. Buller was of the opinion that regardless of how long it took to determine the proper amount of loss, the damages should be determined based on the cost to repair at the rime of loss. It appears clear he attempted to sway Mr. Neufeld and the appraisal panel to this position; then even gave consideration to having the award repriced to reflect this.

On September 16, 2021, Nick Buller itemizes the Appraisal award, detailing the additional amount owed by Safeco for the dwelling to be $200,847.99. While the Appraisal panel, including Safeco's retained expert appraiser, determined that $3,869.79 of the total patio damage was directly related and caused by the covered loss; Safeco elects to delete this amount and stand by their denial. It is not clear whether Mr. Buller understood that appraisal determined the cause of the loss to the patio despite Donan's contrary opinion. The review in the claim notes includes:

Technical Review Completed: Y - Marsili on 9/16/21

Payment Breakdown:
PROP DWG: $196,778.49
$421,759.81 - Appraisal Award RCV
<3,869.76> - less previously denied patio repairs estimated on page 40
<26,520.62> - less depreciation per appraisal award
<192,090.94>- less prior payments on 2/21/17, 3/9/17, 8/30/17 & 12/30/19
<2,500.00> - less deductible
$196,778.49 - Supplemental ACV

PROP OS: $4,069.50
$4,069.50 - RCV per appraisal award

Check Total: $200,847.99 Check Payable To: FS reviewed with IS, who will verify if attorney/PA need to be named on check

Date & Support:
9/16/21 - FS completed technical review process after appraisal award was received. Only change to award is standing behind prior denial on patio damage per Donan report; denial in file on 3/9/17. Payment above is for supplemental ACV per award.

The above note, the appraisal award and appraisals in general were discussed during Nick Buller's deposition. The damage to the patio, which Safeco had determined not to be caused by the loss and excluded by Safeco and Mr. Buller is discussed.. Mr. Buller also admits that he does not know if an appraisal in Colorado can determine causation

Q. Okay. All right. After the appraisal award was issued, do you recall doing a technical review of the award?

A. That's what you have on your screen presently.

Q. Okay. So it's not titled "Technical review," is it? That's just what you -- oh, it is. Okay. In the email chain, correct?

A. Yes.

. . .

Q. Okay. The next part, the -- on the next page, I guess, or at the bottom of that page, ECF 317, you put, "The differences in the appraisal award versus our estimate." Is that after your review of the appraisal award, you kind of just summarized the differences?

A. From a very high level. That's, by no means, all-inclusive of the differences.

Q. Okay. Did you -- how long did you review the appraisal award; do you recall?

A. I don't have a recollection on the time.

Q. Okay. Did you review the appraisal award for accuracy?

A. I reviewed the appraisal award for that, yes.

. . .

Q. What is this document?

A. It's a note that I created on September 16, 2021, requesting payment based on the appraisal award estimate.

Q. This is a different document than the technical review you submitted to your manager, correct?

A. Yes.

Q. Okay. Why -- is there a reason why you are documenting it in more than one place?

A. So as I stated previously, our process for technical reviews changed during this claims process. Our payment request process did not change.

Q. This is the payment process, correct?

A. Yes.

Q. Okay. Who is Marsili, by the way?

A. That would be Ken Marsili. He is James Hudson's -- or was James Hudson's manager at the time.

Q. Okay. There's a note in here that you completed the technical review. You did change the award, because you took out the patio damage per the Donan report; is that right?

A. That's correct.

Q. Why did you do that?

A. Because it's a coverage denial And that needs to -- award -- the appraisal award estimate is still subject to the terms and conditions of the policy.

Q. And what specifically about the patio damage was not covered?

A. The patio damage itself. It – we previously discussed that, yes.

Q. It wasn't covered because it wasn't caused by the loss?

A. Per the terms and conditions of the policy, there was a -- a denial on the patio damages.

Q. Due to the Donan determination about the cost, correct?

A. After review of all the information available to us at the time.

Q. Okay. And sitting here today, do you know whether or not appraisal awards in Colorado can determine causation?

A. As I've answered previously, I don't know. (Pp. 258-261)

Safeco and Mr. Buller elect to delete the damage to the patio from the appraisal award simply because of the Donan report without knowing the laws and regulations that impact claim handling, specifically appraisals, in Colorado.

On October 4, 2021**,** Mandy Winters sends a letter to the Merlin Law Group detailing the payment to be received:

> This letter is a follow up to the appraisal award for the above-referenced claim. We have issued payment for the amount due for the award as follows. Be on the lookout for the check, coming to your address above, in the coming days. Let us know if there are questions. Thank you.
>
> Dwelling:
> Appraisal award RCV - $421,759.81
> Less patio repairs, excluded from coverage <$3,869.76> (estimated on page 40)
> Less depreciation <$26,520.62>
> Less prior payments <$192,090.94>
> Less deductible <$2,500.00>
> ==================================
> Supplemental - $196,778.49
>
> Other Structures:
> Appraisal award - $4,069.50
>
> Combined check amount - $200,847.99

The Appraisal Award, signed by Safeco's appraiser, Mark Neufeld, and the Umpire, is clear evidence of Safeco's failure to reasonably investigate and evaluate the covered loss, giving at least equal consideration to the insured's interests, and to timely pay all amounts owed under the policy. The ACV payment prior to Appraisal totaled **$192,090.94**. The additional ACV payment resulting from the Appraisal Award totaled **$200,847.99.** The time from the date the loss was reported until the above October 4, 2021 letter detailing the upcoming payment totaled 2073 days.

The Appraisal Award, with an ACV payment for more that the amount paid to date by Safeco occurred after the insured was compelled to hire multiple engineers, a public adjuster and an attorney to receive the benefits owed under the policy. This, plus the insured's cost of the Appraisal itself are all expenses an insured should not have to incur to obtain owed benefits.

**General Summary**

Based on my review of the documents provided, it is my opinion that Safeco failed to timely determine and pay all amounts owed under the policy for covered damages. This is evidenced in the above discussion and opinions. It is clear, based on the documents reviewed that Safeco and their representatives failed to meet minimum industry standards and failed to meet their obligations of good faith and fair dealing in the adjustment of this loss.

The insured incurred significant time and expense to obtain the benefits owed to him under the Safeco policy.

Further, the above documents, discussion and opinions clearly reflect that Safeco and its claim handlers failed to give at least equal consideration to the insured's interests during the adjustment of this loss. One example includes the Appraisal Panel had determined that the new damage to the patio, as suggested in the Donan report, and by the insured's engineers, was the direct result of the water loss and was covered damage under the policy. Safeco elected to ignore the findings of the Appraisal Panel and exclude the new patio damage, reducing the Appraisal award and saving Safeco $3,869.76, to the insured's detriment.

Another example is Mr. Buller's subtle attempts to influence the appraisal panel to base the award on 2017 prices.

The AIC 33 textbook, "Aggressive Good Faith and Successful Claims Handling" (Rokes, First Edition, 1987) discusses the failure to conduct a proper investigation and states:

> Where the insurer fails to investigate the case properly, however, there is no question that the insurer is in breach of contract. Further, there is no question that the insurer has been negligent by omitting to conduct a proper investigation, one of the responsibilities under the contract. The right to recover for breach of contract or for the tort of negligence would seem to be apparent. Whether the failure to investigate constitutes an extraordinary showing of disingenuous or dishonest failure to carry out a contract is certainly a question of fact. It certainly demonstrates the existence of a nebulous threshold between negligence and what is considered to be "bad faith."

This preliminary report is being completed prior to completion of all discovery and is subject to revision or modification based upon any additional documents or materials I may review or information I may receive on this matter subsequent to this report.

Stephen L. Strzelec

# Exhibit A

## Stephen L. Strzelec, CPCU, CLU

**7647 Splashing Falls Drive**
**Las Vegas, NV 89131**

**Phone 206-427-4322**
Stevestrzeoec@gmail.com

---

**EMPLOYMENT**

**Strzelec Consulting Services 2002 – Present**
Claims practices analysis

**State Farm Insurance Companies, 1985-2002**

Positions Held

- Auto/Fire Section Manager, Anchorage AK
- Auto Divisional Claim Superintendent, Anchorage, AK
- Auto Claim Superintendent, Vancouver, WA
- Auto Property Superintendent, Tacoma, WA
- Auto Claim Representative, Redmond, WA
- Fire Claim Superintendent, Tacoma, WA
- Fire Reinspector/Trainer, Redmond, WA
- Fire Claim Representative, Tukwila, WA

**Other Employment and Responsibilities**

**Claim Manager, AIGA, 1996-2002**
Responsible for oversight of the handling of claims for the Alaska Guarantee Association
**Flood Coordinator State Farm Pac.NW Region 1987-89**
Responsible for training on Flood Policy and claim handling for region. Coordinated and supervised all flood claims.

**L & S Construction, 1980-1984**
Managing partner

**EDUCATION**

| | |
|---|---|
| BS Business Administration | Seattle City University, Seattle, WA 1987 |
| CPCU | Insurance Institute of America, 1992 |
| CLUThe American College, 2000 | |
| 2 Parts AIC | Insurance Institute of America, |

## RECOGNITION

- Served on committee to reorganize Fire Claim School
- Recognition for Supervision of Alaska wildfire losses.
- Served on Steering Committee for State Farm Section Manager Forum.

## INDUSTRY TRAINING

**State Farm**

Fire Claim Training Series, Evaluating Structural Losses, Fire Basic Claim School, Fire Intermediate Claim School, Fire Estimatics School, Training for Trainers, Management Orientation, Management I-IV, Management Overview, Supervisory Skills, SST Goal Setting, Performance Management Skills, Managing the PP&R Process, Fire Claim Management Course, Situational Leadership, Strategic Planning, Presentation Excellence, BCC I-IV, Auto Claim School, Bodily Injury Claim Management Course, Physical Damage Claim Supervision, Auto Claim Management Course, Auto Divisional Claim Supt. Workshop, Fire Divisional Claim Supt. Seminar, Field Claim Management, Leadership Principles, XACTIMATE Software Training, First Party Seminar, CAT/CMR Redesign Training, TEACH, Auto Section Manager Forum, Fire Section Manager Forum

**Other**

VALE National Building Loss Evaluation School, ICAR (6 parts), ITTI Advanced Auto I

# Exhibit B

I have been working as a claims practices consultant since November 2002 after spending approximately eighteen years in the insurance industry. I have been retained in; Alaska, Alabama, Arizona, Arkansas, California, Colorado, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Dakota, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Washington, West Virginia and Wisconsin.

**Testimony**

During the past four years I have provided testimony in the following cases:

| Case Name | Court | Lawyer Retaining | Dep | Trial |
|---|---|---|---|---|
| Lim v. National General | US District Court, Western District of Washington at Seattle 2:15-cv-00383-RSL | Mullenix | X | |
| Van Deventer v. Lloyds | Second Judicial District Court, County of Bernalillo, New Mexico Case No. D-202-cv-2013-04400 | Jefferies | X | X |
| Mastowski v. American National Ins. | United States District Court, District of Arizona Case No. CV-15-01893-PHX-NVW | Wilborn | X | |
| Johnson v. Allstate | United States District Court for The Western District Of Washington at Seattle No.: 2:15-cv-01449-RAJ | Hanson | X | |
| Williams v. Foremost Insurance | U.S. District Court, Western District of Washington at Seattle No. 2:17-cv-01113-RSM | Hanson | X | |

| | | | | |
|---|---|---|---|---|
| Parkside v. Axis Surplus Ins. Co. | U.S. District Court, Northern District of Texas, Dallas Division<br>No. 3:13-CV-02804 | Delgado | X | |
| Cheryl Holmes v. Farmers Group, Inc. et al | United States District Court, District of New Mexico<br>No. 1:19-cv-00387-JHR-SCY | Horton | X | |
| Durant v. State Farm | Superior Court of Washington in King County<br>No. 14-2-10101-5 KNT | Firkins | X | |
| Johnson v. Allstate P&C Ins. Co. | US District Court, Western District of Washington<br>No. 3:14 –CV- 05064-KLS | Huebner | X | |
| Caetano v. State Farm General | Kings County Superior Court of CA<br>Case No. 13 C0105 | Roe | X | X |
| Anderson v. Country Mutual | United States District Court, Western District of Washington at Seattle<br>No. 2:14-cv-00048-JLR | Carsley | X | |
| Meimeteas v. IDS | Supreme Court of the State of New York, County of Westchester<br>Index No. 60622/2014 | Cieri | X | |
| Box Factory v. Verlan | U.S. District Court, Northern District of Texas, Fort Worth<br>Civil Action No. 4:15-cv- 861 | Raizner | X | |
| Cruz v. Mathenge | Superior Court Of The State Of California County Of Los Angeles<br>Case # BC493949 | Wolden | X | |
| Arkags v. Mesa Und. | U. S. District Court. Southern District of Texas, Houston Division<br>Civil Action No. 4:16-cv-01929 | Slania | X | |
| Duepner v. GEICO | Superior Court of Arizona, County of Maricopa<br>Case No. CV2014-000168 | Thur | X | |

| | | | | |
|---|---|---|---|---|
| Leaman v. Liberty Mutual | Sixth Judicial District Court of Idaho. Banncock County Case No. CV-2014-2553-OC | Ruchti | X | |
| Jana Food Services Inc. v. Nationwide Agribusiness Ins. Co. | United States District Court, Northern Di Texas, Fort Worth Division Civil Action No. 4:16-cv-864-A | Slania | X | |
| Patino v. State Farm Mutual | U. S. District Court, Eastern District of Washington No. 4:16-CV-05096-EFS | Olive | X | |
| Allen and Verasammy v. State Farm Mutual | United States District Court, District of Alaska Case No. 3:15-cv-00019-HRM | Barber | X | |
| Vignola v. Mutual of Enumclaw | Superior Court of the State of Washington , King County No. 16-2-21876-8 KNT | Gahan | X | X |
| James Speros v. Sentinel Insurance Co. | United States District Court, District of Arizona No. CV 14-00224-PHX-JJT | Reiter | X | |
| Arianne Fernandez v. Lisa Morales and State Farm Mutual Automobile Ins. Co. | Superior Court of the State of Washington, Spokane County Case No. 14-2-01156-8 | Shawver | X | |
| John Arena v State Farm Fire and Casualty | District Court, County of Boulder, Colorado No. 2016-CV-02062-30397 | Taussig | X | X |
| TLB v. Acuity | United States District Court, District of C Civil Action No. 17-cv-02856-NYW | Bukowski | X | |
| James Denby v. American Family | Superior Court of Arizona, , Maricopa County Case No. CV-2017-0103557 | Mills | X | |
| R. Allen v. State Farm Florida | Seventh Judicial Circuit Court, Volusia C Case No. 2015-011441-CIDL | Nation | X | |

| | | | | |
|---|---|---|---|---|
| Rothchild v. State Auto | U. S. District Court, Southern District, Houston, Texas<br>C.A. No. 4:18-cv-016922594 | Wickert | X | |
| Gordon v. American Fire | United States District Court,<br>District of Arizona<br>Case No. CV-17-01113-PHX-HRH | Wilborn | X | |
| Lisa and Ernest Yazzie v. GEICO | United States District Court For The District of New Mexico<br>No. 1:16-CV-01085-2-KK-LF | Anderson | X | |
| Ramirez v. Country Mutual | United States District Court,<br>Eastern District of Washington<br>Case No. 2:16-CV-00281 | Kane | X | |
| Destiny World v. Guide One | 146th District Court of Bell County Texas<br>Cause No. 282-018-B | Slania | X | |
| Wikler v. PURE | United States District Court,<br>District of Arizona<br>No. 2:17-CV-02664-PHX-GMS | O'Steen | X | |
| Cambridge v. Peleus Insurance | District Court, 116th Judicial District of Dallas County, Texas<br>Cause No. DC-17-04060 | Slania | X | |
| Augsburger v. Navy Mutual Aid | United States District Court,<br>Western District of Washington<br>at Seattle<br>No. 2:17-cv-01817-BAT | Hanson | X | |
| Miller Creek v. Landmark American | 44th District Court of Dallas County, Texas<br>Cause No. DC-17-04796 | Slania | X | |

| | | | | |
|---|---|---|---|---|
| Montoya v. Loya Insurance | U.S. District Court of the District of New Mexico<br>No. 1:18-cv-00590-SCY-KBM | Harris | X | |
| By The Sea Council of Co-Owners v. Texas Windstorm Insurance Assoc. | 10th Judicial Court of Galveston County, ' No. 18-CV-529 | Delgado | X | |
| McNeil v. GEICO | District Court of the Fourth Judicial District, State of Idaho, Ada County<br>Case No. CV01-17-01955 | Lutz | X | |
| Purdin v. State Farm | Superior Court of the State of Washington, Spokane County<br>Case No. 14-2-01156-8 | Olive | X | |
| Balaji v. Liberty Mutual | U. S. District Court, Southern District of ' Galveston Division<br>C.A. No. 3:18-cv-00289 | Eiland | X | |
| Leahy v. State Farm | Superior Court, King County WA<br>No. 14-2-21353-1 SEA | Shawver | X | |
| Price v. Farmers New World Life | New Mexico First Judicial District<br>No. D-101-CV-20170-1732 | Crow | X | |
| Benetiz v. State Farm Florida | Circuit Court, Seventh Judicial Circuit, Volusia County, Florida<br>Case No. 2014-12328-CIDL | Nation | X | X |
| Gruber Motors v. Continental Ins. Co. | United States District Court, District of Arizona<br>No. 2:18-cv-02760-DJH | Wilborn | X | |
| Scottsburg Hospitality v. Rockhill Insurance | U. S. District Court, Southern District of Texas, Victoria Division<br>C.A. No. 6:18-cv-00038 | Slania | X | |
| Peace Lutheran v. Church Mutual | U.S. District Court, District of Colorado Civil Action No.: 1:18-cv-02706-PAB-NYW | Bukowski | X | |

| | | | | |
|---|---|---|---|---|
| Curtis v. James River | King County Superior Court of WA No. 1 22906-5 SEA | Rosato | X | X |
| Travelers v. N.A. Terrazzo | U.S. District Court Western District of Washington at Seattle No. C19-1175 MJP | Lether | X | |
| Daniel Hopkins v. Integon General Insurance Corp. | United States District Court, Western District of Washington at Seattle No. 2:18-CV-01723 MJP | Rosato | X | X |
| Crossroads American Baptist Church. v. GuideOne Mutual Insurance Co. | U.S. District Court, District of Colorado Civil Action No.: 1:18-cv-01256-REB-NRN | Bukowski | X | X |
| CCISD v. Lloyds | United States Eastern District Court of New York Case No. 19– cv-301 (ARR)(JO) | Font | X | |
| Anastasia Tanner. State Farm M Automobile Insurance Co. | United States District Court for the District of Alaska Case No. 3:19-cv-00253-SLG | Crittenden | X | |
| Ruiz v. Liberty Mutual | U. S. District Court, Southern District of New York No. 7:19-cv-04399-VB | Cieri | X | |
| Landmark Am Ins. v. Port Ro | United States District Court for the Southern District of Texas No. 2:19 cv 0006 | Delgado | X | |
| Katherine Edwards v. State Farn | United States District Court, Western District of Washington at Seattle No. 2:20-cv-01226-RSL | Olive | X | |

| | | | | |
|---|---|---|---|---|
| Kiva Hutton v. GEICO | District Court of Clark County, Nevada<br>Case No. A-18-785834-C | Schnitzer | X | |

# Exhibit C

## PRESENTATIONS AND PUBLICATIONS

Claims Practices Workshop "The Effects of Performance-Based Pay for Adjusters" Regional Law Firms; Reno, NV November 8-9, 2002

"Claim Evaluation systems at SF; Why Colossus is Not Necessary" Colorado Trial Lawyers Assoc. Meeting, March 6, 2003

"First Party Coverage Nuggets: Getting Payment on Undisputed Amounts" Washington State Trial Lawyers Assoc. Meeting, March 27, 2003

CLE Seminar "Understanding Colossus and Other Claim Practices Fads" Nevada Trial Lawyers Association Reno, NV April 16, 2003

CLE Seminar "Understanding Colossus and Other Claim Practices Fads" Nevada Trial Lawyers Association Las Vegas, NV April 17, 2003

"First Party Good Faith and Receiving Payment on Undisputed Amounts" Arizona Trial Lawyers Association Meeting, May, 16, 2003

"Incentive-Driven Claims Practices" Claims Practices Workshop; Regional Law Firms; Reno, NV February 20-21, 2004

"Recognizing Improper Claim Practices" Claims Practices Seminar; National Law Firms. Deadwood, SD May 7-8, 2004

"Trial of a Bad Faith Case" National Law Firms Reno, NV June 3-4, 2005

"The Chronology of Communications From the Claims Adjuster: When you can expect to hear from them and Why" The Settlement Institute October, 12-14, 2006

"The Chronology of Communications From the Claims Adjuster: When you can expect to hear from them and Why" Tennessee Trial Lawyers Association Meeting, January 31, 2007

"Navigating Insurance Claim Quagmires" Claims Practices Seminar; New Mexico Trial Lawyers Foundation; Albuquerque, NM May 25, 2007

“Helping the Adjuster Handle the Claim in Good Faith and Reach a Proper Resolution” American Association for Justice 2007 Annual convention, July 15, 2007

“The Coherent Claim Practices Case” Claims Practices Seminar; National Law Firms. Reno, NV November 30 – December 1, 2007

“The Coherent Claim Practices Case” Claims Practices Seminar; National Law Firms. Las Vegas, NV February 9, 2008

“Disruptive Innovation in Claims Practices” National Law Firms. Reno, NV April 18-19, 2008

“Claims Practices Update” National Law Firms. Reno, NV October 10-11, 2008

“Coherence in Claim Practices Litigation” – Faculty member & Panelist on Claim Practices Issues; National Law Firms, Miami, FL May 1-2, 2009

“Fundamentals of Insurance and Insurance Claim Handling” 360 Advocacy Institute, August 26-28, 2009 Las Vegas, NV

“Laying Track for the Lowball Express” Claim Practices Seminar; National Law Firms; Reno, NV December 4-5, 2009

“Steve Strzelec and Gary Fye on Claim Handling” National Law Firms; Reno, NV April 20-21, 2010

“Claim Practices Workshop” National Law Firms; Reno, NV August 24-25, 2011

“Black Hills Bad Faith Seminar” National Law Firms; Custer State Park, SD, April 4-5, 2013

Seattle University Law School; Seattle WA, October 28, 2013

“Claim Practices Workshop” National Law Firms; Reno, NV June 6-7, 2014

“Claim Practices Workshop” National Law Firms; Reno, NV Sept. 16, 2015

“Claim Practices Workshop” National Law Firms; Reno, NV April 22, 2017

“Claim Practices Workshop” Regional Law Firms; San Juan, PR June 15, 16, 2018

“Proper Handling of First Party UM/UIM Claims” Washington State AAJ Assoc. Meeting, May 8, 2019

# Exhibit D

## Billing Guide

My charges associated with consulting are as follows: $400.00 per hour for consulting and $500.00 per hour for deposition or trial testimony, $150.00 per hour for travel time, and actual costs incurred. A $4,000 retainer is required. While charges are billed against the retainer, it is considered fully earned upon receipt.

Based on prior experience, I require a $2,000 advance deposit for each half-day of deposition testimony (4 hours or less). A full day deposition (more than 5 hours) requires a $4,000 deposit. Actual time and expenses for the deposition, including travel, are billed against the advance. An invoice for any balance due will be provided and payment is required within 30 days. A 2% per month finance charge will be applied to any outstanding balance 30 days after receipt. The deposition will not begin before the required prepayment is made. There are no exceptions.

Strzelec Consulting Services
Stephen Strzelec
Federal EIN 04-3736604

# Exhibit E

## Industry Standards for the Handling of Claims

Part of every policy is a promise that the parties will deal fairly with one another. This implied covenant of good faith and fair dealing requires that neither party do anything to impact the right of the other to receive the benefit of the agreement. With an insurance policy, a special relationship arises out of the parties' unequal bargaining power and the special nature of the insurance contract. The insurer has a much greater obligation to perform under the policy than the typical insured, who knows little of insurance transactions.

An insurer is in a position to take advantage of an insured's misfortune by bargaining for settlement or resolution of the claim for less than the true amount owed. The insurer has control over the investigation, evaluation, processing, and denial of the claim. The insurer also has superior knowledge and buying power for the repairs and services following a loss. This unequal power creates an enhanced duty on the insurer to place the interests of its insured at least equal as its own.

The duties of good faith and fair dealing are embedded within the industry and are taught and accepted as claim handling industry standards. These require an insurer to do nothing to injure the rights of the insured to receive benefits under the policy. Knowing and following the underlying precepts of claims work is crucial to fair claim practices. For example, an insurer must:

- Adopt and implement reasonable standards for handling claims,
- Give at least equal consideration to the insured's interests
- Assist the insured in presenting the claim.
- Adequately and promptly investigate a claim,
- Respond timely to letters and phone calls,
- Adjust the claim (either pay it or deny it) within a reasonably prompt time,
- Attempt in good faith to effectuate prompt, fair and equitable settlement of claims, where liability is reasonably clear,
- Attempt to find a basis to pay the claim rather than find reasons to deny,
- Timely pay all undisputed amounts owed under the policy.
- Disclose all relevant coverages, conditions and restrictions under the policy.
- Provide in writing a detailed reason for denying the claim specifying each contract term or provision upon which it relies,

- The insurance company must interpret its policies reasonably, pursuant to the well-recognized insurance industry rules for insurance policy construction, which include the following:
  - exclusions are to be interpreted narrowly;
  - insuring agreements are to be interpreted broadly
- Know and be in compliance with those laws and regulations that impact claims to the appropriate state, and treat policyholders consistent with requirements of the law.
- Deal fairly and be completely honest with the insured.

These generally accepted claim handling principles or insurance industry standards are well known within the industry and they are taught at many claim schools. They are often written within procedural and claim handling guides, and found in numerous publications including industry-sponsored educational textbooks. Industry standards include this obligation and are clearly detailed in the AIC-33 (Associate in Claims) textbook, "The Claims Environment" (Markham, First Edition, 1993, p12) where it states, in part, "claims representatives should have expert knowledge of insurance policy coverages, the law, and determination of damages"

Industry standards require claim handlers to know and comply with applicable law and regulations that impact claim handling and treat policyholders in a manner consistent with requirements of the law.

The National Association of Insurance Commissioners created a Model Unfair Claims Practices Act that provides statutory and regulatory standards for the handling of insurance claims. These represent a codification of well-established insurance industry standards. Over 45 states have adopted the Model Unfair Claims Practices Act, either in part or in its original form.

The industry recognizes the importance of the Model Act and address it in the AIC-33 (Associate in Claims) textbook, "The Claims Environment" (Markham, First Edition, 1993, p249) when it states, "insureds are frequently permitted to introduce evidence of violations of the Model Unfair Claims Settlement Practices Act and Model Unfair Claims Settlement Practices Regulations because the model act is a recommended standard of care. It was developed [by the National Association of Insurance Commissioners] as a guide for insurance regulators in every state to establish reasonable claim practices".

The claim representative's chief tasks are to investigate, evaluate, and resolve the claim. When an insured purchases insurance, part of what he pays for is a reasonable and even-handed investigation. It is the duty and responsibility of the insurer to investigate both liability and damages. It is the insured's responsibility to cooperate with the investigation, not to undertake the investigation or incur the cost.

This duty to investigate is central to proper claim handling. Industry standards include this obligation and are clearly detailed in the AIC-33 (Associate in Claims) textbook, "The Claims Environment" (Markham, First Edition, 1993, p249) where it states, "A thorough investigation is the foundation of good faith claim handling. Claim representatives must conduct a prompt and objective investigation, using the right personnel and collecting all

relevant evidence. Investigation should continue as long as new facts develop or become available."

The importance of proper investigation of coverage is detailed in the AIC-33 (Associate in Claims) textbook, "The Claims Environment" (Markham, First Edition, 1993, p13) where it states, "Coverage disputes are delicate and serious matters. The primary duty of the claim representative is to deliver the promise to pay. Therefore, the claim representative's chief task is to seek and find coverage, not to seek and find coverage controversies or to deny or dispute claims." The text goes on later to state, "Determining coverage may be very simple or extremely complicated depending on the specific facts of the case. An investigation must often be undertaken to fully develop the facts needed to determine coverage. Good faith claim practices require that this investigation be objective, thorough, and timely." (p29)

The AIC 33 textbook, "Aggressive Good Faith and Successful Claims Handling" (Rokes, First Edition, 1987) discusses the failure to conduct a proper investigation and states:

> Where the insurer fails to investigate the case properly, however, there is no question that the insurer is in breach of contract. Further, there is no question that the insurer has been negligent by omitting to conduct a proper investigation, one of the responsibilities under the contract. The right to recover for breach of contract or for the tort of negligence would seem to be apparent. Whether the failure to investigate constitutes an extraordinary showing of disingenuous or dishonest failure to carry out a contract is certainly a question of fact. It certainly demonstrates the existence of a nebulous threshold between negligence and what is considered to be "bad faith."

# Exhibit F

# Colorado Information/Glossary

## CRS – Colorado Revised Statutes

**10-1-101**

Such policy requires that all persons having to do with insurance services to the public be at all times actuated by good faith in everything pertaining thereto, abstain from deceptive or misleading practices, and keep, observe, and practice the principles of law and equity in all matters pertaining to such business.

**10-3-1104 (1)(h)**; The Unfair Claim and Settlement Practices Act.

(h) Unfair claim settlement practices: Committing or performing, either in willful violation of this part 11 or with such frequency as to indicate a tendency to engage in a general business practice, any of the following:
(I) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue; or
(II) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies; or
(III) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; or
(IV) Refusing to pay claims without conducting a reasonable investigation based upon all available information; or
(V) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed; or
(VI) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear; or
(VII) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds; or
(VIII) Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application; or
(IX) Attempting to settle claims on the basis of an application which was altered without notice to, or knowledge or consent of, the insured; or
(X) Making claims payments to insureds or beneficiaries not accompanied by statement setting forth the coverage under which the payments are being made; or
(XI) Making known to insureds or claimants a policy of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements or compromises less than the amount awarded in arbitration; or

(XII) Delaying the investigation or payment of claims by requiring an insured or claimant, or the physician of either of them, to submit a preliminary claim report, and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information; or
(XIII) Failing to promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage; or
(XIV) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.
(XVII) Failing to adopt and implement reasonable standards for the prompt resolution of medical payment claims.

(hh) Unfair compensation practices: Basing the compensation of claims employees or contracted claims personnel, including compensation in the form of performance bonuses or incentives, on any of the following:
(I) The number of policies canceled;
(II) The number of times coverage is denied;
(III) The use of a quota limiting or restricting the number or volume of claims; or
(IV) The use of an arbitrary quota or cap limiting or restricting the amount of claims payments without due consideration of the merits of the claim

**10-3-1113**

(1) In any civil action for damages founded upon contract, or tort, or both against an insurance company, the trier of fact may be instructed that the insurer owes its insured the duty of good faith and fair dealing, which duty is breached if the insurer delays or denies payment without a reasonable basis for its delay or denial.

(2) Under a policy of liability insurance, the determination of whether the insurer's delay or denial was reasonable shall be based on whether the insurer's delay or denial was negligent.

(3) Under a policy of first-party insurance, the determination of whether the insurer's delay or denial was reasonable shall be based on whether the insurer knew that its delay or denial was unreasonable or whether the insurer recklessly disregarded the fact that its delay or denial was unreasonable.

(4) In determining whether an insurer's delay or denial was reasonable, the jury may be instructed that willful conduct of the kind set forth in section 10-3-1104(1)(h)(I) to (1)(h)(XIV) is prohibited and may be considered if the delay or denial and the claimed injury, damage, or loss was caused by or contributed to by such prohibited conduct.

**10-1-1115 and 1116**

prohibits unreasonable delay or denial of first-party insurance benefits

# Exhibit G

**Terranova Timeline**

On **January 31, 2017**, the insured property sustained a loss from the sudden release of water from a plumbing/heating system.

On **January 31, 2017**, claim 287152846039 was opened. The loss was assigned to Mandy Winters and Nick Buller.

On **February 3, 2017,** contact was made with American Restoration and Lori Worthan.

On **February 6, 2017**, Nick Buller begins his inspection; taking photographs and begins writing his estimate.

On **February 17, 2017**, Nick Buller completes his First Field Report, that includes, in part:

> **DAMAGES:**
> **DWG :**
> This is a single family home, built in the 1970's with upgraded 2x6 wall framing. The home sits on a partial basement, crawlspace and slab. Living space in the home consists of 3 bedrooms, 1 full bathroom and 3 ¾ bathrooms, billiards room, mechanical room (unfinished), living room, kitchen, dining room, office and family room. Home has an attached oversized 3 car garage. The home is repairable related to this loss.
> **Exterior**
> No exterior dwelling damage was noted on this loss. Exterior siding evidences moisture wicking, which is primarily due to moisture from snow over the winter.
> **Interior**
> Mitigation was nearly completed when FE re-inspected this loss; there are a few items, which may require tweaks to the estimate once the mitigation is fully completed. Insured is meeting with multiple contractors and will advise me once they have chosen one to move forward with.
> **Upper Level**
> On the upper level of the home, 2' flood cuts were present throughout all rooms except the hall bathroom and master suite. The library paneling was dry, but the paneling has been stained and requires replacement as it has a rough unfinished texture. Flooring throughout this level was removed, except for the tile in the bathroom and the flooring in the master suite. The carpet in the master bedroom will be removed as it suffered significant staining beyond cleaning. Due to the humidity in the home during and after the loss, there are noticeable cracks along the ceilings require joint tape repairs and ceiling painting. The ceilings in bedrooms 1&2 are over 14' and require scaffolding.
> **Main Level**

On the main level the walls are being removed from floor to ceiling in all rooms except for the hall bathroom, laundry room, office and family room. The middle section of the home suffered direct impact and saturation from the water above and prevented any opportunity of drying. Saltillo tile runs throughout the main level except for the family room (vinyl) and laundry room (pre-finished wood). The Saltillo tiles are cracking throughout due to be water saturation and being installed directly onto particle board. The flooring is not damaged in the office or hall bathroom and will attempt to clean. Faux paint finishes on majority of walls, rough cut unfinished paneling on dining room walls and ceiling will require replacement. Trim and windows themselves will require repairs due to the moisture content in the home. Scraping and preparation for paint and stain will be required. Contractor pointed out moisture in between panes on a handful of windows; advised that appeared to be due to wear & tear as sealants on windows had separated and deteriorated over time. Kitchen cabinets and countertops were removed prior to National Restoration being allowed to inspect and provide an opinion. American Restoration was placed on notice as they violated a conversation FE had with them to leave in place for inspection. Cabinets were 42" uppers with alder wood faces and particle board boxes; lowers were the same. Countertops were 1" granite with 2" rough cut faces and edges placed directly on plywood subdeck; these were removed and destroyed in the process. Granite did present cracking on the surface during initial FE inspection and likely were not salvageable. Appliances will need to be detached and reset; will be inspected by appliance specialist to determine reparability, most appliances were built-in and would be considered dwelling. Per the mitigation company, backsplash was installed directly onto drywall. Insulation and vapor barrier removed on exterior walls.

**Basement**

On this level, the billiards room is being gutted down to the studs. Insulation on the exterior walls and ceiling were affected. Walls were finished with T&G paneling, drywall and simulated wood paneling that was painted. The ceiling was acoustic popcorn. The flooring was carpet. No damage to the stone hearth. The bathroom will be gutted except for the shower, which will be dried from above and all sides. The vanity will be able to be cleaned and re-installed.

Will be hiring an engineer to opine on window condensation as well as stone patio discussed below in OS damages note.

**OS DAMAGES:**

Insured has reported damage to their 21' x 24' stone patio; will have engineer to review and determine
cause of loss and reparability.

**PP DAMAGES:**

Home is well furnished and furnished with artifacts and very high end finishes.

**LOU DAMAGES**: **ATOR/ADOC: ☐ Yes ☒ No**

With mitigation and repairs, the process is likely to approach 5 months from DOL.

**DISCUSSED NORMAL LIVING EXPENSE STATEMENT: ☒ Yes ☐ No**

This was presented to insured onsite.

**ITV/UIR**:

Cost guide variances noted as follows: total livable sf measures 3,571; home is 2 stories; 40% basement, 40% slab & 20% crawlspace; roof is architectural shingles; siding is 90% pine and 10% stone veneer; garage doors are wood and stained; 1 full bathroom and 3 ¾

bathrooms. Heating is hot water baseboard with a boiler system; no AC unit noted; Saltillo tile 50%; engineered wood 10%, ceramic tile 10%, carpet 25% vinyl 5%; wall finishes 70% faux finish paint, 30% t&g paneling; ceiling 20% painted paneling, 80% faux finish drywall; exposed beams in living room, kitchen and family rooms; 2 fireplaces with chimney; water softener.

**WORKPLAN:**

Review any additional demo once mitigation is completed; work with insured's chose contractor on ACOR.

Safeco retained Donan Engineering and on **March 2, 2017**, Michael R. Stark from Donan performed an initial scope study of the insured dwelling. On **March 6, 2017,** Donan completed their initial report, that includes, in part:

*Conclusions*

The Terranova residence is constructed in an area that is known to have expansive soils with shrink-swell potential. The soils at the site are vulnerable to volumetric changes with fluctuations in moisture content of the soil. Changes in the moisture content of moisture-sensitive, expansive soils induce swelling and/or settlement. During wet climatic periods, moisture influx can cause swelling of the soil. Moisture efflux, resulting from dry climatic conditions, can cause consolidation of the soils and, subsequently, the foundation. Variations in the moisture content of the soil, such as climatic conditions and vegetation effects, in addition to the runoff drainage conditions around the perimeter of the residence, cause differential foundation movement.

The finished grade adjacent to a structure should slope away from the foundation to provide positive drainage. Areas of inadequate surface drainage are around the residence, primarily along the west elevation, where the grade adjacent to the residence is flat or negatively sloped, causing roof and surface run-off to accumulate adjacent to the structure. This causes absorption of the excess water by the soils which contributes to differential movement.

Differential foundation movement occurs as a result of heave or settlement in the supporting soils. When foundation movements occur, stresses develop in the structure and finish materials, caused by the change in support conditions when the structure moves or distorts with the foundation. This differential vertical movement has resulted in the observed damages (cracks, separations, etc.) to the stone pavers and mortar joints at the back patio.

A majority of the areas of exterior cracks within the stone pavers and mortar joints within the northwest quadrant of the back patio are older in nature, as indicated by the weathered, rounded, and worn edges of the crack surfaces and an accumulation of debris within the cracks. These conditions are consistent with long-term movement as the result of an ongoing condition that has occurred over an extended period of time.

However, newer cracks in the stone pavers and mortar joints with clean, sharp, and distinct edges are within localized areas along the east edge and at the southwest comer of the back patio. These conditions are indicative of new damages and recent movement of the patio.

The broken pipe and subsequent water leak from within the residence that ultimately drained out and across the back stone paver patio, as reported by Ms. Worthan did not independently cause the recent differential movement of the patio surface. However, the reported water loss event has contributed to the recent differential movement and relative heave/settlement of the back patio surface and has exacerbated the cracks within the stone pavers and mortar joints along the east edge and southwest comer of the back patio.

Condensation and water stains are on the inside surface of the exterior single-pane glass at numerous window units with removable interior storm window inserts. These conditions are at windows on each level of the residence along both the east and west elevations. These window units are not designed or constructed as hermetically-sealed, double-paned windows, and should not be expected to perform as such. Continuous air movement around and behind the removable storm-window inserts exists as the inserts only clip into place on the interior of the window frame and are not permanently sealed. Condensation should be anticipated at these window units as temperature differential conditions warrant, particularly when warm, moist air from within the residence comes in contact with cooler, drier air exterior to the house. The condensation, resultant water streaks, and staining are cosmetic in nature and can be remedied by removing the storm-window insert and cleaning the glass surfaces. These window unit configurations should not be considered damaged or defective.

The observed condensation, water staining, and debris accumulation within the double glass panes at the identified window units at the Terranova residence are consistent with expected, long-term seal failure. The deterioration of the seals is the result of prolonged sun exposure and thermal expansion/contraction of both the glass panes and the air cavity during the installed lifetime of the window units.

Cracks are in the glass of the interior, removable storm-window inserts at two east-facing window units in the basement, one west-facing window in the main-level office, and one east-facing window in the upper-level, north guest bedroom. Additionally, the interior glass is cracked at a west-facing double-paned window in the library. The cracks are consistent with differential structural movement and minor framing deflections, in conjunction with expansion and contraction of the glass window panes resulting from seasonal fluctuations in ambient temperature and relative humidity. The broken windows are not the result of the recent water leak.

*Summary of Conclusions*
In summary, based on what is known at this time, I am of the opinion that:

• The cracks in the stone pavers and mortar joints on the back patio are the result of long-term soil movement.
• The reported broken pipe and subsequent leak contributed to and exacerbated the existing cracks along the east edge and southwest comer of the patio.
• The condensation within the exterior single-pane window units with removable interior storm-window inserts is not the result of the recent water leak. These window configurations are not damaged or defective.
• The condensation of moisture and the water stains between the panes of the insulating glass of the double-paned windows are the result of typical age-related deterioration of the seals at the perimeter of the units.
• The deterioration of the seals is the result of prolonged sun exposure and thermal expansion/contraction of both the glass panes and the air cavity during the installed lifetime of the double-paned window units.
• The cracks on the interior panes of the five identified windows are consistent with differential structural movement and minor framing deflections, in conjunction with expansion and contraction of the glass window panes.

On **March 7, 2017**, Mandy Winters adds a claim note to Nick Buller:

Nick,
I had a chance to review Donan's report. Thank you for engaging them to investigate the issues with the windows and patio further.

In review, I'm in agreement that there would be no coverage for the window damages as they do not appear to be caused by the water loss claim, but that of wear and tear, deterioration and weather over time.

The engineer states the patio damages were exacerbated by the water loss, but was a pre-existing condition due to expansion/contraction of the soil beneath over time and weather. I agree with you as the policy states the following:

BUILDING PROPERTY LOSSES WE DO NOT COVER

We do not cover loss caused directly or indirectly by any of the following excluded perils. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area;

9. Earth Movement, meaning:

a. the sinking, rising, shifting, expanding or contracting of earth, all whether combined with water or not.

I agree that there would be no coverage based upon the opening language that any losses caused indirectly or directly by one of the exclusions, as well as contributing concurrently with one of the excluded perils. Unfortunately we would not have coverage for the patio damages under the claim.

On **March 9, 2017**, Mandy Winters sends the insured a letter that includes, in part:

We have estimated that the rebuild of your damaged property could take up to 6 months. We will be able to afford coverage for your additional living expenses until September 1st, 2017. If you feel an extension is necessary, please provide a letter signed by you and your contractor indicating what caused the delay and if it is insurance-repair related. Extension requests will be considered upon review of your correspondence and any attached supporting documentation. Safeco Insurance Company of America does not cover additional living expenses incurred as a result of changes, additions, alterations, or upgrades that are not related to the repair of damages covered by your policy and that extend the construction time frame.

We have received the pricing back on the Saltillo tiles and have adjusted our scope accordingly to reflect the pricing. A supplemental payment has been issued as follows, and the check has been sent separately.

Below is a breakdown of the payment issued to include the tile replacement. This payment has been made co-payable with you and your lender, Chase Home Finance. A copy of our scope will be e-mailed to you, so that you may provide to them.

Dwelling

| | |
|---|---|
| Total Estimate of Damage | $132,118.79 |
| Recoverable Depreciation | $24,588.36 |
| Prior Payments | $86,362.32 |
| Deductible | $2,500.00 |
| Total Payment | $18,668.11 |

After a review of your policy and the facts that have come to our attention, Safeco Insurance Company of America regrets that it is unable to pay for a portion of your claim because your policy does not provide coverage for part of the loss. Our reasons for this partial denial are as follows:

As you are aware, this claim arises from freezing pipes that burst and flooded the home. We contacted Donan Engineering to inspect the exterior patio as well as the condensation and cracking noticed on some of the windows. Our investigation revealed that your home was constructed in an area known to have expansive soils. This along with the fact that parts of the grade surrounding the home, slope into it which causes drainage to accumulate close to the structure. The water is absorbed by the soil and can cause movement. The

damages to the stone patio revealed evidence of pre-existing damage caused by soil movement over time, as well as new damage that was likely exacerbated by the recent freeze loss with the resulting excess water.

The condensation and water stains on the windows were found throughout all elevations and levels of the home and are expectant of long-term seal failure with contributing factors such as weather and age. The recent freeze loss was not found to be the cause of these issues. Furthermore, the engineer confirms there are no damages to the windows themselves due to the staining and that the cracked windows were the cause of structure movement likely from the expansive soils. We will provide you with a copy of the engineer's report for your review.

Unfortunately, your policy does not provide coverage for the damages to the patio stone pavers or the cracked and stained windows due to the following policy provisions.

. . .

We are willing to reevaluate this decision if you have any new facts or information you believe may affect coverage of your claim. If you have new information, provide it to us in writing at your earliest opportunity.

On **April 13, 2017**, a Claim Report to Scott Gilbert is added to the file by Mandy Winters that includes, in part:

DIARY REPORT
-claim on report to CE, Scott Gilbert

FACTS: Severe water loss to this 2 story home with 4100 sq ft built in 1978 located in Morrison, CO. The boiler failed while the insured was out of the country, causing the temperature to drop in the home and two exterior wall baseboard pipes to freeze and burst. Water damage originated on the 2nct level and came down to the main level collapsing ceilings and eventually into the basement. Large amount of contents affected by water on 2 levels and basement.

OPEN ISSUES: Repairs, DWG RD, code/open items, Contents ACV, storage and delivery, artwork and pinball machine evaluations

RECOVERY: subro is active on file- we are awaiting recent plumbing repair invoice to determine if there was a prior issue that contributed to the baseboard failure

DAMAGES:
DWG: Water damage affected drywall walls and ceilings. Flooring damages include Saltillo tiles throughout, carpet and wood. Ceilings have tongue and groove wood finish and kitchen has high grade stainless appliances. Demo and Ems completed by American Restoration. ACOR pending w/ insd ktor of choice. ACV payment has been issued based upon FE scope. RD is $25k. Reserves are adequate for known RD and open items. We've been having

difficulty reaching the insured to follow up on their ktor selection. We have sent e-mails, text messages and left voicemails. Status letter has also been sent.

PP: Several cleaning vendors are involved to include Rescuetech, Refinishers, CRDN, and Colorado Arts. We have paid all but costs for the artwork refinishing from Colorado arts. We anticipate this to be the larger portion of the contents claim, as the insured have over 100 pieces of artwork. We also have a total loss list which has been identified and sent to the insured for pricing and aging so ACV can be issued. We have sent status letter to follow up as we've been having difficulty reaching the insured most recently. Reserves are adequate for remaining known exposure. We are also waiting for an evaluation on the pinball machines as the insured decided to engage their own expert for this.

OS: Stone patio damage appeared to be unrelated to the water loss- recommending reducing this reserve to NIL

LOU: The insured is not staying in the home as it is not livable. We have reached out to find out if accommodations needed, to which insd has refused to date. The insured eluded at one point they may be staying with a neighbor. We've asked for incurred costs for this and have not received anything to date. Reserve in place for the incurred costs should these be presented. The insured also travels extensively out of the country.

WORKPLAN:
Continue f/u w/ insd
Monitor repair/ACOR status
Contents evaluation/ACV payment
RD
Subro
REDACTED

On **May 24, 2017**, Nick Buller enters a claim note regarding a call from the insured's contractor:

Call in from contractor/ he is disputing our material and labor pricing for the subfloor. He advised T&G 3/4" is $30/sf and his labor is higher than ours. He is at $15 1 490 for 2 1 140 = $7.24/sf. This is far above what our pricing is currently. He advised his estimate pales in comparison to what the customers are working on to send over; they have hired an architect/ an engineer and other companies to assist in being "made whole." Don does not want to meet on Monday 6/5 as he wants to hear back from the customer

On **June 1, 2017**, SBSA sends their report to Lori Worthan than includes:

Per your request, SBSA, Inc. (SBSA) observed the residence located at 43 West Ranch Trail in Morrison, Colorado and reviewed information on the above-noted claim. This work was performed by Andrew J. Rudeen, MAE, EI on May 10, 2017. The site observation included visual observations of the exterior and interior of the residence, as well as a relative level survey of the main floor joists and basement slab-on-ground. The

results of the observation are presented herein. For the purposes of this report, the home faces east.

BACKGROUND INFORMATION:

The building is a two-story single-family residence. According to information provided, the home was built circa 1978. The foundation consists of cast-in-place concrete walls bearing on spread footings. The superstructure is constructed with conventional wood framing. The exterior is primarily clad in vertical siding boards.

SBSA was contacted to evaluate the condition of the residence following a radiant floor heater leak at the second floor. The leak was reportedly discovered in January 2017 and introduced approximately 14,000-gallons of water into the residence. The leak originated at the southeast bedroom baseboard heater. The interior finishes in the basement and first floor had been completely removed prior to SBSA's site visit. The floor finishes and 2-feet of drywall above the second floor framing had also been removed.

OBSERVATIONS:

A. STRUCTURAL

1. FOUNDATION SYSTEM

a. Foundation Performance
SBSA performed a relative level survey of the main floor framing. A relative level survey is only intended to determine relative out-of-levelness at the time of the survey and is used in conjunction with review of current resultant damage to determine the extent of differential foundation movement. A relative level survey of this type with the equipment SBSA utilizes is considered accurate to within plus or minus 1/8-inch. The relative level surveys focused on the structural points of bearing. The first floor framing and foundation are structurally connected to each other. Therefore, a point-of-bearing survey is adequate for the evaluation of the survey when used in combination with the manifestation of resultant damages. Typical construction standards allow for 1-inch elevation change over a distance of 20-feet (L/240).

Based on the results of the relative level survey of the main floor, the total out-of-levelness was determined to be 1-1/16-inches with the low spot occurring at center of the north foundation wall in the northeast crawlspace. The maximum slope of the main floor framing is located at the low spot, which slopes upward toward the east 8/16-inch over a distance of approximately 10-feet (L/240).

The majority of the first floor finishes, with the exception of the north end of the residence, had been removed prior to SBSA's site visit. The damages present at the north end of the residence were reportedly present prior to the leak in the radiant floor heater.

2. FLOOR SYSTEM – BASEMENT SLAB-ON-GROUND

a. Slab-on-Ground Performance

SBSA also performed a relative level survey of the basement slab-on-ground. Based on the results of the relative level survey of the basement slab, the total out-of-levelness was determined to be 13/16-inch with the low spot occurring at center of the north foundation wall in the basement. The maximum slope of the main floor framing occurs at the southwest corner of the basement, which slopes downward toward the north 11/16-inch over a distance of approximately 10-feet (L/174). Isolated slab cracks are present at the center of the basement slab. There is no correlating distress in the slab or the adjacent stone finish that is consistent with post construction slab movement.

3. FLOOR SYSTEM – WOOD FLOOR

a. Moisture Damaged Floor Sheathing

CONCLUSIONS:

A. STRUCTURAL

1. FOUNDATION SYSTEM

a. Foundation Performance

Based on the results of the relative elevation survey of the main floor framing, minimal differential movement of the foundation system has occurred. The maximum slope of the foundation occurs at the north foundation wall in the crawlspace below the den. No visible damages to the floor decking, framing, or foundation wall were visible at this area. This indicates the out-of-levelness occurred before the reported leak.

In addition, the majority of the foundation system in the full basement is within typical construction tolerances. The maximum slope of the floor framing above the full basement occurs at the southeast corner of the basement and slopes toward the north 6/16-inch over a distance of approximately 8-feet (L/256). Based on this, any minor differential movement occurring at the residence likely occurred before the leak.

2. FLOOR SYSTEM – BASEMENT SLAB-ON-GROUND

a. Slab-on-Ground Performance

As discussed, minimal differential movement of the basement slab-on-ground has occurred as a result of the reported leak. The entire slab is under 1-inch out-of-level with isolated locations that exceed typical construction tolerances. Based on this, no repairs to the basement slab-on-ground are required at this time.

3. FLOOR SYSTEM – WOOD FLOOR

a. Moisture Damaged Floor Sheathing

The floor sheathing at the first floor reportedly consisted of two layers of sheathing prior to the leak occurring. The top layer of the sheathing had been removed prior to SBSA's observation. The bottom layer of sheathing was left in place.

The exposed sheathing at the first floor is stained and visibly warped due to the introduction of water from the second floor leak. The sheathing deflected and cracked under light pressure. Similar conditions are present at the second floor sheathing. Water staining and warping are present ranging from the master bedroom door to the south wall of the hall bathroom. Based on the observed conditions, the sheathing at the first and second floor is not adequate to be built on for structural framing purposes as the structural integrity has been reduced.

4. FRAMING

a. Corroded Beam Connections

The bolted steel angle connections at the second floor beams are corroded. The connections are tight and significant section loss was not observed at any of the connections. Given the amount of water introduced by the leak, the surface corrosion of the connections was likely a result.

b. Increased Checking and Torsion in Exposed Wood Beam

Longitudinal cracks (checking) are present at the 6x12 floor beams throughout. Checking, twisting, and shrinkage of the exposed timber framing are consistent with rapid changes in temperature and moisture content in the wood. Normal and expected drying of the wood beams does not result in the amount of damage present in this home. Some minor checking and shrinkage of the wood will occur naturally due to moisture contents in the timbers reaching equilibrium. However, the checking and separation of the exposed timber framing throughout the residence is substantial and beyond expected performance.

In addition to the observed beam checking, twist of the framing has created gaps and separation at some of the beam supports that would not have been present in original construction. The beam ends below the second floor sitting room and south wall of the southeast bedroom are both displaced and rotated at the supports.

The leak event led to high humidity levels at the residence which created an increase in the moisture content in the exposed timber framing. This rapid change in temperature and moisture content in the wood resulted in the increased longitudinal cracking, twisting, and shrinkage of the exposed timber framing beyond normal performance. This resultant damage is both cosmetic and functional damage to the timber framing. Therefore, the resultant damage to the exposed timber framing is directly related to the water loss event.

B. CIVIL

1. FLATWORK

a. Cracked Flagstone Patio

Mortar joint separations are present at the flagstone patio and the rear of the residence and are the result of water from the reported leak penetrating the soils below and freezing. When water freezes, the volume increases approximately 9- percent. The increased volume resulted in an increased vertical pressure under the flagstone patio. The resultant damages manifested as separated mortar joints and isolated flagstone cracks. There is limited debris in the mortar crack and the edges of the cracking remain sharp; there is no evidence of aging in the separation.

C. BUILDING ENVELOPE

1. FENESTRATIONS

a. Broken and Inoperable Windows

Multiple cracked and inoperable windows are present throughout the residence. The leak event introduced additional moisture and humidity into the residence which saturated the window framing. The increased moisture content of the window framing, in turn, caused swelling of the window framing. The water leak reportedly occurred in January 2017. During this time, external temperatures were below the freeze point of water. When water freezes, it expands in volume. The expansion of water as it froze caused additional swelling of the window framing and increase pressure on the glass panes. The increased pressure then resulted in broken glass panes and inoperable windows.

On **June 24, 2017**, Nick Buller sends an email to Lori Worthan with his revised estimate. The email includes:

I hope you and Vinny are doing well. Attached is a copy of my current estimate based on my re-inspection with your contractor at the property; please note, this is not the final estimate, as there are some items we are waiting on before finalizing the estimate. Here is a snapshot of what we are waiting on:

- Framing code for the basement exterior walls; it has been identified by your contractor that these may not be up to current code. In order for coverage to trigger per your policy, we would need to confirm this is an enforced code in your county. This has been communicated to your contractor and my last conversation with him, was that he was waiting to hear back from them.

- Electrical code concerns due to rusting as well as updating the outlet boxes. The same applies to this as above; your contractor is stilI waiting to hear back.

> - There was some concern raised by your contractor regarding HVACi's pricing of the baseboard heater replacements; Don stated to me, he would provide me with a bid. We are still pending this.
>
> I have offered to contact Jefferson County to discuss with them directly, but Don refused to provide me with their contact information. Could you please provide me with a copy of the permit pulled for this project, so that I can attempt to reach out to the building department directly in an effort to speed up their response.
>
> I am here to assist you through the claims process, so if at any time, you have any concerns, please make me aware of them as soon as possible, so I can address them immediately.

Om **July 6, 2017,** Nick Buller sends an email to Don Greenless:

> I just received a call back from Craig Allen with Jefferson County; he was very open and happy to talk with me and I think would be a great contact for us going forward should any other code items come up. Here is what he advised me:
>
> - Basement half walls would require removal and replacement with a floating treated sill plate and either a moisture barrier on the stem wall or a 1" gap from the stem wall
> - He also advised that we would need to rewire the areas that are showing rust on the outlet boxes. This is likely the entire main level other than the lower level room that was undamaged as well as the entire basement.
>
> I will be adjusting my estimate accordingly and sending over to you for review. Now that we have confirmed what they are enforcing we are able to proceed with the demo of those items noted above and working towards finalizing the estimate.

On **August 16, 2017,** Safeco includes a supplement for $59,777.93. The Safeco estimate totals RCV $208,009.45, ACV $183,976.27.

On **August 21, 2017**, a Status Report to Scott Gilbert is added to the file:

> Severe water loss to 2 story home with 4100 sq ft built in 1978 located in Morrison, CO. The boiler failed while the insured was out of the country, causing the temperature to drop in the home and two exterior wall baseboard pipes to freeze and burst. Water damage originated on the 2nd level and came down to the main level collapsing ceilings and eventually into the basement. Large amount of contents affected by water on 2 levels and basement.
>
> The insured is the owner of Rocky Mountain Harley Davidson. The home is full of high end furnishings to include solid wood furniture, antiques, collectibles and artwork. There were over 150 pieces of original artwork affected by the water loss. The insured also has a

library with collectible old books. Several experts have been engaged to include Colorado Arts, Refinishers, Rescuetech and CRDN.

Dwelling: Water damage affected drywall walls and ceilings. Flooring damages include Saltillo tiles throughout, carpet and wood. Ceilings have tongue and groove wood finish and kitchen has high grade stainless appliances. Appliance report is pending to confirm damages. Demo and EMS have been completed to date and paid. The insured has selected a contractor after a 3 month delay, and most recently, has submitted their estimate of repair.

After FS re-inspection with the insured's ktor, Grey Eagle Builders, we have new information which has resulted in the increased costs of damages. See FS report on file 8/16 for more information. The insd ktor bid includes alterations, upgrades and replacement of undamaged items that are not covered under the policy. FS has prepared revised scope for loss-related damages which is added to the file, ready for payment. A significant reserve increase will be requested to cover the anticipated exposure.

Open items include timber framing, engineering, appliances, and code items.

Other Structures: No adjustments recommended. Initial reserve in place for possible patio damages. We received an engineer's report from Donan, who opined the damage to the patio was not related to the water loss. We have denied these claimed damages in previous communications and forwarded a copy of the engineer's findings to the insured. Furthermore, the insured is claiming the driveways were damaged by the EMS company and their equipment/vehicles. These damages would need to be addressed by American Restoration.

Personal Property: Refinishers packed out large furniture items for restoration and is storing offsite. Storage is $450/mo from Refinishers and we are current through end of August 2017. Repair costs have been paid to date. They produced a non-salvage list with approx. values at $21,270 for all items. They have classified their bid to include if items are antique, collectible, high quality or custom made. This can be found in the CVO file 2/ 21 / 17. We are awaiting additional information from the insured in order to price out this inventory. This includes original place of purchase, descriptions and ages. The insured advised she would have this to me within the next few weeks as they have been busy with their business out of country.

The insured has 3 pinballs and 2 slot machines, we are awaiting a report for repairs from the insured, as we were unable to find an expert the insured was comfortable with. The insured informed us that these repairs have been completed.

The pool table is a total loss and valued at $4k from Best Quality Billiards after inspection. This payment pending in the overall ACV for non-salvage items.

Rescuetech assisted with electronics restoration and we have paid these costs to date. There were minimal electronics affected to include flat screen tv, soundbar, dvd player, printer, monitor and speakers.

CRDN has taken and cleaned affected textiles~ this bill has been paid to date. A non-salvage list was produced and sent to the insured to complete descriptions and aging.

Mike Bettman from Colorado arts has inspected the artwork and had the original artist, David Uhl, personally inspect the pieces and provide values. His report is pending as well as the pricing for restoration and total loss values. Majority of art was able to be restored. We've received new information that there are 2 pieces in particular that suffered water damage possibly beyond repair and may be in dispute. According to Mike, these are valued at $120k combined. Mike attempted to restore and the insured inspected the pieces following this and was in agreement with their repair, however a final inspection by the artist is pending before this can be confirmed. He anticipates his costs for everything to be about $150k not including these two pieces if confirmed a total loss. He is also awaiting pricing from 2 other pieces from the original artist.

Remainder of contents not affected, were packed offsite by American Restoration (insd EMS vendor) into pods and inside the garage for storage. POD storage is approx. $250/mo and we are paying POD bills as received. Packout costs have been paid to date.

A significant reserve increase will be recommended in anticipation of the 2 art pieces that may be a total loss.

Loss of Use: The insured owns a residence and conducts business in the British Virgin Islands regularly. He is back and forth between the home and BVI and has been since the loss occurred. The insured has been staying at the neighbor's home while in Colorado, since the onset of the claim. This neighbor is reportedly selling this home, therefore making it available to the insured.

We have requested a lease and payment documentation since first contact. The insured claims they pay the neighbor but has yet to produce the documentation. Initially, the insured advised that they would offer the neighbor $2,200/mo to rent their home during construction. We've received an FRV at $5,100/mo for a 12 mo lease. 4 more months are anticipated in order to complete repairs. If the insured has been paying $2,200/ mo, after 12 mo of housing this equates to $26,400. Demo has been completed to date. There was a 3 month delay in the insured choosing a contractor. Insured selected Grey Eagle builders beginning of May, 2017.

Other: Reserves to be reviewed/ evaluated by Examining and management.

Work Plan:

REDACTED

On **August 30, 2017**, Nick Buller sends an email to Lori Worthan:

> I hope this message finds you well. I appreciate your patience during my review of Grey Eagle Builder's estimate; I have received approval on my revised estimate, which I have attached to this email for your reference. The updated estimate will be sent to Grey Eagle Builders as well for their review; there are a few questions I have for Mr. Greenless, that I will address with him directly. A supplemental payment, based on our revised estimate has been issued to Vinny and the mortgage company; Mandy Winters will be reaching out to you shortly to review.
>
> A few items of note:
>
> - Our estimate is still pending documentation regarding the kitchen appliances (I understand you will be sending these to Mandy Winters at your earliest convenience)
>
> - Grey Eagle Builders' estimate included pricing for windows/sliding glass doors and the stone patio. I have attached a letter dated March 9th of this year sent out by Mandy regarding the engineer's (Do nan) evaluation and determination that those damages were not caused by this water loss event. To date, we have not received any documentation to support otherwise.
>
> - Grey Eagle Builders' estimate also included damage to the driveway. This damage was caused by American Restoration and it would be their responsibility to make you whole. If you'd like, I can reach out to American Restoration to make them aware of these damages if they were not already and coordinate communication between you and them.
>
> - The policy provides coverage to restore you to pre-loss condition; thus, my estimate is written to do so, with consideration for the known code upgrades presented at this time by Grey Eagle Builders. Should any additional code enforceable items be discovered, they will be addressed accordingly with your contractor.

On **September 27, 2017,** Safeco's Mandy Winters sends the insured a letter advising of a supplemental payment:

> We have estimated that the rebuild of your damaged property will take 4 months. We will be able to afford coverage for your additional living expenses until December 31st, 2017. If you feel an extension is necessary, please provide a letter signed by you and your contractor indicating what caused the delay and if it is insurance-repair related. Extension requests will be considered upon review of your correspondence and any attached supporting documentation. Safeco Insurance Company of America does not cover additional living expenses incurred as a result of changes, additions, alterations, or upgrades that are not related to the repair of damages covered by your policy and that extend the construction time frame. We are also unable to cover additional living expenses due to any delays in the process that are within your control. This is including, but not limited to, securing a contractor to complete the loss-related repairs.

We have reviewed your supplemental payment request and calculated the amount of coverage under your policy following changes made by our field specialist, Nick Buller. A check has been sent separately and is made payable to you and your lender, Chase Home Finance.

Below is a breakdown of the actual cash value of your property, which is what your policy provides. This amount is based on a thorough review of the damages and the facts of the loss and the cost of the repairs.

Dwelling

| | |
|---|---|
| Total Estimate of Damage | $208,009.45 |
| Recoverable Depreciation | $24,033.18 |
| Prior Payments | $105,030.43 |
| Deductible | $2,500.00 |
| Total Payment | $76,445.84 |

On **September 27, 2017,** Safeco's Mandy Winters sends the insured a letter advising of the need to keep heat in the building. The letter includes, in part:

We received notice that no further work has progressed at your home since the original demo and subfloor repairs. We understand that the weather is about to tum and could potentially cause further damage to your home without any heat. Please note we have previously paid to replace the heat system according to the bid provided by your contractor. Please be advised that it is your damage and maintain your property, and we would be unable to cover any damages that ensue as a result of neglecting to do this.

Your contractor has advised that there may be further documentation to support the additional repair costs. To date, we have not received this information. We are also awaiting further information from you in order to process your claim to conclusion. We have requested this documentation from you several times in previous communications.

We have reached out to Don Greenless at your request, to inquire about any contents that may potentially become damaged from the cold weather, that are located in PODS on site. He was unable to give us an evaluation of anything located in them. We are happy to reach out to Mike Bettman if you would like us to, so that he may evaluate if any items located in the PODS should be moved to a climate control facility to prevent any damage. Again, it is your responsibility to protect the property from potential harm and damage. We would be happy to help in facilitating this.

The additional living expenses coverage is available to you for the reasonable timeframe needed in order to complete repairs. To date, we have not received any information from you regarding a lease, incurred rental payments, etc., to support what, if any, costs you've

> incurred for alternate housing. We have previously conveyed that the last date we will be able to cover any costs incurred will be through December 31 '1, 2017. We understand that you are back and forth between two residences, including your home in Colorado and a residence in the British Virgin Islands and have been throughout this process. Four months is the reasonable time period agreed upon and necessary in order to complete the loss-related repairs to the home. We are unable to cover additional living expenses as a result of any delays that are within your control.
>
> We are still awaiting additional items in order to resolve your claim, please let us know the status of and submit the following information as soon as you have available:
>
> • Appliance technician report
> • List of total loss content items with ages/ original pricing for evaluation
> • Pinball machine report/ evaluation
>
> If you need us to engage an expert to inspect the pinball machines and appliances, please let us know as soon as possible. We have previously offered to send an expert, but you had informed us you had engaged your own experts for this.

On **October 26, 2017,** Mandy Winters sends another letter to the insured advising of the above needed information:

> As a follow up to my letter to you dated 9/27/17, the additional living expenses coverage is available to you for the reasonable timeframe needed in order to complete repairs. To date, we have not received any information from you regarding a lease, incurred rental payments, etc., to support what, if any, costs you've incurred for alternate housing. We have previously conveyed that the last date we will be able to cover any costs incurred for temp housing and contents storage will be through December 31st, 2017.
>
> We understand that you continue to be traveling back and forth between two residences, including your home in Colorado and a residence in the British Virgin Islands and have been throughout this process. Four months is the reasonable time period agreed upon and necessary in order to complete the loss-related repairs to the home. We are unable to cover additional living expenses as a result of any delays that are within your control.
>
> Here's a recap of what we are still waiting for from you, in order to process the claim further:
>
> We are still awaiting additional items in order to resolve your claim, please let us know the status of and submit the following information as soon as you have available:
>
> • Appliance technician report
> • List of total loss content items with ages/ original pricing for evaluation
> •Pinball machine report/evaluation

On **December 13, 2017, April 27, 2018, June 11, 2018**, **September 11, 2018, and October 25, 2018,** Mandy Winters again sends letters to the insured advising of the above:

In **March, 2018** a status Note is entered in the file that includes:

> Facts/Loss Description: Severe water loss to 2 story home with 4100 sq ft built in 1978 located in Morrison, CO. The boiler failed while the insured was out of the country, causing the temperature to drop in the home and two exterior wall baseboard pipes to freeze and burst. Water damage originated on the 2nd level and came down to the main level collapsing ceilings and eventually into the basement. Large amount of contents affected by water on 2 levels and basement.
>
> The insured is the owner of Rocky Mountain Harley Davidson. The home is full of high end furnishings to include solid wood furniture, antiques, collectibles and artwork. There were over 150 pieces of original artwork affected by the water loss. The insured also has a library with collectible old books. Several experts have been engaged to include Colorado Arts, Refinishers, Rescuetech and CRDN.
>
> Coverage/ Analysis Update Performed: covered / updated
>
> Dwelling: Water damage affected drywall walls and ceilings. Flooring damages include Saltillo tiles throughout, carpet and wood. Ceilings have tongue and groove wood finish and kitchen has high grade stainless appliances. Appliance report is pending to confirm damages. Demo and EMS have been completed to date and paid. The insured has selected a contractor after a 3 month delay, Grey Eagle Builders, who submitted an estimate of repair. FS has re-inspected and reviewed estimate and some adjustments were made. We have issued supplemental payments based off these adjustments. RD is $24k.
>
> The insd's ktor bid includes alterations, upgrades and replacement of undamaged items that are not covered under the policy. The insureds ktor is not in agreement with our scope and has not started repairs to our knowledge. Open items include timber framing, engineering, appliances, and code items. Reserves adequate to address.
>
> Other Structures: No adjustments recommended. Initial reserve in place for possible patio damages. We received an engineer's report from Donan, who opined the damage to the patio was not related to the water loss. We have denied these claimed damages in previous communications and forwarded a copy of the engineer's findings to the insured. Furthermore, the insured is claiming the driveways were damaged by the EMS company and their equipment/ vehicles. These damages would need to be addressed by American Restoration. We have advised the insured of this as well.
>
> Personal Property: Refinishers packed out large furniture items for restoration and is storing offsite. Storage is $450/ mo from Refinishers and we are current through end of December 2017. Repair costs have been paid to date. They produced a non-salvage list with approx. values at $21,270 for all items. They have classified their bid to include if items are antique, collectible, high quality or custom made. This can be found in the CVO

file 2/21/17. This has been submitted to the insured and we are awaiting additional information from the insured in order to price out this inventory. This includes original place of purchase, descriptions and ages. We continue to request this info from the insured.

The insured has been busy with their business out of country.

The insured has 3 pinballs and 2 slot machines, we are awaiting a report for repairs from the insured, as we were unable to find an expert the insured was comfortable with. The insured informed us that these repairs have been completed. These costs are open.

The pool table is a total loss and valued at $4k from Best Quality Billiards after inspection. This payment pending in the overall ACV for non-salvage items. These costs are open.

Rescuetech assisted with electronics restoration and we have paid these costs to date. There were minimal electronics affected to include flat screen tv, soundbar, dvd player, printer, monitor and speakers. Storage paid through Dec, 2017- insd and vendor notified this to be last date.

CRDN has taken and cleaned affected textiles- this bill has been paid to date. A non-salvage list was produced and sent to the insured to complete descriptions and aging.

Mike Bettman from Colorado arts has inspected the artwork and had the original artist, David Uhl, personally inspect the pieces and provide values. His report was received and payment issued for restoration and total loss values of these items. We've received information that there are 2 pieces in particular that suffered water damage possibly beyond repair and may be in dispute. According to Mike, these are valued at $120k combined. Mike attempted to restore and the insured inspected the pieces following this and was in agreement with their repair, however a final inspection by the artist is pending before this can be confirmed. These potential costs are open.

Remainder of contents not affected, were packed offsite by American Restoration (insd EMS vendor) into pods and inside the garage for storage. POD storage is approx. $250/ mo and we are paying POD bills as received. Packout costs have been paid to date. Packback is open pending repair completion.

We have informed insd and vendors that we will no longer pay for storage after December 31st, 2017.

Loss of Use: The insured owns a residence and conducts business in the British Virgin Islands regularly. He and girlfriend, Lori Worthan, are back and forth between the home and BVI and have been since the loss occurred. They are spending more time there since a large hurricane destroyed the island at the end of 2017.

The last information we have is that the insured has been staying at the neighbor's home while in Colorado, since the onset of the claim. This neighbor is reportedly selling this home, therefore making it available to the insured.

We have requested a lease and payment documentation since first contact. The insured claims they pay the neighbor but has yet to produce the documentation. Initially, the insured advised that they would offer the neighbor $2,200/mo to rent their home during construction. We've received an FRV at $5,100/mo for a 12 mo lease. Reserves are based upon this.

4 months are anticipated in order to complete repairs. If the insured has been paying $2,200 / mo, after 12 mo of housing this equates to $26,400. Demo only has been completed to date. The insured has not moved forward with starting the work. There was a 3 month delay in the insured choosing a contractor. Insured selected Grey Eagle builders beginning of May, 2017. It is uncertain if they are still working with this contractor. FS to follow up with them.

Other: We intend to arrange for FS and IPN ktor to inspect home and secure ACOR for the damages related to the water loss. Insd lives in gated community, therefore permission must be obtained prior to an inspection. Status letter sent to insured for follow up.

Work Plan/Recommendations:
Contents evaluation
f/u on remaining items / status to insd
re-inspection/ ACOR w / ktor
LOU evaluation
Packback of contents
Payments
Hold for RD
Open items
Close

REDACTED

Total Incurred: $866,722.49

On **October 25, 2018,** Mandy Winters sends the insures a letter with a Proof of Loss form to be completed and returned.

On **November 29, 2018**, the claim notes a call with the insured as well as sending the insured a copy of the engineer report discussing the flagstone porch and windows. The claim note includes:

Contacted Lori Worthan @ 720-570-6988 1 left vm, advised calling to check in. Contacted Vincent Terranova @ 303-570-15351 advised calling to touch base. He advised he is not happy with our company and that we need to learn to pay. Advised insured that we have communicated with him and with his contractor regarding open items and have not received any response to

date. He inquired which items those were and I advised that we have sent multiple letters without response. Advised we are trying to move this forward and we'd like to meet out at the property with his contractor and an IPN contractor to finalize the estimate; he advised our contractors are sub-standard and will not allow them onto his property. I advised as well that his contractor's estimate includes many items that are not covered, because they were not damaged by the loss. He stated that was my opinion, I advised that is not accurate, that we engaged an engineer to inspect and provide their analysis and that this report has been sent to them previously. He requested I send him an email with the report, advised will do so. Insured then hung up the call.

In **January, 2019**, the file contains an Authority Request that includes, in part:

- Evaluation of damages (to include any applicable policy information)
- RCV Amount = TBD
- ACV Amount= $427,176.86
- Recoverable Depreciation = TBD
- Paid Loss: $427,176.86
- REDACTED
- Deductible: $2500
- Authority Formula (paid plus reserves plus ded): $869,222.49
- Further expenses on file
- AE Paid: $4096.36

On **January 14, 2019**, Safeco is advised that Michael Stoycheff has been retained as the insured's public adjuster. The correspondence includes:

> Our company has been retained by the above referenced insured to assist in the adjustment of their insurance claim. Enclosed is a copy of the Notice of Representation form signed by the insured. Please direct all future correspondence regarding this claim to our office as so noted below.
>
> As we are approaching the two-year anniversary of this loss, and the claim has not been resolved, we are requesting that Safeco to toll the two year period for filing suit pursuant to tll.is policy provision. It is only 20 days to the expiration of our contractual notice period, and we do not want to retain counsel to protect our rights. Please advise in writing by the end of next week, that Safeco is tolling m1til this claim is successfully adjusted.
>
> In order to assist in the adjustment of this claim, we would appreciate it if you would provide a Certified Copy of the Policy and Declaration page in force for this insured at t1 1e time of the loss. If applicable. if t1 1ere is a notification provision in the policy in regard to putting your company on notice of intent to make claim for replacement cost loss, please let tll.is letter serve to do so. The insured retains the right to repair rebuild or replace the damaged property. Documentation will be submitted as soon as it is received.
>
> The insured intends to comply with all provisions of the policy and requests that your company do so as well. Should the policy contain provisions that require tile submission

> of a proof of loss, the insured will rely on the insurer to provide adequate notice to fulfill this requirement. If the insurer is unable to do so, please notify me as soon as possible.
>
> It will be necessary for anyone who wishes to view tile loss to contact us for an appointment. We look forward to working with you or your representative to do so in a timely manner. Might you advise me as to whom that person might be if it is not you?

On **January 29, 2019**, Mark Nuefeild sends a letter to Brent Johnson approving him as the insured's appraiser.

On **January 30, 2019**, Michael Stoycheff sends an email to Nick Buller:

> I am starting to wrap my head around this loss after inspecting it in depth last week with their contractor Don. Would it be possible to get your ESX sketch on this to help save time? Also could you share your photos and the emergency services Xactimate invoice from American? That would be a good start for me. Please advise. Thanks

On **July 12, 2019**, Derek Pumphrey of New Rome completes his report that includes, in part:

> **PURPOSE AND SCOPE**
>
> The purpose of our observation was to determine the following regarding the aforementioned site:

3. To determine the cause of the observed damage to the windows, glass sliding doors and interior finishes.
4. To provide repair recommendations associated with these observed distress items.

> Note: Our observations only encompassed structural members and portions of the interior and exterior building finishes. Only limited destructive testing and/or removal of existing materials was performed as part of this scope of work and as identified in this report; otherwise no destructive testing was performed. The observations and opinions are only for the observed structural and specific building systems of the noted structure(s) at the sites. No other structures outside of the listed sites was / were observed, and a laser level survey was not conducted as part of the scope of work. Only limited measurements were recorded on site
>
> **CONCLUSION**
>
> It is our opinion, based upon a degree of engineering certainty, that the observed distresses at the interior of the residence noted are the result of exposure to inflections in the interior atmospheric conditions, especially lower dew point temperatures, that occurred after the ruptured radiant-heat line and the resulting shut-down of the boiler.

7. The ruptured water supply line - that supplied the baseboard heat from the boiler (that was located in the basement) to the rooms within the residence - was the root cause of the

observed interior distresses to the residence. It is the understanding of this office that this ruptured line occurred in the Master Bedroom on the Upper Floor. Once this line ruptured, then the introduction of the moisture from the 14,000 gallons of water within the interior of the residence, along with dropping temperatures in January 2017, resulted in increases in relative humidity, loss of interior heat and subsequent lower dew point temperatures within the interior. As a result, moisture was introduced to many of the surfaces of interior finishes, fixtures and materials. For example, because the lower dew point temperature occurred after the ruptured radiant heat line, the resulting surface moisture that occurred damaged rafter insultation, drywall (a partial collapse occurred in the Kitchen in early 2017), floor sheathing, exposed metal surfaces and exposed wood surfaces. Examples include:

a. The original plywood floor sheathing in the Living Room, Kitchen and adjacent rooms had evidence of significant water damage (as noted in the SBSA Original Report) to the point of loss of composite sections of the plywood layers. This required replacement of these sheathing locations, which occurred prior to our site observation.
b. Water-staining on the exposed metal connections at the Kitchen area, which is evidence of surface water creation from a lower dew point temperature. The resulting water staining / corrosion as noted above occurred at these connections.
c. Existing cupping of the newer floor sheathing near the main entry / Kitchen areas indicates that the relative humidity and lower dew points were likely still in fluctuation after removal of the original floor sheathing.
d. Water stains on wall-hung pictures as observed in the provided photographs.

8. Based upon the data of the dehumidification efforts by American Restoration, changes in relative humidity and temperature - and by extension the interior air pressure - continued to occur from the commencement of these efforts (February 3, 2017) to the final date of entry (February 17, 2017). Therefore, these interior atmospheric factors exhibited distress on the interior surfaces of the residence, including the window glazing systems, long after the initial pipe rupture occurred.

   a. The Donan Report noted that "Many factors lead to the failures of the seals (in window glazing): opening and closing the windows, changes in wind direction, temperature fluctuations opening and closing doors in the house; and changes in atmospheric pressure all cause cyclic stresses on the windowpanes, frames and seals." (Page 6; underlined letters added for clarity in this reference).
   b. Because of the extreme introduction of temperature, relative humidity, moisture content and pressure within the house in a short time period (i.e. January and February 2017), then the damaged seals and loose gaskets that were observed in the double-pane windows is the result of short-term inflection of interior atmospheric conditions that resulted after the water line rupture. We agree with the Donan Report that extreme temperature, pressure and relative humidity changes can alter the performance of glazing. Add to these atmospheric changes the lower dew point temperatures on interior glazing surfaces and the result is what was observed at this residence: Loss of seal and gasket performance and a noticeable reduction in the effectiveness and

performance of the window systems that was not apparent before the ruptured radiant line.

c. The broken glazing at the glazing inserts is also the result of surface moisture at the adjacent stud framing to the windows and the subsequent alteration to the rough opening dimensions with the alteration to the stud dimensions.

9. The Donan report also noted that differential foundation movement caused the cracking in the interior storm window glazing that was observed in the Basement and the Upper Floor on the east-facing walls and the west-facing wall of the Office on the Main Floor.

a. The glazing cracking at these individual window locations located along the north wall do not provide evidence that differential movement caused this cracking since the relative survey results from the SBSA Report of June 1, 2017 indicate an out-of-plane measurement of just greater than 1-inch on the Main Floor level and less than 1-inch at the basement floor level, with the low-point at each floor located at the north wall located beneath the Master Bedroom. The greatest slope also occurred from this north wall to the east wall with a measured differential movement of ½".
b. Since this survey was conducted in May 2017 and the measured greatest differential movement occurred at foundation locations that are not along the walls where these cracked glazing were located, then the notion of any differential foundation movement damaging the glazing on the east wall is not logical. Rather, the introduction of significant interior atmospheric differential temperatures, pressures, humidity and dew point temperatures that then caused the adjacent framing to move with the noted cracking in the adjacent glazing is a more definitive explanation of the observed distress.
c. Aside from the supped OSB locations near the Office on the Main Floor, no evidence of excessive differential displacement in the flooring on any level was observed via foot placement along the locations of these floor levels.
d. It is therefore not a logical conclusion that the observed glazing cracking was the result of any differential foundation movement, but rather the result of significant interior atmospheric conditions immediately after the radiant heat line rupture.

10. The owner has noted that the windows did not have sagging gaskets or fogging at the double glazing prior to the ruptured line event. The photographic evidence of the residence in February 2017 provides evidence that the distress to the seals and gaskets has worsened since these photographs were taken and only occurred after the radiant heat line ruptured.

11. The exposed 6x wood beams at the Main Entry and the Kitchen were utilized primarily for decorative purposes, with the exception of the beam at the Main Entry and the roof girder beam at the north side of the Living Room. The photographs provided by the owner provide insight into the reasons for the water stains and warping of these beams: The drywall ceiling over these locations (Main Entry, Kitchen and Living Room) contained moisture after the ruptured water line to the point that excessive condensation occurred beneath the ceiling paint (near the Main Entry) and within the drywall ceiling and walls in the Kitchen. The amount of moisture in the drywall ceiling resulted in a partial collapse of the ceiling near the Kitchen window. The amount of trapped moisture, again due to the

lower dew point within the interior after the baseboard heat no longer functioned and water was introduced within the interior, was the root cause for this excessive moisture and for the staining and warping of these exposed beams.

12. Other exposed beams, such as at the stairs near the Kitchen and the roof beam over the Sitting Room at the Upper Floor, had experienced checking after the ruptured radiant heat line.

On **October 21, 2019**, Michael Stoycheff sends Mandy Winters the completed partial Proof of Loss.

On **October 29, 2019,** the file notes the summary of the claim Triage that includes:

> Claim Note – MANCOO
>
> Triage Summary
>
> held call with management and stakeholders
>
> reviewed documents submitted by the PA including engineering and consultant reports and estimate of repairs
>
> estimate submitted includes previously denied damages under the claim
>
> partial proof submitted, relating only to DWG - agree will draft response and loop in PPS for inspection of the contents still outstanding
>
> FS to arrange for re-inspection with experts and contractor in effort to resolve differences in scope/cost

On **October 30, 2019**, Mandy Winters sends Michael Stoycheff a letter responding to the POL and other documents sent:

> This letter is in regards to the documents, including a partial proof of loss, we received from your office on October 21st, 2019. You have submitted documentation in relation to dwelling damages only, for the above captioned claim for water damage to the Terranova residence located at 43 W. Ranch Trl, Morrison, CO 80465.
>
> In review of the Proof of Loss you have submitted, we will request further evaluation and inspections of the damaged property, in effort to resolve the differences on this claim. We have still not received sufficient documentation to support your claim for the personal property portion of this loss and therefore the Proof of Loss is being held in abeyance at this time.
>
> We will be in touch with your office to schedule further inspections of the damaged property, with assistance of various specialists including Nick Buller and Kimberly Albert,

> accompanied by qualified construction and engineering experts. Please allow the property to be made available for our requested inspections. This request is being made in accordance with the following policy provisions.
>
> . . .

On **November 19, 2019**, a joint reinspection was completed by Michael Stark of Donan; Ms. Lori Worthan; Mr. Nick Buller and Ms. Kim Albert, Claim Resolution Specialists with Safeco; Mr. Scott Sarkisian, Senior Estimator with All Phase Restoration; Mr. Michael Stoycheff, Executive and General Adjuster with Adjusters International Matrix Building Consulting; Mr. Don Greenless, Owner of Gray Eagle Builders; and Mr. Derek Pumphrey, P.E., Engineer with New Rome Enterprises, LLC.

On **November 20, 2019**, Nick Buller details his summary of the reinspection in the claim file:

> FS met onsite with insured's significant other, Lori Wortham, Public Adjuster Michael Stoycheff (Adjuster's Int'l), Derek Pumphrey (New Rome Enterprises - engineer), Don Greenless (Grey Eagle Builders), Michael Stark (Donan Engineering), Scott Sarkisian (All Phase Restoration) and Kimberly Albert (PPS).
>
> FS walked through the property with Michael Stark & Scott Sarkisian. Mr. Stark inspected the windows, stone patio and beams throughout the home; the Donan report is forthcoming.
>
> FS and Scott Sarkisian walked through the home, discussed the damages, origin of the loss, nature of the damage, finishes in the home and repair method. We also viewed the exterior of the home as included in the Grey Eagle estimate is to replace all the windows and as such, replace all the siding in order to waterproof the windows. The information regarding the windows and siding was provided by Michael Stoycheff while onsite. Additionally, the Grey Eagle estimate includes to fully gut the master bathroom as they believe the home was not properly mitigated by American Restoration and that there was a posibility moisture was in the walls. This information again was provided by Michael Stoycheff. Upon visual inspection of common walls with the Master Bathroom that were exposed, there was no evidence of water on any insulation or drywall. Holes were previously (prior to inspection) cut in ceiling drywall in the hallway and hall bathroom (upper level) and no evidence of moisture found in attic or on attic insulation. No mold found either.
>
> At this time, we are pending the Donan updated engineering report and will update the repair estimate where appropriate.
>
> FS will upload photos from inspection.

On **November 24, 2019**, Donan's Michael Stark completes and submits his supplemental report. This 12 page report includes, in part:

Additionally, Safeco provided Donan with additional documents from the insured' s engineers for review and comment. These documents included: Observation Report prepared by Solutions Before Solutions After (SBSA), dated June 1, 2017, observed by Mr. Andrew J. Rudeen, M.A.E, E.I., signed and stamped by Ms. Liberty L. Lewis, P.E.; Observation Report prepared by SBSA, dated September 25, 2017, observed by Sameer Rampurawala, E.I., signed and stamped by Mr. Jerad B. Faris, M.S.C.E., P.E.; and Report prepared by New Rome, dated August 21, 2019, signed and stamped by Mr. Derek E. Pumphrey, P.E. The purpose of the joint reinspection, as indicated by Safeco, was to observe the existing conditions of the back stone patio and the windows and to evaluate the cause of cracking damage to the patio and the condensation within the windows. Further, although it was outside the scope of work for the initial assignment, it was requested by Safeco that Donan provide an opinion regarding the replacement of wood suppo1t beams as recommended by the insured's engineers. The following are Donan's observations, comments, and conclusions regarding the additional joint reinspection site study and response to the provided documents.

*Item 2, Window Condensation*

*Document Review*
Within the Observations section of their Report, New Rome states the following:
*"Damage to several windows was also observed thus:*

*a. Loose interior seals of the double-pane, west-facing windows at the Dining Area. The provided photographs from 2017 do not reveal the same degree of loose seals during the dehumidification procedures.*

*b. Fogged double-pane window to the north of the sliding door at the Dining Area. No evidence of this fogged double-pane window was observed in the provided photographs during the dehumidification process.*

*c. Loose gasketing of the Dining Area windows.*
*[ ... ]*

Within the Conclusions section of the report, New Rome states the following: *"Based upon the data of the dehumidification efforts by American Restoration, changes in relative humidity and temperature - and by extension the interior air pressure - continued to occur from the commencement of these efforts (February 3, 2017) to the final date of entry (February 17, 2017). Therefore, these interior atmospheric factors exhibited distress on the interior surfaces of the residence, including the window glazing systems, long after the initial pipe rupture occurred."* New Rome continues: *"Because of the extreme introduction of temperature, relative humidity, moisture content and pressure within the house in a short time period (i.e. January and February 2017), then the damaged seals and loose gaskets that were observed in the double-pane windows is the result of such*

*short-term inflections of interior atmospheric conditions that resulted after the water line rupture. We agree with the Donan Report that extreme temperature, pressure and relative humidity changes can alter the performance of glazing. Add to these atmospheric changes the lower dew point temperatures on interior glazing rand the result is what was observed at this residence: Loss of seal and gasket performance and a noticeable reduction in the effectiveness and performance of the window systems that was not apparent before the ruptured radiant line occurred."*

Within the Repair Recommendations section of the report, New Rome states the following: *"Remove the damaged window glazing and frames and replace with new double pane windows. Ensure that these new windows are installed per manufacturer recommendations, which includes the flashing at the sill, jambs and top to ensure code-compliant (i.e. manufacturer recommended installation techniques)."*

*Donan Response*

During the re-inspection of the house, window conditions similar to those documented during the initial study were observed. These conditions are comprised of debris accumulation (rather than active condensation), staining, and/or water streaks on the glass panes of numerous window units. The windows with these observed conditions include units within the living room, kitchen, dining room, and stairwell on the main level, and the guest bedrooms, bathroom, hallway nook, library, master bedroom, and lookout on the upper levels. Additionally, portions of the perimeter seals are deteriorated, displaced, and/or missing around the interiors and exteriors of multiple windows.

Donan concurs with New Rome that potentially extreme changes in the temperature, relative humidity, moisture content, and pressure occurred within the house as a result of the prior water loss event. These extreme changes transpired over a relatively short timeframe, from roughly late-January 2017, when the broken pipe and leak occurred, to reportedly February 17, 2017, when the dehumidification efforts were completed.

These changes in the temperature, relative humidity, moisture content, and pressure contributed to the process of the condensation of moisture occurring within numerous window units at the residence. However, the root cause of the moisture condensation is the deteriorated, displaced, and/or missing conditions of the perimeter seals at multiple windows. These conditions, as were previously observed during the initial study, were consistent with long-term failure events due to typical age-related deterioration of the seals.

As stated within the Summary of Conclusions section of the original report, *"The condensation of moisture and the water stains between the panes of the insulating glass of the double-paned windows are the result of typical age-related deterioration of the seals at the perimeter of the units."* Additionally, it was stated, *"The deterioration of the seals is the result of prolonged sun exposure and thermal expansion/contraction of both the glass panes and the air cavity during the installed lifetime of the double-paned window units."*

The joint reinspection of the subject windows and the provided documents from the insured 's engineers do not provide any new data or information that would require Donan to revise the conclusions in the original report. Therefore, the conclusions related to the window condensation remain unchanged as originally submitted.

*Item 3, Broken Window Glazing*

*Document Review*

Within the Conclusions section of the Observation Report dated June 1, 2017, SBSA states the following: *"Multiple cracked and inoperable windows are present throughout the residence. The leak event introduced additional moisture and humidity into the residence which saturated the window framing. The increased moisture content of the window framing, in turn, caused swelling of the window framing. The water leak reportedly occurred in January 2017. During this time, external temperatures were below the freeze point of water. When water freezes, it expands in volume. The expansion of water as it froze caused additional swelling of the window framing and increase pressure on the glass panes. The increased pressure then resulted in broken glass panes and inoperable windows."*

Within the Repair Recommendations section of the same report, SBSA states the following: *"Remove and replace all broken and/or inoperable windows throughout."* SBSA provides nearly identical conclusions and repair recommendations regarding the broken and/or inoperable windows in their Observation Report dated September 25, 2017.

Within the Observations section of their Report, New Rome states the following: *"Damage to several windows was also observed thus:*

. . .

*Donan Response*

During the re-inspection of the house, window conditions similar to those documented during the initial study were observed. These conditions included windows with cracked glass panes at the following locations: two east-facing units in the basement, one west-facing unit in the library, one west-facing unit in the main-level office, and one east-facing unit in the upper-level north guest bedroom. Additionally, isolated windows were noted to not fully operate and open/close.

The cracks are consistent with slight differential movement and minor framing deflections, in conjunction with expansion and contraction of the building materials resulting from fluctuations in ambient temperature and relative humidity. Donan concurs with New Rome that changes in the temperature, relative humidity, moisture content, and pressure occurred within the house as a result of the prior water loss event. The framing deflections and expansion/contraction of both the glass panes and adjacent wall and window framing components were exacerbated by the variation of interior atmospheric conditions resulting from the prior water loss event and that continued to occur during the dehumidification

process. In this manner, the windows with broken glass window panes and/or the units that do not fully operate/open/close were adversely affected by the prior broken pipe and subsequent water loss event.

*Item 4, Wood Support Beams*

*Document Review*

Within the Conclusions section of the Observation Report dated June 1, 2017, SBSA states the following: *"Longitudinal cracks (checking) are present at the 6xl2 floor beams throughout. Checking, twisting, and shrinkage of the exposed timber framing are consistent with rapid changes in temperature and moisture content in the wood Normal and expected drying of the wood beams does not result in the amount of damage present in this home. Some minor checking and shrinkage of the wood will occur naturally due to moisture contents in the timbers reaching equilibrium. However, the checking and separation of the exposed timber framing throughout the residence is substantial and beyond expected performance.*

*In addition to the observed beam checking, twist of the framing has created gaps and separation at some of the beam supports that would not have been present in original construction. The beam ends below the second floor sitting room and south wall of the southeast bedroom are both displaced and rotated at the supports.*

*The leak event led to high humidity levels at the residence which created an increase in the moisture content in the exposed timber framing. This rapid change in temperature and moisture content in the wood resulted in the increased longitudinal cracking, twisting, and shrinkage of the exposed timber framing beyond normal performance. This resultant damage is both cosmetic and functional damage to the timber framing. Therefore, the resultant damage to the exposed timber framing is directly related to the water loss event."*

Within the Repair Recommendations section of the same report, SBSA states the following: *"The torsional displacement alters the bearing condition at each end of the exposed beam. While this has limited impact on the structural performance of the beam, this altered alignment and increased checking alters the original aesthetic and prevents reinstallation of properly aligned and detailed wall finishes. Remove and replace the existing beam in kind."* SBSA provides nearly identical conclusions and repair recommendations regarding the increased checking and torsion in the exposed wood beams in their Observation Report dated September 25, 2017.

Within the Observations section of their Report, New Rome states the following: *"Observation of stains and warping of the exposed wood beams include the following:*

*a. Warping of the 6 x 12 roof girder beam at the north end of the Living Room was observed, with noticeable warping at the east bearing end. Noticeable water staining*

*and surface checking and deterioration of this girder beam was also observed, particularly from the first metal connection near the west side along the length toward the east bearing end.*

. . .

Within the Conclusions section of the report, New Rome states the following: *"The exposed 6x wood beams at the Main Entry and the Kitchen were utilized primarily for decorative purposes, with the exception of the beam at the Main Entry, the roof girder beam at the north side of the Living Room and the supported north-south roof beam over the Living Room. The photographs provided by the owner provide insight into the reasons for the water stains and warping of these beams: The drywall ceiling over these locations (A1ain Entry, Kitchen and Living Room) contained moisture after the ruptured water line to the point that excessive condensation occurred beneath the ceiling paint (near the Main Entry) and within the drywall ceiling and walls in the Kitchen. The amount of moisture in the drywall ceiling resulted in a partial collapse of the ceiling near the Kitchen window. The amount of trapped moisture, again due to the ruptured line in conjunction with lower dew point temperatures within the interior after the baseboard heat no longer functioned, was the root cause for this excessive moisture and for the staining and warping of these exposed beams."* New Rome continues: *"Other exposed beams, such as at the stairs near the Kitchen and the roof beam over the Sitting Room at the Upper Floor, had experienced checking after the ruptured radiant heat line."*

Within the Repair Recommendations section of the report, New Rome states the following: *"Remove the exposed and warped wood beams over the Kitchen Area, the Main Entry and to the north of the Living Room. Since the three (3) beams at the Main Entry, the roof girder beam at the north end of the Living room and the north-south roof beam at the Living Room are structural, then the supported roof rafters, floor joists (at the Main Entry) and other roof beams will need to have temporary shoring installed prior to the removal and replacement of these beams."* New Rome adds: *"For the beams that have experienced only checking (i.e. at the stairs and above the Sitting Room), use wood filler and other repair techniques to provide an appearance that matches the original."*

*Donan Response*

During the re-inspection of the house, conditions of the wood support beams generally similar to those documented within the SBSA and New Rome reports were observed. These conditions included varied degrees of longitudinal cracking (or checking) and twisting of the support beams throughout the house. At isolated locations, the extent of twisting or warping of the member has created gaps and/or separations between the supports at the ends of the beams.

In particular, the three support beams above the main entry, kitchen, and living room areas, respectively, as identified by New Rome above, exhibited conditions consistent with excessive twisting or warping of the member. This excessive twisting and warping has resulting in torsional displacement or rotation of the ends of the beams slightly off their bearing supports as initially installed.

As it was outside the defined scope of the initial assignment, the checked, twisted, and/or conditions of the three identified beams were not directly observed or documented during the March 2017 study. However, the variation of interior atmospheric conditions and changes in temperature and moisture content of the wood support beams resulting from both the prior water loss event and dehumidification process contributed to the increased longitudinal cracking, twisting, and shrinkage of the exposed wood support beams beyond what would normally be anticipated.

In this manner, the three support beams above the main entry, kitchen, and living room areas, respectively, as identified by New Rome above, were adversely affected by the changes in temperature and moisture content resulting from the prior broken pipe and subsequent water loss event. Donan concurs that the recommended removal and replacement of the three, main-level wood support beams as identified in the New Rome report are reasonable and appropriate

On **December 6, 2019,** a summary of the claim triage is entered:

Claim Note – MANCOO

Triage summary

held call w/ stakeholders

discussed issues w/ potential further damage to contents stored in PODs on site, with no attention and exposure to harsh winter elements in over 2 years.

Agreed letter sent previously and on multiple occasions notifying insured that further damage to items inside PODS would not be covered, furthermore damage unrelated to the water loss due to their storage would not be covered

agree to re-iterate in letter to encompass dwelling damage seen in recent inspection

PPS to work on sorting out prior payments for TL items along with TL items outstanding. Will request payment for items due

will request call with legal stakeholder to discuss REDACTED

On **December 10, 2019**, Mandy Winters sends the insured a letter with the reinspection results:

This letter is a follow up to our recent re-inspection of your home and personal property located at 43 W Ranch Trl., Morrison, CO 80465. During the inspection, we observed a large amount of personal property stored into two pods, along with the attached garage and a detached bam. It is our understanding that the personal property items stored onsite,

have remained in their current location for at least 2 years. Boxes were seen to have water lines as well as rodent feces throughout the pods and other storage areas.

At this time, we have not confirmed the condition of these items, however please be advised that we had previously communicated to you in numerous correspondence, that there would be no coverage under your policy for any damages that may have ensued to the contents, as a result of but not limited to, improper storage, failure to mitigate, or exposure to harsh weather elements. It is your duty to protect your home and personal property from further damage and maintain your property following a loss.

We made multiple attempts to reach out to you to assist with moving your belongings to a climate-controlled facility, in order to avoid any potential harm or damage to the contents. You had requested we contact your contractor, Don Greenless, to find out about the personal property. When we inquired with Don about the contents, he was unable to provide any information as to their condition, or if items needed to be addressed further.

We also requested on multiple occasions to re-inspect the dwelling with a local contractor, in order to reach a resolution on the damages caused by the water loss. We received notice of representation by Adjusters International in January of2019. Following Adjusters International's involvement, a re-inspection was made available and took place on November 191h, 2019. During this inspection we observed the home to be in a gutted state, without any heat and evidence of lack of maintenance for an extended period. To re-iterate, it is your responsibility to protect your home from further damage and to maintain your property following a loss and we would be unable to cover for any damages ensued, as a result of failure to do this.

Here's a recap of what we are still waiting for from you, in order to process the claim further:

We are still awaiting additional items in order to resolve your claim, please let us know the status of and submit the following information as soon as you have available:

1. Pinball machine report/evaluation including repair estimates by the technician
2. Additional contents packout costs, completed by your contractor, Grey Eagle Builders

Furthermore, we have previously issued a payment to you in the amount of $78,373.38 on 9/9/17, for the costs of cleaning/restoring your damaged art per the estimate received from Colorado Arts. A corresponding letter dated 9/12/17 outlining this payment, was also sent to you as well as a phone call placed to Lori Worthan. We were recently informed by Ivfike Bettman, that the art is still being stored by Colorado Arts, however no restoration has started. We are uncertain if additional damage has ensued to the art, due to a lack of prompt repair, however you may wish to have Colorado Arts start on restoration in order to avoid any additional damages. We are unable to provide coverage for any additional damages to the art, that may have ensued due to a lack of repair or mitigation.

At this time, we have received your contractor's estimate along with engineers reports and are reviewing this documentation. We are also awaiting further engineering reports following our reinspection of your property on November 19th, 2019. Once we have completed our review, we will be in touch with your public adjuster's office to discuss.

We now refer you to your policy form HOM-7030EP 1/09 HOMEOWNERS POLICY & HOM- 71 OOCOEP 11114 SPECIAL PROVISIONS - COLORADO which states in part:

SECTION I-PROPERTY COVERAGES

BUILDING PROPERTY LOSSES WE DO NOT COVER

We do not cover loss caused directly or indirectly by any of the following excluded perils. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area;

1. freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system, or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing, while the dwelling is vacant, unoccupied or under construction, including being newly built, remodeled, reconstructed, renovated or repaired. This provision does not apply if you have used reasonable care to:

a. maintain heat in the building; or
b. shut off the water supply and drain the system and appliances of water;

2. freezing, thawing, pressure or weight of water, ice or snow whether driven by wind or not, to a swimming pool, hot tub or spa, including their filtration and circulation systems, fence, landscape sprinkler system, pavement, patio, foundation, retaining wall, decorative or privacy wall, bulkhead, pier, wharf or dock;

5. continuous or repeated seepage or leakage of water or steam, or the presence or condensation of humidity, moisture or vapor which occurs over a period of weeks, months or years.

6. a. wear and tear, marring, scratching, deterioration;
b. inherent defect, mechanical breakdown;
c. smog, rust or other corrosion, or electrolysis;
d. smoke from agricultural smudging or industrial operations;
e. settling, cracking, shrinking, bulging, or expansion of pavements, patios, foundations, walls, floors, roofs, ceilings, swimming pools, hot tubs, spas or chimneys;
f. birds, vermin, rodents, insects or domestic animals;

g. pressure from or presence of plant roots.

However, we do insure for any resulting loss from items 1. through 6. unless the resulting loss is itself excluded under **Building Property Losses We Do Not Cover** in this Section. If loss to covered property is caused by water or steam not otherwise excluded, we will cover the cost of tearing out and replacing any part of the building necessary to repair the system or appliance. We do not cover loss to the system or appliance from which water or steam escaped.

9. Earth Movement, meaning:

a. the sinking, rising, shifting, expanding or contracting of earth, all whether combined with water or not. Earth movement includes but is not limited to **earthquake**, landslide, mudflow, mudslide, sinkhole, subsidence, movement resulting from improper compaction, site selection or any other external forces, erosion including collapse or subsidence of land along a body of water as a result of erosion or undermining resulting from the action of water. This includes the channeling of a river or stream;
b. erosion, shifting or displacement of materials supporting the foundation; and
c. volcanic blast, volcanic explosion, shockwave, lava flow, lahars and fallout of volcanic particulate matter.

This exclusion applies whether the earth movement is caused by or resulting from human or animal forces or any act of nature.

We do cover direct loss by fire, explosion or theft.

10. Water Damage, meaning:

a. (1) flood, surface water, waves, tidal water, tsunami, seiche, overflow of a body of water, storm surge or spray from any of these, whether or not driven by wind, including hurricane or similar storm; or
(2) release of water held by a dam, levee, dike or by a water or flood control device or structure;

b. water below the surface of the ground, including that which exerts pressure on, or seeps or leaks through a building, wall, bulkhead, sidewalk, driveway, foundation, swimming pool, hot tub or spa, including their filtration and circulation systems, or other structure;

c. water which escapes or overflows from sewers or drains located off the residence premises;

d. water which escapes or overflows from drains or related plumbing appliances on the residence premises. However, this exclusion does not apply to overflow and escape

caused by malfunction on the residence premises, or obstruction on the residence premises, of a drain or plumbing appliance on the residence premises; or

e. water which escapes or overflows or discharges, for any reason, from within a sump pump, sump pump well or any other system designed to remove water which is drained from the foundation area.

Water includes any water borne materials.

This exclusion applies whether the water damage is caused by or resulting from human or animal forces or any act of nature.

Direct loss by fire, explosion or theft resulting from water damage is covered.

12. Neglect, meaning your failure to use all reasonable means to save and preserve property at and after the time of a loss, or when property is endangered.

17. Weather that contributes in any way with a cause or event not covered in this section to produce a loss. However, any ensuing loss caused by a covered peril and not otherwise excluded is covered.

18. Planning, Construction or Maintenance, meaning faulty, inadequate or defective:

a. planning, zoning, development, surveying, siting;

b. design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

c. materials used in repair, construction, renovation or remodeling; or

d. maintenance;

of property whether on or off the insured location by any person or organization. However, any ensuing loss not excluded is covered.

**SECTION I-PROPERTY CONDITIONS**

3. An Insured's Duties After Loss. In case of a loss to which this insurance may apply, you must perform the following duties:

a. cooperate with us in the investigation, settlement or defense of any claim or suit;

b. give immediate notice to us or our agent;

c. notify the police in case of loss by theft;

d. protect the property from further damage, make reasonable and necessary repairs required to protect the property and keep an accurate record of repair expenses;

e. prepare an inventory of the loss to the building and damaged personal property showing in detail the quantity, description, replacement cost and age. Attach all bills, receipts and related documents that justify the figures in the inventory;

f. as often as we reasonably require:

(1) exhibit the damaged and undamaged property;

(2) provide us with records and documents we request and permit us to make copies; and

(3) submit to examinations under oath and subscribe the same. We may examine you separately and apart from your spouse, civil or domestic partner, or any other insured

You shall not interfere with us examining any other insured

8. Suit Against Us. No action shall be brought against us unless there has been compliance with the policy provisions.

**SECTION I-PROPERTY COVERAGES**

**BUILDING PROPERTY LOSSES WE DO NOT COVER**

Item 6.f. is deleted and replaced by the following:

g. birds, vermin, rodents, insects or domestic animals, except for breakage of glass;

Safeco Insurance Company of America respectfully continues to reserve any and all rights and defenses under the policy and any applicable state laws, which may now exist or which may arise in the future. No waiver or estoppel of any kind is intended or should be inferred. We do not waive any of the terms, conditions or requirements of the policy.
If you have any questions, please contact me at the number below

On **December 12, 2019**, Mandy Winters sends a letter to the insured advising of the statute of limitations expiring on January 31, 2020.

On **December 16, 2019**, Nick Buller sends Michael Stoycheff an email advising receipt and sending of updated estimate from All Phase, Donan Engineering Report, and updated Safeco estimate.

On **December 16, 2019**, Nick Buller updates payment Breakdown as follows:

Payment Breakdown:

PROP DWG: $10,614.67
$218,657.51 - RCV
$24,066.57 - less depreciation
$181,476.27 - less prior payments on 2/21/17, 3/9/17, 8/30/17
$2,500.00 - less deductible
$10,614.67 - supplemental ACV Payment

Check Payable To: VINCENT TERRANOVA & CHASE HOME FINANCE ISAOA / ATIMA

Date Uploaded: 12/16/19

Supporting Documentation:
FS completed re-inspection as noted in file on 11/20/19. All Phase Restoration completed a review of the damages and updated an estimate for which the above payment is based on. This reflects the agreed cost of repairs with All Phase related to the 1/31/17 water loss. The period of repairs per All Phase is 4-5 months.

On **December 18, 2019,** the claim notes show a summary of personal property to date:

Completed inputting items that DBA Refinishers determined to be a total loss and could not be salvaged --input into XM8. These are antique and other furniture items, separate from any artwork that has been deemed total loss and paid for in prior payment.

Uploaded XM8 estimate and scope photos on 12/17.

At this time, unsure of condition of items in PODS (2)garage and barn. May need to be cleaned before being packed back into the home. Known damages to date are the non-salvage artwork (paid for in part in the $78,373.38 PPUN payment) and XM8 estimate completed today of furniture items.

Sent TM Authority request for: $243,010.06

Technical Review Template
Policy Holder/Vendor Name: Terranova
Claim No.: 287152846039
What is being reviewed: XM8
Initial or Supplement? Initial xm8 estimate since PPS assigned
Line item(s) to review: all
Document(s) Location: attached
Prior Paid: $189,972.51
Requesting authority for: $243,010.06
Notes: Initial payments were not done in xm8--- as this is pre co-deployment, nor is there a LL summary. but attached is the IS excel of all payments made to date and I pasted it below.

> My request is for the items deemed a total loss when I met with furniture refinisher out in CO, which were never paid for-values determined by Refinisher:
> plus estimated pack back/cleaning/additional damages. Unsure of damages until these items are moved out of PODS/Garage/Barn.
>
> PPUN XM8 figures are:
> $23,037.55 xm8 RCV
> $ 3,656.29 DP (low as many antiques)
> $19,381.26 ACV to be paid
>
> PPUN Damages are:
> $23,037.55 XM8 RCV
> $189,972.51 Payments broken out below paid by IS
> $ 10,000.00 estimated for pack back, cleaning of PPUN (PH paying storage himself)
> $ 20,000.00 estimated for additional damages/More Artwork?
> $243,010.06 total damages and AUTH REQUESTED

On **January 27, 2020,** the insured's representative sends a letter of representation to Mandy Winters and Nick Buller with a formal request for Appraisal. The letter states:

> By way of introduction, Merlin Law Group has been retained to represent the interests of Vincent Terranova, with regard to its claim for direct physical damage under Policy No. OY7555527 and Claim No. 287152846039 resulting from a hail and windstorm occurring on January 31, 2017.
>
> In an effort to provide both parties additional time to address and resolve outstanding items in the claim adjustment, please find a draft Tolling Agreement for your review and consideration. Please let us know at your earliest convenience if you are amenable to entering into said agreement. If we do not receive a response prior to, or you are not agreeable to enter into a tolling agreement, Vincent Terranova will be forced to file suit on or before January 31, 2020 to preserve his rights under the policy of insurance and Colorado law.
>
> Please allow this correspondence to serve as Vincent Terranova's written request to participate in the appraisal process outlined within the insurance policy. In compliance with the terms of the policy, Vincent Terranova is appointing Brent Johnson to serve as his chosen appraiser. Mr. Johnson's contact information is below:
>
> Brent L. Johnson
> Brent L. Johnson Appraiser
> 803 Roland Avenue Chariton, IA 50049
> Direct: (515) 559-4828
> heartlandpa@yahoo.com
>
> Please confirm Safeco Insurance Company of America will participate in the appraisal process and appoint its chosen appraiser.

> Further, please consider this our formal request for a certified copy of the insurance policy including all attachments, applicable endorsements, declaration page(s). and applications in full force and effect at the time of the loss. Further, please provide our office with all recorded statements, correspondence, videos, statements, examination under oath transcripts, engineering reports, and estimates in your possession regarding this claim, along with any documents and information relied upon by Safeco Insurance Company of America in its coverage decision. Please also provide any underwriting documents that may provide the parties with information relating to the condition of the property and any prior claims made by your insured if being relied upon by Safeco Insurance Company of America in its coverage decision.
>
> Please be reminded, there may be documents and/or exhibits which only Safeco Insurance Company of America or its agents may have which are related to Vincent Terranova's claim. Therefore, as these matters may be pending for quite some time before those various documents are identified, please consider this your insured's written request that any written or electronic files, documents, exhibits, handwritten notes, telephone messages, or other items in any related to the property and its policy, not be compromised, purged, lost destroyed or mishandled in any fashion. Rather, we ask that all such written, printed and electronic documents and other materials are guarded carefully until this matter is concluded in rota by either a judgment or an executed Settlement Agreement/Release.

On **January 28, 2020**, Safeco names Mark Neufeld as their appraiser.

On **January 28, 2020**, Mandy Winters sends a letter to the insured's attorney, Jon Bukowski, that includes, in part:

> Thank you for your letter of representation dated January 27, 2020. We are in the process of reviewing the additional documentation you've submitted relating to the tolling agreement extension and our response will be forthcoming.
>
> As you are aware, Nick Buller, Kim Albert (Contents Specialist), and I have been assigned to assist you in all other aspects of your client's claim. Because there are three adjusters handling your client's claim, all information received will be shared in the handling of all portions of this claim.
>
> We will email a copy of the complete policy including all applicable endorsements at your request, expert reports and letters, along with confirmation of our named appraiser in a separate letter.

On **January 28, 2020**, Nick Buller sends the following to Safeco's appraiser, Mark Neufeld:

> Here are the following items related to the above new appraisal:

- Latest ESX & PDF from All Phase Restoration for the repairs

- Latest Donan Engineering report regarding the deterioration/wear & tear (non-covered) to the windows, flagstone patio and covered water damage to exposed beams
- My initial photos • Initial & Follow-Up inspection report from SBSA (hired by insured)
- Repair estimate & beam repair estimate from Grey Eagle Builders (insured contractor)

On **March 6, 2020**, Mandy Winters sends a letter to Jon Bukowski with a status of the appraisal that includes:

> We wanted to touch base regarding the status of the above referenced claim, and the current progress with respect to the appraisal process. As you know, we've engaged Mark Neufeld with JS Held, as our chosen appraiser in this matter. All efforts have been made on our part, to schedule the inspection as quickly as possible, which was originally set for Feb. 27th and 28th, 2020.
>
> On February 24th, our appraiser was contacted to request a rescheduled date of inspection for March 18th & 19th, 2020. We recently received communication again, requesting another rescheduling date of March 16th & 17th, 2020, however due to a conflict Mr. Neufeld had for that timeframe, the new dates of March 23rd & 24th have now been agreed upon.
>
> We have also agreed to your request for an extension to the Tolling Agreement up to and including the date of May 29th, 2020.
>
> Recently your appraiser brought to our attention that there is a court order, demanding the appraisal be completed by May 1st, 2020. We were not aware of this date or a court order, and so if you could please send us any documentation you have which provides clarification to that statement, we would really appreciate it.

On **May 12, 2020**, email exchange between Winters and Bukowski extending the tolling agreement an additional 90 days.

On **July 20-21, 2020**, email exchange between Winters and Bukowski extending the tolling agreement a 3rd time to 10/2/20.

On **September 17-18, 2020**, email exchange between Winters and Bukowski extending the tolling agreement a 4th time to 12/2/20.

In **November, 2020,** Mandy Winters completes her Status Note to the file, that includes:

> Status Note – Mandy Winters
>
> File on Report to: Examining
>
> *4th tolling agreement extended to 12/2/20
>
> Facts/Loss Description: Severe water loss to 2 story home with 4100 sq ft built in 1978 located in Morrison, CO. The boiler failed while the insured was out of the country,

causing the temperature to drop in the home and two exterior wall baseboard pipes to freeze and burst. Water damage originated on the 2nd level and came down to the main level collapsing ceilings and eventually into the basement. Large amount of contents affected by water on 2 levels and basement. The insured is the owner of Rocky Mountain Harley Davidson. The home is full of high end furnishings to include solid wood furniture, antiques, collectibles and artwork. There were over 150 pieces of original artwork affected by the water loss. The insured also has a library with collectible old books. Several experts have been engaged to include Colorado Arts, Refinishers, Rescuetech and CRDN.

Coverage/Analysis Update Performed: covered / updated

Dwelling: Water damage to 1st and 2nd levels. 3rd floor turret was not affected. Walls and flooring affected throughout. Kitchen was higher end including stainless appliances. Ceilings had T&G wood and beams. Original ACV estimate completed and undisputed paid to date. The insured's contractor bid was almost double FS RCV. The home has sat unoccupied for 3 yrs at this time and has been completely gutted to the stud walls. We are currently in the appraisal process as the insured's PA submitted an estimate over $600k our original RCV. Last status indicates we are close to reaching an award.

Other Structures: No adjustments recommended. Initial reserve in place for possible patio damages. We received an engineer's report from Donan, who opined the damage to the patio was not related to the water loss. We have denied these claimed damages in previous communications and forwarded a copy of the engineer's findings to the insured. Furthermore, the insured is claiming the driveways were damaged by the EMS company and their equipment/vehicles. These damages would need to be addressed by American Restoration. We have advised the insured of this as well.

Personal Property: The insured has a large number of art and high end collectibles. PPS has been engaged and we have re-inspected items that were packed out and stored in PODS on site since the DOL. An inventory was made and priced for the damaged furniture, ACV issued. We are still evaluating salvage items such as pinball machines and slot machines. We previously paid the insured to have art restored as well as TL of the art.

Loss of Use: The insured owns another residence in the British Virgin Islands. They have been located there for the majority of the time, following the loss. We have not received any documentation for costs incurred as a result of displacement. The last information known, was that the insured stayed with a friend/neighbor initially, but has since been in the BVI. Reserve remains in place for consideration of any incurred costs. We have put an end date on any ALE submitted and communicated in writing as well.

Work Plan/Recommendations:

Follow up on appraisal award
Payment per award
Close claim

Reserves: holding to current – no basis for change at this time

DWG - $171,903.49
LOU - $35,000 OS - $12,000
PPUN - $189,113.21
Total Incurred: $866,722.49

On **November 23, 2020**, email exchange between Winters and Bukowski extending the tolling agreement a 5th time..

On **January 13, 2021**, Mark Neufeld invokes the umpire and forwards his position to same.

On **March 9, 2021,** the Umpire inspects the loss.

On **April 3, 2021,** Nick Buller sends an email to Mark Neufeld with correspondence. The email states:

> Per our conversation, attached are status letters sent to the insureds over the course of a year from 9/2017 to 9/2018. These letters show the lack of response from the insured relative to the outstanding items needed to evaluate their claim as well as moving forward with repairs.
>
> Additionally, here is a screen shot of the loss settlement portion of the policy and I will specifically direct you to 5b; which states we will pay the full cost of repair or replacement of that part of the damaged building for equivalent construction and use on the same premises as determined shortly following the loss. I believe this speaks directly to the timing around evaluating the damages and cost of covered repairs.
>
> Please let me know if you need anything else

On **July 1, 2021**, Nick Buller make a claim note advising receipt of the Umpire's estimate at $459,000.

On **August 11, 2021**, Brent Johnson sends an email to the appraisal panel advising of missing items on the estimate. This 57 page report advises:

> I have been reviewing the estimate provided for review from Roy Becker and there are items that are missing that I believe need to be included. I will start in the Lower Level and work my way up to the Upper Level. This report may not include all things, but all attempts were made to be accurate. I have attached pictures where the missing damage(s) are and tried to be specific to the Umpire estimate but there is no "line item numbers" so I tried to describe each item.

On **August 20, 2021**, Mark Neufeld sends an email to Mandy Winters an Nick Buller that he reviewed the 57 page report and provided a response to the Umpire

On **September 14, 2021**, the appraisal panel delivered an appraisal award totaling $464,465.60 replacement cost and $399,308.69 actual cash value; signed by the Umpire and insurer appraiser.

On **September 16, 2021**, Nick Buller itemizes the Appraisal award, detailing the amount owed as follows:

> Technical Review Completed: Y - Marsili on 9/16/21
>
> Payment Breakdown:
> PROP DWG: $196,778.49
> $421,759.81 - Appraisal Award RCV
> <3,869.76> - less previously denied patio repairs estimated on page 40
> <26,520.62> - less depreciation per appraisal award
> <192,090.94>- less prior payments on 2/21/17, 3/9/17, 8/30/17 & 12/30/19
> <2,500.00> - less deductible
> $196,778.49 - Supplemental ACV
>
> PROP OS: $4,069.50
> $4,069.50 - RCV per appraisal award
>
> Check Total: $200,847.99 Check Payable To: FS reviewed with IS, who will verify if attorney/PA need to be named on check
>
> Date & Support:
> 9/16/21 - FS completed technical review process after appraisal award was received. Only change to award is standing behind prior denial on patio damage per Donan report; denial in file on 3/9/17. Payment above is for supplemental ACV per award.

On **October 1, 2021**, Safeco issues a check for the above net Award of $200,847.99.

On **October 4, 2021,** Mandy Winters sends a letter to the Merlin Law Group detailing the payment to be received:

> This letter is a follow up to the appraisal award for the above-referenced claim. We have issued payment for the amount due for the award as follows. Be on the lookout for the check, coming to your address above, in the coming days. Let us know if there are questions. Thank you.
>
> Dwelling:
> Appraisal award RCV - $421,759.81
> Less patio repairs, excluded from coverage <$3,869.76> (estimated on page 40)
> Less depreciation <$26,520.62>
> Less prior payments <$192,090.94>
> Less deductible <$2,500.00>
> ================================
> Supplemental - $196,778.49

Other Structures:
Appraisal award - $4,069.50

Combined check amount - $200,847.99